**No. 25-4249**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

NEETA THAKUR, on behalf of themselves
and all others similarly situated; et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-04737

————————————

## BRIEF FOR APPELLANTS

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ...................................................................3

STATEMENT OF THE ISSUES.........................................................................3

PERTINENT STATUTES ...................................................................................4

STATEMENT OF THE CASE.............................................................................4

    A.    Factual Background .......................................................................4

    B.    Prior Proceedings..........................................................................7

SUMMARY OF ARGUMENT.............................................................................9

STANDARD OF REVIEW ............................................................................... 11

ARGUMENT ...................................................................................................... 12

I.    The Equity Termination Class Is Not Likely to Prevail on the Merits. ............. 12

    A.    Selective Grant Recipients Do Not Have a First Amendment Right to Continued Government Funding. ................................. 12

    B.    The Statutory Claim Against the NEH and NSF Lacks Merit. ............... 20

II.    The Form Termination Class Is Not Likely to Prevail on the Merits.............. 25

    A.    The Tucker Act Impliedly Precludes These APA Claims. ...................... 25

    B.    These Claims Are Not Reviewable Under the APA. ............................... 32

    C.    The Challenged Grant Terminations Were Reasonable. .......................... 36

III.    Plaintiffs' Alleged Injuries Are Too Attenuated for Article III Standing or, at a Minimum, Preclude Class-Wide Relief. ...................................... 38

IV.    The Remaining Equitable Factors Do Not Support Injunctive Relief. ............. 42

CONCLUSION ................................................................................................. 45

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                        **Page(s)**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ............................................................... 1, 15

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ...................................................... 27

*American Med. Ass'n v. Reno*,
57 F.3d 1129 (D.C. Cir. 1995) .................................................... 37

*Bennett v. New Jersey*,
470 U.S. 632 (1985) ................................................................ 29

*Board of Regents of the Univ. of Wis. Sys. v. Southworth*,
529 U.S. 217 (2000) ................................................................ 16

*Block v. Community Nutrition Inst.*,
467 U.S. 340 (1984) .................................................................31

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ............................................................ 26, 30

*Buckley v. Valeo*,
424 U.S. 1 (1976) ................................................................... 13

*California v. Texas*,
593 U.S. 659 (2021) ................................................................ 39

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025) ................................................... 28, 31

*California ex rel. Becerra v. Azar*,
950 F.3d 1067 (9th Cir. 2020) .................................................... 15

*Crowley Gov't Servs., Inc. v. General Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) ................................................... 25

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ................................................................ 28

*Dennis Melancon, Inc. v. City of New Orleans*,
703 F.3d 262 (5th Cir. 2012) ..................................................... 43

iii

*Department of Educ. v. California*,
145 S. Ct. 966 (2025) ........................................................ 2, 11, 25, 27, 28, 42, 43, 44

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........................................................ 36

*Finley v. National Endowment for the Arts*,
100 F.3d 671 (9th Cir. 1996),
*rev'd*, 524 U.S. 569 (1998) ........................................................ 17

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) ........................................................ 39

*Food & Drug Admin. v. R. J. Reynolds Vapor Co.*,
145 S. Ct. 1984 (2025) ........................................................ 31

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) ........................................................ 28

*Harris v. McRae*,
448 U.S. 297 (1980) ........................................................ 13

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985) ........................................................ 27

*James v. Caldera*,
159 F.3d 573 (Fed. Cir. 1998) ........................................................ 27

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ........................................................ 11

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993) ........................................................ 16

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................................ 2, 25, 32, 33

*Louisiana v. Biden*,
64 F.4th 674 (5th Cir. 2023) ........................................................ 35

*Lujan v. G & G Fire Sprinklers, Inc.*,
532 U.S. 189 (2001) ........................................................ 38

*Lujan v. National Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................................ 36

iv

*Lyng v. International Union, United Auto., Aerospace & Agr. Implement Workers of Am.*,
    485 U.S. 360 (1988) ............................................................... 13, 14

*Maryland v. King*,
    567 U.S. 1301 ............................................................................ 44

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ................................................................ 26

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ........................................ 27, 28, 29

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ........................................... 33

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) .......................... 1, 13, 14, 16, 17, 18, 19

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................ 42

*North Side Lumber Co. v. Block*,
    753 F.2d 1482 (9th Cir. 1985) ........................................... 31

*Regan v. Taxation With Representation of Washington*,
    461 U.S. 540 (1983) ........................................................ 12, 13

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ........................................................ 17, 18

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ............................................ 12-13, 14, 16

*Smiley v. Citibank* (S.D.), N.A.,
    517 U.S. 735 (1996) ................................................................ 37

*Speiser v. Randall*,
    357 U.S. 513 (1958) ................................................................ 15

*Trump v. Boyle*,
    No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025) ............... 44

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ..................................... 39, 41, 44

v

*Tucson Airport Auth. v. General Dynamics Corp.*,
    136 F.3d 641 (9th Cir. 1998) ............................................... 26, 30

*United Aeronautical Corp. v. U.S. Air Force*,
    80 F.4th 1017 (9th Cir. 2023) ............................................. 27

*United States v. American Libr. Ass'n*,
    539 U.S. 194 (2003) ............................................................ 16

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .................................................. 24, 39, 42

*Watson v. Chessman*
    362 F. Supp. 2d 1190, 1196 (S.D. Cal. 2005) ....................... 35

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................ 11-12

**Statutes:**

Administrative Procedure Act (APA):
    5 U.S.C. § 701(a)(2) ........................................................... 32
    5 U.S.C. § 702 ...................................................... 26, 29, 30
    5 U.S.C. § 704 ............................................................. 26, 30

20 U.S.C. § 956(c) ................................................................ 21, 34

20 U.S.C. § 956(c)(4) ............................................................ 20-21

28 U.S.C. § 1292(a)(1) ............................................................... 3

28 U.S.C. § 1331 ......................................................................... 3

28 U.S.C. § 1491(a)(1) ......................................................... 27, 29

42 U.S.C. § 1862k(b)(1) ....................................................... 22-23

vi

## Regulatory Materials:

2 C.F.R. § 200.309 ................................................................ 5

2 C.F.R. § 200.339(c) ........................................................... 5

2 C.F.R. § 200.340 ........................................................... 5, 34

2 C.F.R. § 200.340(a)(4) .................................................. 32, 35

2 C.F.R. § 200.343 ................................................................ 5

Exec. Order No. 13,985, § 1,
    86 Fed. Reg. 7009 (Jan. 25, 2021) ............................... 18

Exec. Order No. 14151, § 2(b)(i),
    90 Fed. Reg. 8339 (Jan. 29, 2025) ................................. 4

Exec. Order No. 14173, § 3(c)(iii),
    90 Fed. Reg. 8633 (Jan. 31, 2025) ................................. 4

## Other Authorities:

Alan Blinder & Vimal Patel, *Can Donors Fill the Major Budget Holes
    that Colleges Face Under Trump?*, N.Y. Times (June 28, 2025) ......................................... 39

EPA, *EPA General Terms and Conditions* (Oct. 1, 2021),
    https://perma.cc/VQE8-87GX ....................................... 5

EPA, *EPA General Terms and Conditions* (Oct. 1, 2022),
    https://perma.cc/4K7R-7PPE ...................................... 5, 6

NEH, *General Terms and Conditions for Awards to Organizations
    (for Awards Issued October 1, 2024, or Later)* § XIII(A)
    (Dec. 18, 2024), https://perma.cc/7X4J-TCHH .................... 6

NEH, *NEH Update on the 2024 Revisions to 2 CFR 200*
    (June 25, 2024), https://perma.cc/8659-PAPP ..................... 6

NEH, *General Terms and Conditions for Awards to Organizations
    (for Grants and Cooperative Agreements Issued Between
    January 1, 2022, and September 30, 2024)* (Jan. 11. 2022),
    https://perma.cc/UH6L-J8U7 ...................................... 6

NSF, *Award Terms and Conditions*, https://perma.cc/B8ZR-VQKK ............................... 6

NSF, *Research Terms & Conditions Agency Specific Requirements* ¶ 41(b)(2)
(Jan. 30, 2023), https://perma.cc/M9M7-7NDJ ........................................... 6

NSF, *Research Terms and Conditions Overlay to the Uniform Administrative*
*Requirements, Cost Principles, and Audit Requirements for Federal*
*Awards (Uniform Guidance), 2 CFR §200*, at 18 (Nov. 12, 2020),
https://perma.cc/2PF4-JNJA ............................................................ 6

Jennifer Schuessler & Michaela Towfighi, *Humanities Endowment Funds*
*Trump's Priorities After Ending Old Grants*, N.Y. Times (Aug. 5, 2025) ...................... 22

Nidhi Subbaraman et al., *Harvard Is Asking Corporations to Fill Its*
*Federal Funding Gap*, Wall St. Journal (June 27, 2025) ...................................... 40

# INTRODUCTION

The district court ordered the Environmental Protection Agency (EPA), the National Endowment for the Humanities (NEH), and the National Science Foundation (NSF) to reinstate grants whose applications list a researcher from a University of California (UC) institution.  This injunction was premised on two erroneous premises: that determinations about how the government spends its own money to selectively subsidize research can be treated as impermissible viewpoint discrimination under the First Amendment, and that a district court can layer arbitrary-and-capricious review under the Administrative Procedure Act on top of the rights provided in a government contract or the remedies Congress has authorized for government contract disputes.

On the first point, the Supreme Court has made clear that selective grant programs can distinguish among grants' viewpoints, so long as the grant programs do not discriminate based on expressive conduct outside of the grants.  *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998); *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217-18 (2013).  The district court's contrary conclusion was based on mistaken reliance on cases involving efforts to leverage government spending to affect conduct outside of the grant program or on cases that did not involve selective grants at all.

On the second point, the failure to appreciate the appropriate scope of remedies for counterparties to government contracts led the court to commit

multiple errors.  APA claims that a grant termination was arbitrary and capricious are impliedly precluded by the Tucker Act.  *See Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam).  Moreover, APA claims that an agency terminated one program to reallocate resources to another program within a discretionary grant program are committed to agency discretion by law and thus unreviewable.  *See Lincoln v. Vigil*, 508 U.S. 182 (1993).  Finally, grant terminations that comply with the terms of the grant are reasonable.

Plaintiffs' and the district court's attempts to avoid these clear rules would require this Court to adopt novel, extraordinary propositions.  For example, plaintiffs appear to suggest that the First Amendment allows the government to award a grant based on its viewpoint but prohibits the government from terminating the grant because of that same viewpoint.  In addition, plaintiffs appear to suggest that even if Congress impliedly precluded APA claims by grant recipients, Congress intended to allow APA claims by nonparties to the contract, thus awarding a form of relief to entities with more attenuated interests in the grant at issue that is not available to the grantees themselves.  Finally, even when a contract provides a straightforward mechanism to terminate the contract because the agencies' priorities have changed, using that simple mechanism would—under the plaintiffs' view—always be unreasonable because the APA imposes a heightened, extracontractual duty to provide a lengthy, written explanation for mundane contract actions.

2

None of plaintiffs' claims have merit, and the preliminary injunction should be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, ER-176, but jurisdiction is contested, *see infra* pp. 25-32, 38-41. The district court certified a class and granted plaintiffs' motion for a preliminary injunction on June 23, 2025. ER-3-67. The government timely appealed on July 10, 2025. ER-273-274. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

The district court granted a preliminary injunction covering two different classes. For the Equity Termination Class, there are two issues in this appeal:

1.      Whether the First Amendment requires the government, in selective grant programs, to continue funding research that the government concludes is no longer in the public interest.

2.      Whether the NSF's and NEH's enabling statutes required those agencies to fund the terminated grants.

For the Form Termination Class, there are three issues presented in this appeal, any of which is sufficient to reverse. The issues are:

3.      Whether the Tucker Act precludes APA claims that contracts were arbitrarily terminated and that seek reinstatement of the contracts.

3

4.      Whether funding choices among grants are committed to agency discretion by law.

5.      Whether the grant terminations were reasonable.

Finally, both classes present a common question:

6.      Whether plaintiff researchers have standing to challenge the termination of grants for which they are not the grant recipients, when their alleged injuries depend on assumptions about how third parties will respond to the terminations.  Or, at a minimum, whether the individualized standing inquiry prevents class-wide relief.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.      Factual Background

1.  In the days after his inauguration, the President issued several Executive Orders setting forth his Administration's priorities.  The Order "Ending Radical and Wasteful Government [Diversity, Equity, and Inclusion (DEI)] Programs and Preferencing" instructed agencies to "terminate, to the maximum extent allowed by law, … 'equity-related' grants or contracts."  Exec. Order No. 14151, § 2(b)(i), 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025).  The Order "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" similarly ordered the termination of certain DEI-related "mandates, requirements, programs, or activities, as appropriate."  Exec. Order No. 14173, § 3(c)(iii), 90 Fed. Reg. 8633, 8634 (Jan. 31, 2025).  Other Executive

4

Orders "instruct[ed] federal agencies to terminate, review, or revise federal grants" for additional reasons. ER-13 (discussing Executive Orders 14168, 14154, 14217, 14238, 14158, and 14222).

2. Accordingly, federal agencies reviewed their existing grants to private institutions. The grant programs at issue here are highly selective. EPA's Science to Achieve Results program, for example, funds approximately 275 of the 2,500 grant and fellowship applications it receives annually, and the NSF funds approximately 900 of the 5,700 grant applications it receives annually. ER-11-12. The agencies exercise significant discretion when determining which grants to fund with their limited resources based on how the projects advance the agency's goals.

Federal regulations generally provide for the termination of awarded grants. *See, e.g.*, 2 C.F.R. §§ 200.309, .339(c), .343. Section 200.340, simply titled "[t]ermination," reserves authority to terminate grants "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

Awardees are informed that awards may be terminated based on changed priorities. EPA awardees are directed to the agency's general terms and conditions, which are available online. EPA, *EPA General Terms and Conditions* (Oct. 1, 2022).[1]

---

[1] https://perma.cc/4K7R-7PPE. The 2021 version has the same termination provision. EPA, *EPA General Terms and Conditions* (Oct. 1, 2021), https://perma.cc/VQE8-87GX.

5

The first page of those terms and conditions states: "Consistent with 2 CFR 200.340, EPA may unilaterally terminate this award in whole or in part: … if the award no longer effectuates the program goals or agency priorities," providing the specific example of when "EPA determines that the objectives of the award are no longer consistent with funding priorities." *Id.* at 1-2. NEH maintains general terms and conditions for its grants, which provide that termination or suspension is permitted when "an award no longer effectuates the agency's needs and priorities" or "other reasonable cause." NEH, *General Terms and Conditions for Awards to Organizations (for Awards Issued October 1, 2024, or Later)* § XIII(A) (Dec. 18, 2024);[2] *see also* NEH, *NEH Update on the 2024 Revisions to 2 CFR 200* (June 25, 2024).[3] NSF awards are similarly subject to terms and conditions specified in the award notice providing that they can be terminated if they no longer effectuate agency priorities.[4]

As relevant here, the agencies invoked this authority to terminate certain grants they concluded no longer aligned with agency priorities. Most centrally, the agencies

---

[2] https://perma.cc/7X4J-TCHH. The earlier general terms and conditions include the same authority. NEH, *General Terms and Conditions for Awards to Organizations (for Grants and Cooperative Agreements Issued Between January 1, 2022, and September 30, 2024)* (Jan. 11. 2022), https://perma.cc/UH6L-J8U7.

[3] https://perma.cc/8659-PAPP.

[4] *See, e.g.,* NSF, *Research Terms & Conditions Agency Specific Requirements* ¶ 41(b)(2) (Jan. 30, 2023), https://perma.cc/M9M7-7NDJ; NSF, *Research Terms and Conditions Overlay to the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Guidance), 2 CFR §200*, at 18 (Nov. 12, 2020), https://perma.cc/2PF4-JNJA; NSF, *Award Terms and Conditions*, https://perma.cc/B8ZR-VQKK.

declined to continue to fund grants that they concluded were inconsistent with the President's priorities as expressed in Executive Orders.

### B.  Prior Proceedings

1.  The named plaintiffs are six individual faculty members or researchers at UC institutions who worked on projects that had a grant terminated by NEH, NSF, or EPA.  ER-166.  None of the named plaintiffs received any such grant directly.  They moved to certify a class of all UC researchers, Dkt. 18, and sought an order requiring the reinstatement of grants by 16 federal agencies, Dkt. 7.  As noted below, however, the order at issue here is limited to the three federal agencies discussed above.

2.  The district court certified two overlapping classes and granted a preliminary injunction requiring the reinstatement of grants.  Both classes consist of "University of California researchers, including faculty, staff, academic appointees, and employees … who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the EPA, NSF, or NEH (or their sub-agencies)."  ER-56-57.  The Equity Termination Class covers grants "terminated pursuant to Executive Orders 14151 or 14173"—the two Executive Orders discussed above relating to DEI—and the Form Termination Class covers grants "that are terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake, from and after January 20, 2025."  ER-56-57.

7

For the Equity Termination Class, the district court concluded the terminations likely violated the First Amendment. ER-23. The court "assum[ed]" the grant terminations were not based on "speech on the recipients' own time and dime," but nonetheless held they violated the First Amendment. ER-23 (quotation omitted). Acknowledging that the government "may, of course, … selectively fund certain speech to the exclusion of other speech in order to advance its chosen message," the court concluded that these terminations were "viewpoint-based funding decisions" and held they were impermissible because they did not "advanc[e] a government message." ER-24-25 (quotation omitted). The court also concluded that the terminations violated NSF's and NEH's (but not EPA's) statutory obligations. ER-28-29.

For the Form Termination Class, the district court rejected the government's reliance on the Tucker Act, which generally precludes APA claims premised on contracts with the government, for two reasons. First, the court concluded that a claim that contract "terminations [were] carried out in an arbitrary and capricious manner does not rest on a contention that Defendants breached … contracts." ER-42-43. Second, the court reasoned that even if the Tucker Act would bar claims by grant recipients, the court could resolve similar claims by nonparties to the grants. ER-42-43.

The district court also rejected the government's argument that the availability of alternative funding sources defeated plaintiffs' standing, ER-46-52, and concluded

8

that "Plaintiffs are … likely to succeed in showing that the mass grant terminations carried out via form letters were conducted in a manner that was arbitrary and capricious," ER-30.

The district court concluded that certifying both classes was appropriate because they met the criteria of Rule 23(a) and (b)(2). ER-60-64. The district court also applied its relief "on a prospective basis," declaring that "any future grant terminations … meeting the above [class] criteria are vacated upon issuance." ER-5.

The district court denied the government's request for a stay pending appeal. ER-66-67. As of August 7, this Court has not acted on the government's motion for a stay pending appeal.

3. As noted, the district court limited the injunction to the three defendant agencies (EPA, NEH, and NSF) who had terminated a grant which listed a named plaintiff. ER-64-65. Plaintiffs informed the government they intend to amend their complaint and seek injunctive relief against additional agencies on the same basic theories.[5]

## SUMMARY OF ARGUMENT

Neither of the two classes is likely to prevail on the merits. The Equity Termination Class's constitutional and statutory claims each lack merit. The district

---

[5] On July 18, after this appeal was filed, plaintiffs amended their complaint by adding only two new named plaintiffs who worked on grants terminated by the Department of Transportation and the Department of Defense, and on August 1 plaintiffs sought additional injunctive relief against those two agencies.

court fundamentally misunderstood the First Amendment in finding the terminations were likely unconstitutional. The Supreme Court has made clear that the government is not required to subsidize particular projects or to subsidize on a content- or viewpoint-neutral basis. Rather, when acting as a *patron* rather than a *regulator*, the government can generally choose what to fund. Regardless, the district court's implicit conclusion that it is constitutional to *award grants* because of their DEI content but unconstitutional to *terminate them* for the same reason is a one-way constitutional ratchet that finds no purchase in First Amendment doctrine.

The district court's alternative rationale—that any DEI-related terminations were necessarily contrary to law—was plainly erroneous too. The statutory provisions that the court invoked are in many cases entirely inapplicable. And in all others, the agencies could easily comply with those statutes by making grants other than those at issue here. This theory therefore cannot support the injunction requiring reinstatement of *these* grants. In any event, this claim requires a grant-by-grant assessment and is patently not suitable for class-wide adjudication.

The Form Termination Class's claim fails for multiple independent but mutually reinforcing reasons. Plaintiffs are not entitled to layer on top of the rights and remedies that attach to the government's contractual relationships additional procedural rights derived from the APA that apply to other types of actions whose propriety is not governed by a contract providing for standards of conduct and giving rise to a specific and tailored remedy.

10

First, the district court lacked jurisdiction. The claim is that the agencies failed to provide sufficient individualized explanations for the terminations to satisfy the reasoned-decision-making requirement of the APA. But the Tucker Act precludes APA claims based on contract terminations. The Supreme Court recently emphasized that point in *Department of Education v. California*, 145 S. Ct. 966, 968 (2025) (per curiam), staying an injunction granted on the same theory as this one. The district court thought it had jurisdiction because these plaintiffs are not grant recipients, but that flips channeling on its head, providing greater rights to third parties than to the actual grant recipients. If anything, plaintiffs' remoteness from the contracts means they lack Article III standing in the first place—including because the actual grant recipients can continue funding plaintiffs' projects using alternative funding (and in some instances already have). In any event, the agencies' actions are unreviewable because they are committed to agency discretion by law and, even if reviewed, were reasonable.

## STANDARD OF REVIEW

This Court "review[s] an order regarding preliminary injunctive relief for abuse of discretion, but review[s] any underlying issues of law de novo." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (per curiam). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities

11

tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.    The Equity Termination Class Is Not Likely to Prevail on the Merits.

The preliminary injunction in favor of the Equity Termination Class was erroneous; neither the constitutional nor statutory claims have merit.  The First Amendment does not require the federal government to fund DEI grants.  When governments operate selective grant programs, they can permissibly award or terminate grants based on the contents of the grant, without implicating the First Amendment.  The statutes NEH and NSF are alleged to have violated have little bearing on this case:  Even if the type of DEI objectives pursued by the grant were the type of diversity mentioned in the statute (they generally are not), the statutes do not even arguably forbid or require any action relevant here.

### A.    Selective Grant Recipients Do Not Have a First Amendment Right to Continued Government Funding.

**1.**  The Supreme Court has long been clear that the First Amendment provides the government significant flexibility when it acts as patron to subsidize speech, as opposed to when it acts as sovereign to regulate it.  The "decision not to subsidize the exercise of a fundamental right does not infringe the right," *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983), and "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain

activities it believes to be in the public interest," *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). The government may permissibly "cho[ose] to fund one activity to the exclusion of the other," *id.*, and "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998).

The government can thus, for example, permissibly refrain from funding abortions, *Harris v. McRae*, 448 U.S. 297, 315 (1980), from subsidizing government lobbying, *Regan*, 461 U.S. at 550, and from subsidizing striking employees, *Lyng v. International Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 485 U.S. 360, 371 (1988), and can withhold funding from political candidates who do not enter party primaries, *Buckley v. Valeo*, 424 U.S. 1, 105 (1976) (per curiam).

The government is no less entitled to cease funding controversial DEI programs that the government no longer believes are in the public interest. The First Amendment does not require funding grants to research programs that the government believes no longer serve the public interest, any more than funding anti-drug programs requires the government to fund speech advocating for the use of dangerous drugs.

The district court was thus manifestly mistaken to equate the government's refusal to subsidize speech with an effort to censor or to suppress speech. Whenever the government chooses to stop subsidizing an activity, there may be less of that activity, but that reduction alone is a far cry from suppression of protected activity.

13

*Cf. Lyng*, 485 U.S. at 371 (acknowledging that a constitutionally permissible spending statute "works at least some discrimination" against the otherwise protected activity).

**2.** Even though the government "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake," *Finley*, 524 U.S. at 587-88, funding decisions are subject to a constitutional constraint insofar as the government cannot leverage its funding power to impose an unconstitutional condition—such as conditioning grants on refraining from expressive conduct "that [is] separate and independent from the project that receives … funds." *Rust*, 500 U.S. at 196. The Supreme Court explained this distinction in *Finley*, and later Supreme Court cases have clarified it.

The First Amendment, of course, precludes the government from using its regulatory power to "drive 'certain ideas or viewpoints from the marketplace,'" and any regulation that "ai[ms] at the suppression of dangerous ideas" is subject to the most stringent First Amendment scrutiny. *Finley*, 524 U.S. at 587 (citations omitted). These concerns are not generally implicated, however, by selective government funding that leaves private entities free to express themselves as they wish using their own resources. Thus, the Supreme Court explained in *Finley* that "cho[osing] to fund one activity to the exclusion of the other" is permissible. *Id.* at 588 (citation omitted). The constitutional concern arises only when Congress is using the funding to affect speech outside of the program. For example, while limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the

14

legalization or practice of prostitution or sex trafficking"—are constitutionally permissible, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217-18 (2013) (quotation omitted), conditioning federal funds on a pledge to adopt a policy "explicitly opposing prostitution and sex trafficking" is not, *id.* at 210 (quotation omitted).

Here, the government can choose to stop funding DEI-related grants. If the government had refused to provide any funding to entities that engaged in DEI activities using their own funds—assuming those DEI activities constituted protected expression—this case would implicate the constitutional rules that apply when the government "seek[s] to leverage funding" to limit or penalize "speech outside the contours of the program itself." *Id.* at 214-15; *see Speiser v. Randall*, 357 U.S. 513, 519 (1958) (conditioning "tax exemption" on refraining from "certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech"). That is a form of coercion that actively suppresses a protected private activity rather than just refraining from publicly funding it.

But nothing remotely like that is present here. "The Supreme Court has repeatedly reaffirmed … that the government may constitutionally preclude recipients of federal funds from addressing specified subjects so long as the limitation does not interfere with a recipient's conduct outside the scope of the federally funded program." *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1093 n.24 (9th Cir. 2020). The government getting out of the business of funding DEI-related projects does not

15

plausibly "aim at the suppression of dangerous ideas" in the sense of driving the idea from the marketplace. *Finley*, 524 U.S. at 587. The government "does not 'penalize'" institutions that choose to do DEI research, "or deny them the right to" do that research; it has merely made a constitutionally permissible "decision not to subsidize their doing so." *United States v. American Libr. Ass'n*, 539 U.S. 194, 212 (2003) (plurality opinion).

**3.** The cases on which plaintiffs rely are inapposite. Many of them relate not to selective grant programs, but rather to funding that is otherwise available to all comers. That framework is inapplicable here. When the government decides to "selectively fund a program," as here, it may choose grants that advance its policy goals and reject grants that do not. *Finley*, 524 U.S. at 588 (quoting *Rust*, 500 U.S. at 193); *accord id.* at 590 (Scalia, J., concurring in the judgment) (evaluating "grant applications" on "content- and viewpoint-based criteria" is "perfectly constitutional").

Plaintiffs invoke a line of cases holding that certain funding programs open to all comers must comply with "[t]he standard of viewpoint neutrality found in the public forum cases." *Board of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 230 (2000). Those cases draw on the principle that when the government creates a "limited public forum," open to discussion of a particular "subject matter"—such as an in-person space for discussion or a bulletin board—the government must be "viewpoint neutral." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 389, 393 (1993).

16

The Supreme Court extended this doctrine to certain government "funding decisions" in *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 833 (1995), even though funding programs are "a forum more in a metaphysical than in a spatial or geographic sense," *id.* at 830. That case involved a public university's funding of a variety of student groups in order to provide "a wide range of opportunities" for students. *Id.* at 824 (quotation omitted). The Court emphasized that it addressed a situation in which "the University … expends funds to encourage a diversity of views from private speakers." *Id.* at 834.

The Supreme Court's subsequent decision in *Finley* was a direct response to an opinion by a divided panel of this Court that applied *Rosenberger*'s viewpoint-neutrality requirement to the National Endowment of the Arts' selective grant program. *Finley v. National Endowment for the Arts*, 100 F.3d 671, 683 (9th Cir. 1996) ("Although NEA awarded only 88 grants from an applicant pool of 5,168, it cannot provide those scarce grants to favor a particular viewpoint."), *rev'd*, 524 U.S. 569 (1998). The dissenting judge in this Court would have held that "[w]hether government can consider content and viewpoint depends on whether the money it gives out is generally available to all who meet some basic standard, or whether it is a prize given to a select few." *Id.* at 684 (Kleinfeld, J., dissenting). The Supreme Court held that the Ninth Circuit majority's "reliance on …. *Rosenberger* … [was] misplaced" for the reason stated in the Ninth Circuit dissent, notably that the NEA's grant program was "distinguish[ed] … from *Rosenberger*" because of "the competitive process according to

17

which the grants are allocated." *Finley*, 524 U.S. at 586. Where, as in *Finley*, "the Government does not indiscriminately 'encourage a diversity of views from private speakers,'" and is not making similarly "objective decisions on allocating public benefits," *Rosenberger* is inapplicable. *Id.* (quoting *Rosenberger*, 515 U.S. at 834). Thus, unless the provision at issue in *Finley* was "applied in a manner that raises concern about the suppression of disfavored viewpoints," it was constitutional. *Id.* at 587. Such suppression could not be attributed merely to selective funding decisions, whose validity the Court reaffirmed. *Id.* at 588.

Through this series of cases, the Supreme Court has thus clarified that as a general matter, when engaged in selective funding, the government need not be agnostic about whether it supports the activity being funded. That principle gave rise to the grants at issue here in the first place. The government explicitly favored means of promoting equity in its grantmaking. *See, e.g.*, Exec. Order No. 13,985, § 1, 86 Fed. Reg. 7009, 7009 (Jan. 25, 2021) ("It is therefore the policy of [the Biden] Administration that the Federal Government should pursue a comprehensive approach to advancing equity…."). Plaintiffs presumably do not believe that this selectivity was unconstitutional, although their application of *Rosenberger* in this context would suggest that it was. The only thing that has changed is that the government no longer wishes to fund this particular type of grant, and nothing about that change alters the relevant legal principles. Rather, if the government was entitled to award grants because it wished to subsidize the grants' viewpoints, there is no constitutional

18

basis to prevent the government from terminating them if it no longer wishes to do so (even assuming that terminating grants on particular topics is properly treated as viewpoint rather than content discrimination).

Similarly, the district court's suggestion that viewpoint-neutrality principles apply unless there is a specific "government message" being conveyed, ER-25, finds no support in *Finley*, where the government had conceded that "the artistic expression funded by an NEA grant is not the government's own speech; the NEA's award of the grant does not constitute government approval of a particular message or point of view that may be communicated by the work of art," Respondents' Brief at 29, *Finley*, 524 U.S. 569 (No. 97-371), 1998 WL 47281. *Cf. Finley*, 524 U.S. at 598-99 (Scalia, J., concurring in the judgment) ("*Rosenberger*, as the Court explains … found the viewpoint discrimination unconstitutional, not because funding of 'private' speech was involved, but because the government had established a limited public forum—to which the NEA's granting of highly selective (if not highly discriminating) awards bears no resemblance." (citation omitted)).

Finally, there is no plausible argument in this case that the government has created a public forum or limited public forum through a set of disparate grants to grantees around the country on a wide variety of contracts. The funded activities do not share an audience, a means of communication, or anything else that would suggest that the government is creating a forum. The district court properly did not suggest otherwise.

19

**B.  The Statutory Claim Against the NEH and NSF Lacks Merit.**

The district court concluded that the Equity Termination Class's preliminary injunction against the NEH and NSF (but not against the EPA) could be alternatively justified by APA claims that the terminations violated relevant statutes.  ER-30.  That is equally erroneous.

None of the statutes impose a mandatory duty to fund particular grants or include a prohibition on terminating particular grants.  Even if the grants at issue here were related to the matters discussed in the statutes at all (which they generally are not), the agencies have broad discretion to determine how to pursue the statutory goals and thus no statute plausibly requires the agency to continue the particular grants at issue here.  Moreover, the subject-matter of the statutes is much more limited than the district court suggested: both agencies' statutes envision the agencies considering a specific, narrow type of diversity in making grants, and the statutes have no bearing on the agencies' decisions to terminate the unrelated DEI initiatives at issue here.

**1.**  The NEH's enabling statute has no evident connection to this case.  The NEH Chairperson may advance 10 objectives, one of which is to:

> initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community.

20

20 U.S.C. § 956(c)(4). Thus, the pursuit of "the diversity and richness of our American cultural heritage" is permitted but not required by the statute; the provision "authorize[s]" the Chairperson to provide grants in these 10 categories, *id.* § 956(c), but does not require that all 10 be pursued. Absent statutory text *requiring* NEH to pursue that objective, this provision plainly cannot support a contrary-to-law claim.

The statute also provides that in awarding grants, "the Chairperson shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." *Id.* But this provision, too, does not require the government to fund any particular grant, much less categorically prohibit the government from terminating grants on the ground that it prefers not to fund certain equity-related programs. Further, this provision focuses on *who* receives the grants, but the claims here focus on the *subject matter* of the grants. Plaintiffs have not attempted to show that they are underrepresented scholars or work at underrepresented institutions, nor could they possibly assert that claim on a class-wide basis for all UC researchers. To the contrary, if anything is true on a class-wide basis of researchers in one of the largest state university systems in the United States, it is that they are *not* at underrepresented institutions. Neither the district court nor plaintiffs has attempted to explain how terminating grants to UC researchers violates a duty to give regard to "scholars, and educational and cultural institutions, that have traditionally been underrepresented."

The two NEH grants identified in district court illustrate the gulf between the statutes at issue and plaintiffs' claims in this case. One grant "reconstruct[ed] and analyze[d] the history of Istanbul's Orthodox Christian communities in the final Ottoman century," ER-73, and the other involved a project to digitize the writings of Mark Twain, ER-149. Neither relates to the statutes on which the district court relied.

Even if some (unidentified) grants could be thought to implicate the type of diversity mentioned in the statutory provisions, each NEH statutory provision confers substantial discretion—indeed, as noted, one of them imposes no obligations at all. In particular, neither prohibits NEH from terminating grants that pursue those objectives in one particular way in order to reallocate resources to pursue them in a different way. *See, e.g.*, Jennifer Schuessler & Michaela Towfighi, *Humanities Endowment Funds Trump's Priorities After Ending Old Grants*, N.Y. Times (Aug. 5, 2025).

**2.** The terminations were also permissible under NSF's enabling statute. Those provisions similarly do not compel NSF to fund any particular grant, and once again the provisions the district court identified have no evident connection to most of the grants involved in this case.

When "carrying out activities designed to achieve [certain] goals," Congress has instructed the National Science Foundation to "use" four "core strategies," one of which is:

> Develop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering.

22

42 U.S.C. § 1862k(b)(1). The district court erroneously concluded that every termination of a grant for DEI-related reasons violated this statutory provision. ER-27-29.

The grants identified in district court do not come close to supporting that sweeping conclusion. Indeed, they provide no basis for concluding that NSF has violated that statute in any individual instance, much less across the board.

Two grants identified in district court, while contrary to NSF's new priorities with regard to DEI, have nothing to do with developing intellectual capital in underserved people. The first involves designing new "measurement tools" to assess "[s]cientific and environmental literacy" "by engaging in a community-driven process that will center the voices of communities of color." ER-136. The second focuses on "mov[ing] toward more racially just and equitable work environments" by "facilitat[ing] and guid[ing] organization-wide discussions related to racial equity." ER-137. Terminating these grants does not implicate the statutory command to "emphasi[ze]" underserved "groups and regions" when "[d]evelop[ing] intellectual capital." 42 U.S.C. § 1862k(b)(1).

Moreover, even if the statutory provision were thought to be relevant to some grants, each provision confers substantial discretion on NSF in how it allocates its resources in pursuit of the statutory goals. In particular, no statute prohibits NSF from terminating grants that employ a strategy in one particular way in order to reallocate resources to grants that employ it in a different way. Take the final NSF

23

grant identified in district court, which aims to "advance understanding of design practices that contribute to rightful presence of Indigenous youth" in STEM, defining rightful presence as a "justice-centered conceptualization of equity that re-authors rights to shape learning in ways that make present the lives of youth who have been 'made missing' through racialization and colonialization in STEM learning." ER-138; ER-141. NSF can, consistent with its judgment about how best to pursue the core strategy of "[d]evelop[ing] intellectual capital" in underserved communities, decide to allocate its scarce funding resources to grants it believes would be more effective than developing practices that increase "rightful presence." NSF also has significant discretion to prioritize among the four core strategies and could permissibly terminate some grants that pursue one of the strategies in order to free up resources to invest more in the other three strategies.

**3.** At an absolute minimum, the fact-intensive inquiry into whether the terminated grants implicate the enabling statutes renders class-wide relief manifestly inappropriate. DEI initiatives are not monolithic, and not all DEI initiatives relate to the types of diversity described in the statutes. Rule 23(b)(2) classes are appropriate only when the defendants' "conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (quotation omitted). Because deciding whether any DEI-related grant involves the specific types of diversity in the statutes requires a grant-by-grant review, class relief was inappropriate.

## II.    The Form Termination Class Is Not Likely to Prevail on the Merits.

The Form Termination Class's APA claims are all premised on the idea that plaintiffs can circumvent the rights and remedies that attach to contracts with the United States and subject the government to additional obligations and remedies beyond what contract law requires. That conclusion is mistaken, and led the district court to commit several related errors. First, as *Department of Education v. California* held, the Tucker Act impliedly precludes review of these claims. 145 S. Ct. at 968. Second, consistent with *Lincoln v. Vigil*, 508 U.S. 182 (1993), decisions about how to allocate funding among grants are committed to agency discretion and thus unreviewable. Finally, even if the grant terminations were reviewed on the merits, the terminations were reasonable.

### A.    The Tucker Act Impliedly Precludes These APA Claims.

The federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Plaintiffs here rely on the APA's waiver of sovereign immunity. But that waiver applies "only if three conditions are met: (1) [the] claims are not for money damages, (2) an adequate remedy for [the] claims is not available elsewhere and (3) [the] claims do not seek relief expressly or impliedly forbidden by another statute." *Tucson Airport Auth. v. General Dynamics Corp.*,

25

136 F.3d 641, 645 (9th Cir. 1998) (collecting the conditions contained in 5 U.S.C. §§ 702 and 704).

The dispute in this case is about only the third condition, whether "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

The district court erred in blending the three distinct conditions. Even when a suit "satisf[ies] the first two prongs"—that is, the suit is not seeking money damages and there is no adequate remedy elsewhere—there is still no jurisdiction if the suit is "barred by the third" condition. *Tucson Airport Auth.*, 136 F.3d at 645. For these reasons, the Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), is entirely inapposite, as it concerned only the first two prongs and not the third. Similarly, the district court's reliance on the lack of an adequate remedy elsewhere to conclude there was jurisdiction here, ER-42-43, was plainly contrary to both this Court's precedent and the plain terms of the APA.

**1.** The central issue on appeal is determining what suits are impliedly precluded by the Tucker Act. The Tucker Act waives immunity for "any claim against the United States founded … upon any express or implied contract with the United States" by authorizing claims for money damages in the Court of Federal Claims. 28

26

U.S.C. § 1491(a)(1). Thus, the "Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This jurisdictional division ensures that contract claims against the government are channeled into the court that has "unique expertise" in that area, *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985), and which Congress has generally not empowered to grant injunctive relief, *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998).

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, this Court looks at "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see also, e.g.*, *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1025 (9th Cir. 2023) (noting this Court applies *Megapulse*). Under that framework, the Supreme Court recently held the government was likely to succeed in showing that nearly identical claims were precluded. *California*, 145 S. Ct. at 968.

Specifically, in *Department of Education v. California*, several states advanced APA claims that the Department of Education had impermissibly terminated grants, similar to the terminations at issue here. The plaintiffs in *California* alleged the termination of various teacher-education grants for discriminatory practices—including in the form

27

of DEI violated the APA. *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 95 (1st Cir. 2025). The district court ordered the terminated grants reinstated. *Id.*

The First Circuit declined to stay that order, but the Supreme Court issued a stay. Notably, the district court here parroted the First Circuit's reasoning that the Supreme Court rejected. It claimed that the source of the rights was not the contract but was federal law: being free from "arbitrary and capricious" terminations. ER-43; *cf. California*, 132 F.4th at 96-97 ("the essence of the claims is not contractual" but that defendant's "actions [were] insufficiently explained, insufficiently reasoned, and otherwise contrary to law—arguments derived from the Administrative Procedure Act" (citation and quotation omitted)).[6] In granting the government's request for emergency relief, however, the Supreme Court explained that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). That explanation controls here. Framing the claim as one of agency error does not avoid the Tucker Act because, as *Megapulse* observed, "[i]t is hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be

---

[6] The district court further observed that plaintiffs here brought a constitutional claim. But, as explained above, the First Amendment claim plainly fails on the merits, and the question whether plaintiffs' APA claims are precluded does not depend on whether plaintiffs have brought a different type of claim in the same lawsuit. *Cf. DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press.").

28

urged to involve as well agency error subject to review under the APA." 672 F.2d at 967 n.34 (quotation omitted).

The relief plaintiffs seek is for the government to make payments under grant agreements, which bear all the hallmarks of a contract. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that "many … federal grant programs" are "much in the nature of a contract" (quotation omitted)). Specifically, plaintiffs asked for an injunction "restor[ing] … lost funding" and modifying the grants to provide "extensions." ER-171. Seeking specific performance of the contract and modification of the contract are quintessentially contract claims, and all contract claims are barred under the APA whether they seek money damages or not. *See* 28 U.S.C. § 1491(a)(1) (applying to claims based "upon any express or implied contract with the United States"); 5 U.S.C. § 702 (precluding review "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought").

The district court lost sight of the *Megapulse* inquiry, which focuses on the source of the rights and the remedies sought. Here, the source of the rights asserted is the contracts themselves: plaintiffs have not identified any statute or regulation that could plausibly be read to entitle them to federal funds. A general right to be free from arbitrary-and-capricious decisionmaking is no substitute for a substantive right upon which the claim is premised; as *Megapulse* observed, any contractual claim could be recharacterized as an arbitrary-and-capricious claim.

29

Similarly, the remedy awarded here was specific to the contracts into which plaintiffs' employers had entered, rather than compelling compliance with any independent statutory or regulatory mandate. The district court ignored whether the remedies are *contractual* remedies, instead asking whether the remedies sought would be available in the Court of Federal Claims, ER-45, or whether the remedy sought was "money damages" within the meaning of an unrelated APA provision not at issue here, ER-44 (discussing *Bowen*, 487 U.S. at 893). Injunctive and declaratory relief about contracts—seeking to reinstate contracts or declare that a contract remains in effect—illustrate that the claims are premised on a contract with the United States, regardless of whether that relief would be available to plaintiffs in the Court of Federal Claims or whether they do not seek money damages.

**2.** The district court relied on one other feature of this case to conclude that there was jurisdiction: plaintiffs are not parties to the contracts and thus would not be able to proceed in the Court of Federal Claims. The district court failed to take this Court's heed not to "conflat[e] two distinct concepts…: the presence or absence of an adequate remedy within the meaning of § 704, and the requirement that a cause of action not be 'impliedly forbidden' under § 702." *Tucson Airport Auth.*, 136 F.3d at 646. The only relevant question is whether Congress's creation of a Tucker Act remedy for contract claims impliedly precludes APA review, even if that leaves these plaintiffs without a remedy. And review is plainly precluded: it would be nonsensical if APA review of identical claims were precluded for the parties with actual rights

30

under the contracts but not for third parties. When Congress creates "a cause of action enabling [some parties] (and not [others]) to seek judicial review … [a]llowing [the others] to sue under the APA would … frustrat[e] that scheme." *Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1995 n.8 (2025) (citing *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345-47 (1984)). That is particularly true when Congress strictly limits the venue and remedies available to the proper parties; others who are not authorized to sue cannot have access to a cause of action that would be entirely unavailable to the proper parties. Just as allowing claims for equitable relief would "frustrat[e]" "Congress' intent not to allow post-award declaratory relief on government contracts," *North Side Lumber Co. v. Block*, 753 F.2d 1482, 1486 (9th Cir. 1985), allowing suit by nonparties to contracts would frustrate Congress' intent to limit these claims to suits brought by parties to the contract.

Moreover, the district court erroneously distinguished *California* on the ground that those plaintiffs "were *parties*." ER-45. As *California* came to the Supreme Court, it was disputed whether all the plaintiffs were parties to the contracts. While the plaintiff States asserted claims of the institutions within those States, the government argued that not all the institutions were affiliates such that the States could sue on their behalf. The First Circuit expressly declined to resolve that dispute, 132 F.4th at 100-01, and the Supreme Court evidently did not regard it as relevant to its determination about the reach of the Tucker Act's preclusion. The presence of

31

entities who may not be entitled to assert rights under the contract thus does not distinguish this case from *California*.

### B.    These Claims Are Not Reviewable Under the APA.

Although the Tucker Act's preclusive effect is itself dispositive, the district court further erred in reviewing actions for which the APA does not provide review. Even when the APA has waived sovereign immunity, the statute generally limits judicial review to "final agency action," 5 U.S.C. § 704, that is not "committed to agency discretion by law," *id.* § 701(a)(2). The district court adopted an improperly narrow view of when agencies can terminate a grant that "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). This longstanding regulation provides broad—indeed, largely unreviewable—authority for federal agencies to terminate funding agreements that no longer serve the government's interests. The court's suggestion that it could second-guess these conclusions, or that the government was compelled to provide a lengthy explanation of its decisionmaking process, was mistaken. Further, the district court's prospective relief, purporting to vacate agency actions that have not yet occurred, clearly lacks a "final agency action."

**1.** The Supreme Court made clear in *Lincoln v. Vigil*, 508 U.S. 182 (1993), that agency decisions like this—to discontinue a previously funded program to reallocate those funds to more productive uses—are committed to agency discretion by law and not reviewable under the APA's reasoned-decision-making standards. 5 U.S.C. § 701(a)(2). In *Lincoln*, the Supreme Court held that the Indian Health Service's

32

decision to discontinue a program and reallocate funds to other programs was committed to agency discretion by law and thus not reviewable. 508 U.S. at 185-88. The Court explained the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. Thus,

> an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'

*Id.* at 193.

"Of course," the Court went on, agencies must comply with any operative statutes. *Lincoln*, 508 U.S. at 193. But as long as the agency does so (and satisfies whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id.*

Although *Lincoln* addressed lump-sum appropriations, courts have made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such

33

decisions "clearly requir[e] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted).

The programs at issue here provide significant discretion in determining how best to allocate appropriated funds across grant applicants. Consider the NEH, which makes grants pursuant to an open-ended statutory provision in 20 U.S.C. § 956(c), "authoriz[ing]" the "Chairperson" "to enter into arrangements, including contracts, grants, loans, and other forms of assistance" in 10 different categories. While the statute provides some procedural requirements— *e.g.*, a requirement that the Chairperson receive the recommendation of the National Council of the Humanities before awarding grants, 20 U.S.C. § 956(c)—the statute provides no standard by which to judge the agency's allocation of funds and administration of grants.

The district court concluded that "[d]efendants have not met their burden to show such unbounded discretion here," in part for failing to cite specific provisions about the NEH and EPA. ER-39. But the absence of statutory provisions limiting the agency's discretion *is* the government's point; it is *plaintiffs* who must show a violation of law in order to secure preliminary injunctive relief.

The district court also pointed to regulations (such as 2 C.F.R. § 200.340) which can impose "regulatory limits on the agencies' discretion." ER-39. But the district court did not base its holding on the violation of those regulations, instead merely concluding that the agencies' actions were arbitrary and capricious. The Supreme Court acknowledged in *Lincoln* that courts could ensure compliance with

34

statutory and regulatory requirements, but the mere existence of some limits on the agency's discretion—as there were in *Lincoln* itself—does not authorize the district court to impose additional requirements beyond those set out in statutes and regulations.

Here, the regulations expressly allow the actions taken here to terminate a funding agreement that "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). While the district court is correct that those regulations require "written notice" for terminations and that terminations be "pursuant to the terms and conditions of the Federal award," ER-39 (quotation omitted), nobody argues those procedures were not followed.

2. Moreover, class members received prospective relief from future agency actions, with the district court purporting to "vacat[e]" "future grant terminations … upon issuance." ER-4-5. But future actions are not reviewable under the APA. Under the APA, plaintiffs must identify the specific, "final agency action" that has already occurred. *See, e.g.*, *Watson v. Chessman*, 362 F. Supp. 2d 1190, 1196 (S.D. Cal. 2005) ("[T]he alleged 'agency action' … has not yet happened. As such, the APA has no relation to this case."). While a future termination may eventually represent a final agency action, a plaintiff may not "in a single swipe at the duly elected executive" seek judicial superintendence over the entire, future grantmaking process of the Executive Branch. *See Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023). The APA does not allow a plaintiff to seek prospective, "*wholesale* improvement of [government]

35

program[s] by court decree," but limits a plaintiff to challenging "some particular 'agency action' that causes it harm." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

### C.     The Challenged Grant Terminations Were Reasonable.

Even if the Tucker Act did not preclude review, and if the agencies' discretionary decisions were subject to review, the terminations would be upheld under the arbitrary-and-capricious standard, which "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*

The district court faulted the agencies for sending form letters and for allegedly not engaging in "individualized consideration" of each grant. ER-19-20. But the agencies did engage in individualized review. The NEH, for example, classified grants into four categories based on "High, Medium, Low, or No Connection" to the equity-related Executive Orders. ER-26 (quotation omitted). The district court did not suggest otherwise, instead faulting the agencies for selecting grantees based on criteria the district court deemed inappropriate—the premise of the court's holding with regard to the Equity Termination Class—while simultaneously concluding that the agencies did not engage in any individualized assessment. As discussed above, the court was wrong to conclude that the agencies' priorities were unlawful, but the mere

36

existence of those priorities makes clear that individualized assessments were performed.

Finally, the district court criticized the agencies for failing to adequately consider the "reliance interests" of the grant recipients' employees. ER-20. This criticism once again misunderstands the interplay between contract principles and the APA. Reasonable reliance is a foundational principle of contract law, and could affect the measure of contract damages or the extent of the government's obligations. And many government contracts determine up front the degree to which counterparties are entitled to rely on the contract's continuation by providing for close-out costs or other measures in the event that the contract is terminated. The possibility of those contract remedies reflects the extent to which the government is compelled to consider reliance interests in determining whether to terminate or breach a contract. And here, in any event, the grants stated that they could be terminated if agency priorities change, *see supra* pp. 5-6, so any reliance on continued funding was clearly unreasonable. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (requiring agencies to consider "legitimate reliance").

The district court's misunderstanding about reliance interests is emblematic of its broader misunderstanding of this claim. The necessary extent of an agency's explanation for its action varies with context. *See, e.g., American Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995). When government contracts provide for the circumstances in which they can be terminated—*e.g.*, when agency priorities change—

37

or the manner in which the termination shall occur—*e.g.*, using a specific form letter—government action consistent with those contract terms are a fortiori reasonable. *Cf. Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) (holding that a terminated government contractor receives due process through the availability of a breach-of-contract claim without any additional process or pre-termination hearing). The APA does not impose a separate, heightened standard of conduct or explanation. This explains both why the government's actions were reasonable *and* why these claims are precluded by the Tucker Act. Regardless of plaintiffs' attempt to frame their claims as arbitrary-and-capricious review, such review necessarily entails review of whether the government has complied with the terms of the contract.

## III. Plaintiffs' Alleged Injuries Are Too Attenuated for Article III Standing or, at a Minimum, Preclude Class-Wide Relief.

The district court drew the wrong inference from the fact that plaintiffs are not themselves the grant recipients. As noted above, the court erroneously concluded that plaintiffs should have more rights to file APA suits than the actual parties to the grants. In fact, plaintiffs' status makes the preliminary injunction all the more inappropriate as plaintiffs' injuries from the grant terminations are too attenuated. Plaintiffs' alleged injuries depend upon and derive from the choices of third-party grant recipients about how to react to any grant termination. If grant recipients replace federal funds with alternative funds, or cut funding that does not harm plaintiffs, then plaintiffs would plainly lack standing.

38

Moreover, plaintiffs are required to establish standing for each grant that is ordered reinstated. *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562-63 (2025) (holding that courts lack power to award injunctive relief "broader than necessary to provide complete relief to each plaintiff with standing to sue"). Because no class members were injured by some of the grants (or at least portions of grants) ordered reinstated, the class-wide injunction requiring full reinstatement of the grants is plainly improper. *Cf. Wal-Mart Stores, Inc.*, 564 U.S. at 360 ("The key to the (b)(2) class is '…that the conduct is such that it can be enjoined … only as to all of the class members or as to none of them.'").

**1.** Where, like here, "a causal relation between injury and challenged action depends upon the decision of an independent third party …, standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (quotation omitted). To satisfy their burden in such "circumstances, the plaintiff must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quotation omitted). And plaintiffs have not made the necessary showing. Far from showing that grant recipients will terminate funding for the projects on which plaintiffs work, plaintiffs' declarations concede that some alternative funding already has been provided and more is being sought.

39

Plaintiffs' declarations consistently describe how they are actively "seeking alternate funding sources." ER-98; *see, e.g.*, ER-77; ER-89; ER-114; ER-134; ER-155; ER-164. Plaintiff Jedda Foreman presents a particularly stark example. Foreman stated that federal funding constitutes only "20-25%" of her employer's budget, ER-133, and when NSF terminated a supplemental funding grant related to one of Foreman's projects, her employer "still went forward" with the project and paid for it out of other funds. ER-134. Plaintiff Neeta Thakur similarly conceded that some funding shortfall from grant terminations had been covered by other "discretionary funds." ER-98. And several other declarations described ongoing attempts to solicit alternate funds, without any basis for presuming that they were all fruitless. *See, e.g.*, ER-116; ER-98. *See generally* Nidhi Subbaraman et al., *Harvard Is Asking Corporations to Fill Its Federal Funding Gap*, Wall St. Journal (June 27, 2025); Alan Blinder & Vimal Patel, *Can Donors Fill the Major Budget Holes that Colleges Face Under Trump?*, N.Y. Times (June 28, 2025). The district court thus clearly erred in concluding—on a class-wide basis—that "no alternate funding is readily available." ER-51.

Moreover, even if alternative funding is not found, grant recipients could elect to cut expenses in ways that do not injure plaintiffs. The named plaintiffs' declarations give numerous examples of such spending reductions that would not create a cognizable injury for the plaintiffs: other "researchers and graduate students will lose hours and compensation," ER-89; *see* ER-115, coworkers may "resig[n] in order to find positions elsewhere," ER-155, or projects may reduce travel "to schools

40

and universities to share [their] work," ER-156. Such injuries to nonparties are not appropriately remedied by a preliminary injunction. *CASA, Inc.*, 145 S. Ct. 2562-63.

The named plaintiffs have each failed to carry their burden to show that grant recipients will predictably terminate the particular research projects that employ them rather than find alternative funding or cut other expenses, either of which would leave plaintiffs uninjured.

**2.** At a minimum, the district court's implicit conclusion that every member of the class has standing to seek *full reinstatement* of each grant is clearly belied by the record, and the injunction is overbroad.

Even if, as the district court suggested, grant recipients collectively will be unable to replace all the funds they would have received from federal agencies, that is not the relevant question. Preliminary injunctions need to be tailored to *these plaintiffs'* injuries, *CASA, Inc.*, 145 S. Ct. 2562-63, and their alleged injuries derive from only that portion of the grants that are not replaced (or likely to be replaced) by alternative funding. Foreman, for example, clearly has no injury that is redressed by reinstating the portion of the grant that was already covered by alternative funds, and an injunction requiring the reinstatement of that portion plainly exceeded the district court's equitable powers.

Even assuming success on the merits, a proper injunction would reinstate only that portion of the grant funding shortfall that had not been replaced (and was not likely to be replaced), not the entire grant. Determining such an injunction would

41

require a grant-by-grant inquiry, however, which precludes class-wide relief, because relief in a Rule 23(b)(2) class is inappropriate when "each individual class member would be entitled to a *different* injunction." *Wal-Mart Stores, Inc.*, 564 U.S. at 360. Necessary information would need to be obtained from each of the absent class members about the status of alternative funding for their particular grants, a procedure that is not practical in a Rule 23(b)(2) class.

Plaintiffs have not even attempted to make the showing that would be necessary to justify requiring the full reinstatement of every grant—showing that no grant recipient has found any alternative funds; nor could they, as the record demonstrates the opposite. Without that showing, class-wide relief is plainly improper.

## IV.  The Remaining Equitable Factors Do Not Support Injunctive Relief.

The balance of equities and the public interest counsel against a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that these factors merge in cases involving the government). In particular, the district court's order will cause significant and irreparable harm to the government. Beyond the obvious harms to the President's ability to execute core Executive Branch policies, the order irreparably harms the public fisc. The order requires the agencies to reinstate grantees' access to funds. ER-4. As in *Department of Education v. California*, the government "is unlikely to recover the grant funds once they are disbursed." 145

42

S. Ct. at 969. Plaintiffs have not promised to return withdrawn funds, and the funds are disbursed to nonparty grant recipients from whom the court would likely lack authority to order their return. Nor does the nominal $100 injunction bond protect against the government's substantially larger injuries. ER-66. Thus, the challenged order will result in the immediate outflow of significant amounts of money from the public fisc with minimal oversight and limited prospects for recovery if it is ultimately determined that the grant terminations were lawful. Conversely, even absent preliminary relief, nothing would prevent plaintiffs from having their research funded by the grant recipients if plaintiffs or the grant recipients were to prevail in obtaining an order to restore "any wrongfully withheld funds through suit in an appropriate forum." *California*, 145 S. Ct. at 969.

In contrast, the gravamen of plaintiffs' claim is monetary, and the grant recipients who employ plaintiffs will receive any funds they are owed if they ultimately prevail in an appropriate forum. The "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (alteration in original) (quotation omitted).

Second, the harm to the government is compounded by the injunctions' interference with the President's ability to execute core Executive Branch policies. As explained, the grants at issue here were terminated based on the assessment that the

43

grants conflict with the Administration's policy priorities. Interfering with the President's ability to control his subordinates by directing them to ensure that selective funding is consistent with his priorities—and thus requiring the government to expend money in support of causes that are inconsistent with the Administration's policy objectives—inflicts a severe separation-of-powers harm on the Executive Branch by "improperly intru[ding] on a coordinate branch of the Government." *CASA, Inc.*, 145 S. Ct. at 2561 (alteration and quotation omitted); *cf. Maryland v. King*, 567 U.S. 1301, 1303 (Roberts, C.J., in chambers).

The Supreme Court assessed these factors in *California* and its weighing of the equities in a stay posture also shows that the balance weighs against an injunction. As the Court explained, the government suffers irreparable harm because it is "unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. The Supreme Court has since reiterated that its stay decisions "inform how a court should exercise its equitable discretion in like cases"; accordingly, the Supreme Court's balancing of the equities "squarely control[s]" here. *Trump v. Boyle*, No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025).

44

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be reversed.[7]

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

YAAKOV M. ROTH
   *Principal Deputy Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

 *s/ Derek Weiss*
DEREK WEISS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7230*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*

   *(202) 616-5365*

August 2025

---

[7] The district court's preliminary injunction order also purported to "VACAT[E]" the "grant terminations" of the Form Termination Class and to "VACAT[E]" the *"grants"* of the Equity Termination Class.  ER-3-4 (emphasis added). The former plainly cannot stand if the injunction against the terminations is reversed, and the latter is likely a typographical error.

45

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*s/ Derek Weiss*
Derek Weiss

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 28.1-1(b) because it contains 10,879 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Garamond 14-point font, a proportionally spaced typeface.

*s/ Derek Weiss*
Derek Weiss

**ADDENDUM**

## TABLE OF CONTENTS

5 U.S.C. § 702 ..................................................................................................A1

5 U.S.C. § 704 ..................................................................................................A1

28 U.S.C. § 1491(a) .........................................................................................A2

42 U.S.C. § 1862k ............................................................................................A3

20 U.S.C. § 956(a)-(c) .....................................................................................A5

## 5 U.S.C. § 702

### § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

## 5 U.S.C. § 704

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

**28 U.S.C. § 1491(a)**

**§ 1491. Claims against United States generally; actions involving Tennessee Valley Authority**

(a)

    (1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

    (2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

A2

**42 U.S.C. § 1862k**

**§ 1862k. Findings; core strategies**

**(a) Findings**

Congress finds the following:

(1) The United States depends upon its scientific and technological capabilities to preserve the military and economic security of the United States.

(2) America's leadership in the global marketplace is dependent upon a strong commitment to education, basic research, and development.

(3) A nation that is not technologically literate cannot compete in the emerging global economy.

(4) A coordinated commitment to mathematics and science instruction at all levels of education is a necessary component of successful efforts to produce technologically literate citizens.

(5) Professional development is a necessary component of efforts to produce system-wide improvements in mathematics, engineering, and science education in secondary, elementary, and postsecondary settings.

(6)

(A) The mission of the National Science Foundation is to provide Federal support for basic scientific and engineering research, and to be a primary contributor to mathematics, science, and engineering education at academic institutions in the United States.

(B) In accordance with such mission, the long-term goals of the National Science Foundation include providing leadership to—

(i) enable the United States to maintain a position of world leadership in all aspects of science, mathematics, engineering, and technology;

(ii) promote the discovery, integration, dissemination, and application of new knowledge in service to society; and

(iii) achieve excellence in United States science, mathematics, engineering, and technology education at all levels.

A3

**(b) Core strategies**

In carrying out activities designed to achieve the goals described in subsection (a), the Foundation shall use the following core strategies:

(1) Develop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering.

(2) Strengthen the scientific infrastructure by investing in facilities planning and modernization, instrument acquisition, instrument design and development, and shared-use research platforms.

(3) Integrate research and education through activities that emphasize and strengthen the natural connections between learning and inquiry.

(4) Promote partnerships with industry, elementary and secondary schools, community colleges, colleges and universities, other agencies, State and local governments, and other institutions involved in science, mathematics, and engineering to enhance the delivery of math and science education and improve the technological literacy of the citizens of the United States.

**20 U.S.C. § 956(a)-(c)**

**§ 956. National Endowment for the Humanities**

**(a) Establishment**

There is established within the Foundation the National Endowment for the Humanities.

**(b) Chairperson of the Endowment; appointment, term, reappointment; vacancy; expiration of term**

(1) The Endowment shall be headed by a chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate.

(2) The term of office of the Chairperson shall be four years, and the Chairperson shall be eligible for reappointment. The provisions of this paragraph shall apply to any person appointed to fill a vacancy in the office of the Chairperson. Upon expiration of the Chairperson's term of office the Chairperson shall serve until the Chairperson's successor shall have been appointed and shall have qualified.

**(c) Functions of the Endowment; publications; traditionally underrepresented recipients of financial assistance**

The Chairperson, with the advice of the National Council on the Humanities (hereinafter established), is authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance, to—

(1) develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

(2) initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities; any loans made by the Endowment shall be made in accordance with terms and conditions approved by the Secretary of the Treasury;

(3) initiate and support training and workshops in the humanities by making arrangements with institutions or individuals (fellowships awarded to individuals under this authority may be for the purpose of study or research at appropriate nonprofit institutions selected by the recipient of such aid, for stated periods of time);

(4) initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community;

A5

(5) foster international programs and exchanges;

(6) foster the interchange of information in the humanities;

(7) foster, with groups, education in, and public understanding and appreciation of the humanities;

(8) support the publication of scholarly works in the humanities;

(9) insure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

(10) foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

In the case of publications under clause (8) of this subsection such publications may be supported without regard for the provisions of section 501 of title 44 only if the Chairperson consults with the Joint Committee on Printing of the Congress and the Chairperson submits to the Committee on Labor and Human Resources of the Senate and the Committee on Education and Labor of the House of Representatives a report justifying any exemption from such section 501. In selecting individuals and groups of exceptional talent as recipients of financial assistance to be provided under this subsection, the Chairperson shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented.

[Subsections (d) through (m) omitted]

A6