No. 25-4249

# United States Court Of Appeals
# For the Ninth Circuit

---

NEETA THAKUR, et al.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, et al.,

*Defendants-Appellants.*

---

Appeal from a Decision of the United States District Court for the Northern District of California, No. 3:25-cv-04737-RFL   *Honorable Rita F. Lin*

---

## APPELLEES' ANSWERING BRIEF

---

ANTHONY P. SCHOENBERG
LINDA S. GILLERAN
DONALD E. SOBELMAN
KYLE A. MCLORG
DYLAN M. SILVA
KATHERINE T. BALKOSKI
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400 Telephone
tschoenberg@fbm.com
lgilleran@fbm.com
dsobelman@fbm.com
kmclorg@fbm.com
dmsilva@fbm.com
kbalkoski@fbm.com

ELIZABETH J. CABRASER
RICHARD M. HEIMANN
KEVIN R. BUDNER
ANNIE M. WANLESS
NABILA M. ABDALLAH
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
(415) 956-1000 Telephone
ecabraser@lchb.com
rheimann@lchb.com
kbudner@lchb.com
awanless@lchb.com
nabdallah@lchb.com

ERWIN CHEMERINSKY
CLAUDIA POLSKY
U.C. BERKELEY SCHOOL OF LAW
215 Boalt Hall
Berkeley, California 94720-7200
(510) 642-6483 Telephone
echemerinsky@law.berkeley.edu
cpolsky@law.berkeley.edu

*Attorneys for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

No corporation is a petitioner in this case. Therefore, no corporate disclosure statement is required under Rule 26.1 of the Federal Rules of Appellate Procedure.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................1

STATEMENT OF THE ISSUES.................................................5

STATEMENT OF THE CASE.................................................6

I.   Factual Background .................................................6

    A.   Federal Agency Grantmaking ...............................6

    B.   Federal Funds Awarded to the UC System .....................10

    C.   The Trump Administration Directed Federal Agencies to Terminate Research Grants. ...............................12

    D.   Defendants' Grant Terminations......................................14

II.  Procedural Background ............................................21

SUMMARY OF THE ARGUMENT ................................................24

STANDARD OF REVIEW ...................................................30

ARGUMENT ..............................................................30

I.   The District Court Has Jurisdiction.....................................30

    A.   Plaintiffs Have Standing.................................................30

    B.   The Tucker Act Does Not Preclude Review. ...................34

II.  Plaintiffs Are Likely to Succeed on The Merits.........................39

    A.   Plaintiffs Are Likely to Succeed on Their First Amendment Claims.................................................39

    B.   Plaintiffs Are Likely to Succeed on Their APA Claims. ..................45

III. The District Court Correctly Balanced the Equities in Issuing the Preliminary Injunction. .................................................54

CONCLUSION ..............................................................57

46686\20565055.8

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) .......................................................................39, 53

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ...........................................................47

*Bowen v. Mich. Acad. of Family Physicians*,
476 U.S. 667 (1986) ...........................................................................38

*Cienega Gardens v. United States*,
194 F.3d 1231 (Fed.Cir. 1998) .......................................................26, 37

*City & Cnty. of S.F. v. Trump*,
897 F.3d 1225 (9th Cir. 2018) .............................................................53

*Cmty. Legal Servs. E. Palo Alto v. U.S. Dep't of Health and Hum. Servs.*,
137 F.4th 932 (9th Cir. 2025)........................................................26, 37

*Constructora Guzman, S.A. v. United States*,
161 Fed. Cl. 686 (2022) .....................................................................38

*Dep't of Commerce v. New York.*,
588 U.S. 752 (2019)...........................................................................47

*Dep't of Educ. v. California*,
145 S.Ct. 966 (2025)....................................................................*passim*

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020)......................................................................45, 48, 49

*Diamond Alt. Energy, LLC v. EPA*,
145 S.Ct. 2121 (2025) ....................................................................31, 32

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*Elrod v. Burns*,
427 U.S. 347 (1976)............................................................28, 54

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)...............................................................46

*FDA v. Wages & White Lion Invs.*, L.L.C.,
145 S.Ct. 898 (2025)...............................................................46

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) .................................................30

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)................................................................31

*Koala v. Khosla*,
931 F.3d 887 (9th Cir. 2019) ..................................................44

*Lujan v. G & G Fire Sprinklers, Inc.*,
532 U.S. 189 (2001)................................................................48

*Matal v. Tam*,
582 U.S. 218 (2017)................................................................26

*McNary v. Haitian Refugee Center, Inc.*,
498 U.S. 479 (1991)................................................................38

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002)................................................52

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................45

*Nat'l Wildlife Fed'n v. Burlington N. R.R. Inc.*,
23 F.3d 1508 (9th Cir. 1994) ..................................................30

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
422 F.3d 782 (9th Cir. 2005) ..................................................30

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Nat'l Endowment of the Arts v. Finley*,
524 U.S. 569 (1998)............................................................27, 41, 43

*Nat'l Insts. of Health v. Am. Public Health Ass'n*,
606 U.S. ___, 145 S.Ct. ___, 2025 WL 2415669 (August 21, 2025) .........*passim*

*Nken v. Holder*,
556 U.S. 418 (2009)..........................................................................54

*Ohio v. Env't Prot. Agency*,
603 U.S. 279 (2024)....................................................................28, 45

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ............................................................34

*Prantil v. Arkema France S.A.*,
No. 4:17-cv-02960, 2022 WL 1570022 (S.D. Tex. May 18, 2022)..................34

*Ransom v. United States*,
900 F.2d 242 (Fed. Cir. 1990) ..........................................................37

*Regan v. Tax'n With Representation of Wash.*,
461 U.S. 540 (1983)....................................................................41, 43

*Saravia for A.H. v. Sessions*,
905 F.3d 1137 (9th Cir. 2018)..........................................................30

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)..........................................................................31

*Thakur v. Trump*,
Case No. 25-cv-04737, 2025 WL 1734471 (N.D. Cal. June 23,
2025) ...................................................................................*passim*

*Thakur v. Trump*,
No. 25-4249, 2025 WL 2414835 (9th Cir. Aug. 21, 2025)........................*passim*

*Tootle v. Sec'y of Navy*,
446 F. 3d 167 (D. C. Cir. 2006).........................................................26

v

# TABLE OF AUTHORITIES
## (continued)

Page

*U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*,
  665 F.3d 1339 (D.C. Cir. 2012) ............................................................. 6

*United Aeronautical Corp. v. U. S. Air Force*,
  80 F.4th 1017 (9th Cir. 2023) ..................................................... 25, 36

## Federal Statutes

5 U.S.C. § 701(a)(2) ............................................................................. 51

5 U.S.C. § 706(2)(A)&(C) ............................................................ 49, 52

20 U.S.C. § 951(9) ................................................................................. 7

20 U.S.C. § 956 ..................................................................................... 7

20 U.S.C. § 956(c) ................................................................... 8, 19, 50

20 U.S.C. § 956(c)(4) ............................................................................ 8

20 U.S.C. §§ 1234a, 1234b ................................................................. 55

42 U.S.C. § 1861 et seq ......................................................................... 8

42 U.S.C. § 1862k(a)(6)(A) ................................................................... 9

42 U.S.C. § 1862k(b)(1) .................................................................. 9, 50

42 U.S.C. § 1862s-5(c)&(d)(1) ........................................................... 10

42 U.S.C. § 1862s-5(d)(1) ................................................................... 50

42 U.S.C. § 1862s(b) ........................................................................... 10

42 U.S.C. § 1885a ................................................................................ 50

42 U.S.C. § 1885b ................................................................................ 50

National Science Foundation Act of 1950, 64 Stat. 149 (1950):

  Pub. L. 81-507 § 1 ............................................................................. 8

vi

# TABLE OF AUTHORITIES
## (continued)

**Page**

Pub. L. 81-507 § (a)(2)-(4) .................................................................9

**Court Rules**

Fed. R. Civ. P. 23(b)(2)...............................................................33, 34, 51

**Treatises**

2 Newberg & Rubenstein on Class Actions
§§ 4.26, 4.28 (6th ed. 2025 update) ...................................................34

Shaffer & D. Ramish, Federal Grant Practice
§ 36:29 (2024 ed.) .......................................................................55

**Executive Orders**

Executive Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025)............................12

Executive Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025)............................13

Executive Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)............................13

Executive Order No. 14173, 90 Fed. Reg. 8633, 8633-34 (Jan. 21, 2025) ................................................................................12

Executive Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025).............17, 18, 46

Executive Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025)..........................14

**Federal Rules and Regulations**

2 C.F.R. § 200.340(a)..................................................................52

2 C.F.R. § 200.340(a)(4) .........................................................46, 51, 52

2 C.F.R. § 200.346 .......................................................................55

2 C.F.R. § 200.340 ......................................................................17

vii

## INTRODUCTION

This case poses a question of profound importance: May the President of the United States, and agencies under his direction, cut off hundreds of millions of dollars of grants to researchers in an arbitrary manner, with no semblance of due process, without following the procedures required by law, and often on the basis of the perceived viewpoint of the research?

The stakes for the researchers, for society, and for the world could not be higher. Once funds are cut off, research must stop. Laboratories must close. Staff must be laid off; post-doctorate researchers and graduate students must leave. Papers are not published. Research, including for scientific and medical advances, ceases. Even if later, somehow, the research resumes, it is permanently and irreparably set back.

The Plaintiffs in this case are researchers at the University of California, the world's leading public research institution. Its ten campuses, three affiliate national laboratories, and dozens of institutes, centers, and facilities produce research that has changed the world, increased human knowledge, and contributed to the prominence and security of the United States and the health and welfare of all Americans.

Beginning January 20, 2025, President Trump issued Executive Orders directing agencies to terminate grants, including those related to disfavored topics,

1

such as diversity, equity, and inclusion ("DEI"). The Environmental Protection

Agency ("EPA"), National Science Foundation ("NSF"), and National Endowment

for the Humanities ("NEH") (collectively, "Agency Defendants") implemented the

President's orders by abruptly and unlawfully terminating grants *en masse*. They

selected grants for termination using keyword searches for what they deemed

forbidden terms and concepts and terminated them via form letters without any

reasoned explanation. Grants with no apparent connection to DEI concepts were

also terminated via form letter without any reasoned explanation.

The terminations dealt a devastating blow to leading researchers at the

University of California, who relied on such federal grants. ER-6-7. From January

20 to early June 2025, the federal government had terminated at least $324 million

in grants to the University of California system. ER-193 at ¶ 112; *see also* ER-20.

This is a significant underestimate: it is limited to grants listed on the Department

of Government Efficiency website (which was incomplete), and does not include

instances where University of California researchers received sub-grants that were

terminated.

Subsequent to the filing of the Complaint – and in violation of the

preliminary injunction in this case – the Trump administration on August 1, 2025,

cut off $584 million in funding to University of California, Los Angeles researchers via form letters.[1]

On June 4, 2025, Plaintiffs, who are University of California researchers with terminated federal grants, filed their Class Action Complaint for Declaratory and Injunctive Relief. ER-166-272. A day later, Plaintiffs filed their Motion for Temporary Restraining Order (ER-286), which the District Court later converted to a Motion for Preliminary Injunction, and a Motion for Class Certification (ER-288).

The District Court granted Plaintiffs' Motion for Preliminary Injunction, finding that Plaintiffs were likely to succeed on their Administrative Procedure Act ("APA") and First Amendment claims and that "the balance of equities and the public interest strongly favor the entry of a preliminary injunction."[2] ER-7-8; ER-52-53; *see also* ER-3-5, *Thakur v. Trump*, Case No. 25-cv-04737, 2025 WL 1734471 (N.D. Cal. June 23, 2025). The District Court certified two classes and ordered injunctive relief. ER-3-5.

---

[1] *See* Alan Blinder and Michael Bender, *Trump Wants U.C.L.A. to Pay $1 Billion to Restore Its Research Funding*, N. Y. Times (August 9, 2025) https://www.nytimes.com/2025/08/08/us/trump-ucla-research-funding-deal.html.

[2] The District Court did not reach the other claims in Plaintiffs' Complaint, including that the grant terminations violated separation of powers, the Impoundment Control Act, and due process of law. ER-40. These issues were briefed in the District Court and remain a basis for injunctive relief.

46686\20565055.8

Pursuant to the Order, Agency Defendants began reinstating grants, allowing Plaintiffs to access research funds and resume research. ER-295-96. Then, after waiting weeks, NEH and EPA filed a motion to partially stay the preliminary injunction; the NSF did not join this motion. ER-273-75; Dkt. No. 7.

On August 21, 2025, this Court denied Defendants' motion for a stay of the injunction. *Thakur v. Trump*, No. 25-4249, 2025 WL 2414835 (9th Cir. Aug. 21, 2025) (hereafter cited as "*Thakur*").

Defendants' appeal of the preliminary injunction offers no new facts and simply rehashes arguments that failed below and that this Court expressly rejected. Thus, to a very large extent, the issues presented in Defendants' appeal and in this brief were resolved in this Court's decision denying Defendants' request for a stay of the District Court's preliminary injunction. The only new development – obviously not raised in Defendants' brief – is the Supreme Court's ruling in *National Institutes of Health v. American Public Health Association*, No. 25A103, 2025 WL 2415669 (August 21, 2025). Plaintiffs address this development in their discussion of jurisdiction below and explain why this case is clearly distinguishable from that ruling. But apart from the implications of the Supreme Court's decision on the District Court's jurisdiction over Administrative Procedure Act claims, every other issue in this appeal was decided and resolved by this Court

4

in favor of Plaintiffs in its ruling denying the motion to stay the preliminary injunction.

## STATEMENT OF THE ISSUES

1.    Do Plaintiffs have standing to challenge Defendants' grant termination actions as violating the APA and the First Amendment?

2.    Does the District Court have jurisdiction to decide Plaintiffs' claims that Defendants' grant termination actions violated the First Amendment and the APA?

3.    Did the termination of grants *en masse* via form letters, without individualized explanation or consideration of reliance interests, violate the APA?

4.    Did Defendants' termination of grants in accord with presidential Executive Orders, on the basis of the purported viewpoint of the research, violate the First Amendment?

5.    Does the balance of the equities support the District Court's preliminary injunction?

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the Addendum to this brief.

46686\20565055.8

## STATEMENT OF THE CASE

### I.    Factual Background

#### A.    Federal Agency Grantmaking

Article I of the Constitution grants Congress the power of the purse. *See U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346-47 (D.C. Cir. 2012) (the "power over the purse was one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'") (quoting The Federalist No. 51, at 320 (James Madison) (Clinton Rossiter ed. 1961)).

Pursuant to this bedrock principle, prior to Inauguration Day on January 20, 2025, federal agency grantmaking proceeded under the authority of Congress, which appropriated taxpayer funds for specific public purposes and objectives. Agencies carried out these statutory directives and observed due process in the making, renewing and termination of grants, adhering to the requirements of the APA.

Defendants in this case – including the EPA, NEH, and NSF – are examples of such federal agencies. Prior to Inauguration Day, Defendants awarded grants using money appropriated and allocated to them by Congress, to promote these agencies' missions in a manner compliant with statutory mandates, pursuant to regular administrative processes, on the basis of individualized review and

6

evaluation, and subject to termination only for reasons stated in applicable regulations.

**EPA.** Created in 1970, EPA was given a "broad mandate" to "develop competence in areas of environmental protection that have not previously been given enough attention." ER-196 ¶ 123. Numerous laws empower EPA to protect the environment and public health, including the Clean Air Act, Clean Water Act, Safe Drinking Water Act, and many more. ER-197 ¶ 127. When Congress passes new environmental laws, it tasks EPA with their implementation. *Id.* ¶ 127. These laws all direct EPA to carry out its core mission: "to protect[] human health and the environment." *Id.* ¶ 128. EPA also carries out its mission by awarding grants. *Id.* ¶ 131. EPA awards more than $4 billion in grants (called "assistance agreements") every year. *Id.* ¶ 131.

**NEH.** NEH is an independent federal agency established in 1965 to support the advancement of the humanities across the country. ER-217 ¶¶ 220-21. Congress created NEH, along with its sister agency, the National Endowment for the Arts, so Americans could understand "the diversity of excellence that comprises our cultural heritage." 20 U.S.C. § 951(9); ER-217-18 ¶ 225. Accordingly, Congress established NEH to provide funding for individuals involved in research, publication of scholarly works, and promotion of the humanities. *See* 20 U.S.C. § 956; ER-218 ¶ 226. Under NEH's enabling statute, the

7

Chair of NEH is "authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance" to effectuate these goals. *Id.*

Congress's directives for NEH specifically require it to support diverse and underrepresented viewpoints. ER-218 ¶ 227. For example, one statutory function of NEH is to authorize grants to "initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c)(4); ER-218 ¶ 228. Likewise, in selecting recipients of funding, the NEH Chair "shall give particular regard to scholars, and educational and cultural institutions, which have traditionally been underrepresented." 20 U.S.C. § 956(c); ER-218 ¶ 229. Each year, NEH typically makes about 900 grants, ranging from approximately $1,000 to $750,000. ER-221 ¶ 241. Across all grant programs, only about sixteen percent of applications receive funding. *Id.*

**NSF.** Congress established NSF in 1950 as an independent agency designed "[t]o promote the progress of science; to advance the national health, prosperity, and welfare; to secure the national defense; and for other purposes." Pub. L. 81-507 § 1 (1950) (National Science Foundation Act of 1950, 64 Stat. 149, codified at 42 U.S.C. § 1861 et seq.); ER-234 ¶ 303.

8

NSF is tasked by statute to "provide Federal support for basic scientific and engineering research, and to be a primary contributor to mathematics, science, and engineering education at academic institutions in the United States." 42 U.S.C. § 1862k(a)(6)(A); ER-234 ¶ 306. The Act authorizes and directs NSF to "initiate and support basic scientific research in the mathematical, physical, medical, biological, engineering, and other sciences," as well as "specific scientific research activities in connection with matters relating to the national defense." Pub. L. 81-507 § 3(a)(2)&(3); ER-234 ¶ 307.

The Act also directs NSF to provide "grants, loans, and other forms of assistance" to "support . . . scientific research" and award "scholarships and graduate fellowships in the mathematical, physical, medical, biological, engineering, and other sciences." Pub. L. 81-507 § 3(a)(2)&(4); ER-235 ¶ 308. The Act has been amended since 1950, including through the National Science Foundation Authorization Act of 1998 (the "1998 Amendment"). ER-235 ¶¶ 309-10. The 1998 Amendment reaffirmed NSF's statutory commitment to making the United States a leader in STEM fields, and sets forth several "core strategies" for achieving the above goals, including the following: "Develop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." 42 U.S.C. § 1862k(b)(1); ER-236 ¶ 312. Congress further mandated that the NSF

9

Director "shall . . . support programs designed to broaden participation of underrepresented populations in STEM fields," including specifically awarding "grants . . . to increase the participation of" minorities, women, and persons with disabilities. 42 U.S.C. § 1862s-5(c)&(d)(1); ER-235 ¶ 309.

NSF awards research grants through a merit review process that is regarded as the gold standard of scientific review. ER-234 ¶ 304. Expert panels of independent scientists, engineers, and educators, all vetted to avoid conflicts of interest, serve as reviewers of NSF grants, reviewing them for both "intellectual merit" and "broader [societal] impacts." 42 U.S.C. § 1862s(b); ER-236 ¶ 315.

## B. Federal Funds Awarded to the UC System

The University of California (the "UC System") is the world's leading public research institution. ER-184 ¶ 76. Comprising ten campuses, three affiliate national laboratories, and dozens of institutes, centers, and research laboratories across California, the UC System has made – and continues to make – outstanding contributions to research that have changed the world and enhanced human knowledge, while contributing to the national security and global prominence of the United States, and the health and welfare of all Americans. *Id.*

Without the UC System's research, the world would not have the internet, MRI machines, plug-in hybrid cars, cochlear implants, the world's largest 3-D map of the universe, a universal viral vaccine, a brain implant that prevents Parkinson's

symptoms, or the use of CRISPR gene-editing to cure sickle cell disease and treat other medical conditions. ER-185 ¶¶ 77-78. Decades of UC cancer research have saved nearly four million lives in the past thirty years. ER-185 ¶ 78. Entire industries have grown out of UC research, including biotechnology, computing, semiconductors, telecommunications, and agriculture. ER-186 ¶ 80. UC research prowess has continued at breakneck speed. ER-186 ¶ 81. The UC System averages four new inventions *per day*. *Id.* In 2023, seventy-eight startups were launched using UC intellectual property or technology. *Id.* UC research quite literally shapes the future - 8.2% of all U.S. academic research is conducted by UC researchers. *Id.*

Such achievements would not be possible without federal funding. ER-186 ¶ 82. For years, the UC system has partnered with the federal government to deliver groundbreaking innovations that have made the American public healthier, safer, smarter, and better able to compete in a global market. *Id.*

Federal funding is the single most important source of UC research funding, historically accounting for more than half of the UC system's total research awards. ER-186 ¶ 83. In fiscal year 2024, the UC system received $4.069 *billion* in federal research awards, covering 10,256 distinct awards. *Id.* These stable federal funding sources, and the research talent they attract and empower, have enabled the UC system to make its outsized contributions to human progress for decades. ER-187 ¶ 86.

11

### C. The Trump Administration Directed Federal Agencies to Terminate Research Grants.

Beginning on January 20, 2025, the Trump Administration directed federal agencies to "terminate" previously awarded grant funds through a series of Executive Orders ("EOs") to that effect. ER-191 ¶ 104.

For example, Executive Order No. 14151, titled "*Ending Radical and Wasteful Government DEI Programs and Preferencing*" (the "DEI Order"), instructed the Attorney General and others to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025); ER-190 ¶ 101. Additionally, the DEI Order directs each federal agency head to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts" within sixty days. *Id.*

Executive Order No. 14173, titled "*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*" (the "Discrimination Order"), addresses purported "immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA]." 90 Fed. Reg. 8633, 8634 (Jan. 21, 2025); ER-190-91 ¶ 102. The Discrimination Order requires the Director of OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to

12

"[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." 90 Fed. Reg. 8633, 8633-34 (Jan. 21, 2025); ER-191 ¶ 102.

Executive Order No. 14168, titled "*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*" (the "Gender Order"), directed that "[f]ederal funds shall not be used to promote gender ideology," instructing federal agencies to revise grant conditions accordingly, and defining "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." 90 Fed. Reg. 8615, 8615-16 (Jan. 20, 2025); ER-191 ¶ 103.

Executive Order No. 14158, titled "*Establishing and Implementing the President's 'Department of Governmental Efficiency'*" ("First DOGE Order"), required the head of each federal agency to establish a team of at least four Department of Government Efficiency ("DOGE") employees within their agency. ER-192 ¶ 107. Per the First DOGE Order, DOGE would be "dedicated to advancing the President's 18-month DOGE agenda." 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025); ER-192 ¶ 108.

13

Executive Order No. 14222, titled "*Implementing the President's 'Department of Governmental Efficiency' Cost Efficiency Initiative*" ("Second DOGE Order"), purports to begin the Executive's "transformation in Federal spending on contracts, grants, and loans." 90 Fed. Reg. 11095, 11095 (Feb. 26, 2025); ER-192 ¶ 109. This Second DOGE Order required federal agencies to review all existing grants with an eye toward termination. *Id*. According to DOGE's self-described "Wall of Receipts," as of May 31, 2025, federal agencies had terminated over 15,000 grants, totaling roughly $44 billion in "savings." ER-193 ¶ 110.

**D.     Defendants' Grant Terminations**

**1.     Environmental Protection Agency**

Shortly after President Trump took office, EPA began working closely with DOGE. ER-200 ¶ 142. By March 7, the Democratic Staff of the Senate Committee on Environment and Public Works reported that EPA had issued guidance to senior staff indicating that "all [funding] actions greater than $50,000 now require approval from an EPA DOGE Team member." ER-200 ¶ 143. A huge part of this DOGE-EPA collaboration included mass-canceling grants. ER-200 ¶ 144.

EPA touted its relationship with DOGE in several press releases. *Id.* For example, on February 25, 2025, an EPA press release issued a "second round of EPA-DOGE partnered cancellations." ER-201 ¶ 145. EPA stated that these

14

cancellations "represent more than $60 million saved as the EPA puts a stop to wasteful DEI and environmental justice programs." *Id.* In a March 10, 2025 press release, EPA announced a fourth round of EPA-DOGE terminations, this time stating it was cancelling more than 400 grants "across nine unnecessary programs." ER-201 ¶ 146. The press release concluded, as do the others, by stating: "EPA continues to work diligently to implement President Trump's executive orders." *Id.*

In a court filing on April 23, 2025, EPA administrator Dan Coogan revealed that EPA leadership conducted a review of grants to determine "which should be terminated based on alignment with Administration priorities." ER-202-03 ¶ 154. Although the EPA claimed this was an "individualized, grant-by-grant review," no details were provided. ER-203 ¶ 155. Instead, Mr. Coogan revealed that entire grant programs created by Congress under the Inflation Reduction Act were slated to be terminated. *Id.*

EPA turned its attention to universities and research grants on or around April 15, 2025, when Mr. Coogan sent an email directing staff to cancel existing grants. ER-203 ¶ 156. Instead of providing researchers with reasoned explanations of termination decisions, EPA sent form termination letters. ER-203 ¶ 159. One such letter, received by Plaintiff Thakur on April 28, 2025, reads as follows:

> **Subject:** Termination of EPA Assistance Agreement [Grant No.] under 2 CFR 200.340
>
> **From:** EPA Award Official

15

**To:** [Grant Recipient]

. . . . . This EPA Assistance Agreement is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities. The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities.

ER-97-98 at ¶¶ 20-24.

This letter does not explain why the grant would contradict agency priorities. ER-203 ¶ 161. Nor did the form letters terminating the grants indicate or explain that there was any consideration of the reliance interests on the federal funds. ER-268 ¶ 463.

## 2. National Endowment for the Humanities

On March 13, 2025, NEH Chair Shelly Low was directed by the White House to resign. ER-222 ¶ 246. DOGE actors recommended dramatically cutting NEH staff and cancelling grants made under the Biden administration that had not

16

been fully paid out. *Id.* On March 20, 2025, NEH posted a webpage titled "*NEH Implementation of Recent Executive Orders*." ER-222 ¶ 247. The page stated NEH was updating the Funding Restrictions section of its Notices of Funding Opportunities ("NOFOs") "to comply with several recent Executive Orders, including 'Ending Radical and Wasteful Government DEI Programs and Preferencing,' 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government,' and 'Ending Radical Indoctrination in K-12 Schooling.'" ER-223 ¶ 247.

On or around April 2, 2025, recipients of NEH grant funding began receiving emails that included form termination letters containing the following explanation for the terminations:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in 2 CFR § 200.340. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 1, 2025.

ER-153-54 at ¶¶ 33-38; ER-76 at ¶¶ 26-28.

17

Although the termination letter to NEH grantees states that EO 14217 "mandates that the NEH eliminate all non-statutorily required activities and functions," that Order makes no mention of NEH (despite mentioning other agencies). 90 Fed. Reg. 10577 (Feb. 19, 2025); ER-224 ¶ 253. The termination letters make no effort to explain how or why the relevant grant fails to "effectuate[] the agency's needs and priorities" or otherwise warrant termination. ER-224 ¶ 254. Nor did they address NEH's prior assessment – through its comprehensive panel and Council review process – that these projects *do* effectuate agency priorities and are aligned with the statutory mandate and goals of NEH. *Id.*

On April 24, 2025 – three weeks after NEH began terminating existing grants – the agency issued a press release titled "*An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders.*" ER-225 ¶ 257. The press release stated NEH had taken steps to "ensure that all future awards will, among other things, be merit-based, awarded to projects that do not promote extreme ideologies based upon race or gender, and that help to instill an understanding of the founding principles and ideals that make American an exceptional country." ER-225 ¶ 258.

As part of the press release, NEH issued a new "Statement on NEH Priorities" and "Frequently Asked Questions." ER-225 ¶ 259. Two of the posted "Frequently Asked Questions" addressed the terminated grants:

18

Q:    Why is NEH cancelling awards?

A:    All federal grantmaking agencies, including NEH, must ensure that taxpayer dollars are spent effectively and are consistent with each agency's mission. . . .

Q:    What types of awards are being cancelled?

A:    In collaboration with the Administration, NEH has cancelled awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion (or DEI) and environmental justice, as well as awards that may not inspire public confidence in the use of taxpayer funds.

ER-226 ¶ 261.

NEH's new "priorities" directly contradict its statutory mandate to make grants that "reflect the diversity and richness of our American cultural heritage" and "give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." 20 U.S.C. § 956(c); ER-226 ¶ 263.

### 3.    National Science Foundation

Since the Trump Administration took office in January 2025, NSF terminated more than $1 billion in scientific grants, previously approved and awarded through the merit review process, which NSF was legally obligated to provide. ER-238 ¶ 323. The grant terminations generally were not preceded by warnings and came as a shock to the researchers whose livelihoods and life's work depended on them. *Id*. The grant terminations were typically conveyed in short, standardized missives containing the following boilerplate statements:

- "[T]he agency has determined that termination of certain awards

19

is necessary because they are not in alignment with current NSF
priorities."

- "NSF is issuing this termination to protect the interests of the
government pursuant to NSF Grant General Conditions (GC-1)
term and condition entitled 'Termination and Enforcement,' on the
basis that they [sic] no longer effectuate the program goals or
agency priorities."

ER-130-31 at ¶¶ 53-57; ER-239 ¶ 324. These form terminations end by stating:

"This is the final agency decision and not subject to appeal." ER-131; ER-239

¶ 324.

In an apparent attempt to justify the terminations, NSF published a

"Statement of NSF Priorities" on April 18, 2025, explaining that "[r]esearch

projects with more narrow impact limited to subgroups of people based on

protected class or characteristics do not effectuate NSF priorities." ER-239 ¶ 325.

NSF also issued an accompanying set of FAQ's, which indicated that awards not

aligned with NSF priorities include, but are "not limited to those on diversity,

equity, and inclusion (DEI), environmental justice, and

misinformation/disinformation." ER-239 ¶ 326.

A review of the terminated awards suggests that many were flagged for

termination because of disfavored words in the project titles, *e.g*., "Effects of Leaf

Diversity on Aquatic Insect Colonizer Diversity" (2230887); "Revealing the Vast

Diversity Within the Legume-Rhizobia Mutualism" (2345627); "The Evolution of

Evolvability in Microbial Populations" (1914916); and "Ecological Turnover at the

20

Dawn of the Great Ordovician Biodiversification Event - Quantifying the Cambro-Ordovician Transition Through the Lens of Exceptional Preservation" (2047192). *See* https://grant-watch.us/nsf-data.html.

### 4. Remaining Federal Agency Defendants

The remaining Federal Agency Defendants have terminated grants in similar, categorical, and lockstep fashion, despite facing limitations and restrictions on agency action, similar to those faced by EPA, NEH, and NSF, their respective enabling acts, and governing regulations.[3] ER-248 ¶ 357.

## II. Procedural Background

On June 4, 2025, Plaintiffs filed their Class Action Complaint for Declaratory and Injunctive Relief. ER-166-272. A day later, Plaintiffs filed their Motion for Temporary Restraining Order, which the District Court later converted to a Motion for Preliminary Injunction and a Motion for Class Certification. ER-286. The District Court granted limited, expedited discovery and heard the motions on an emergency basis. ER-289-90.

---

[3] Plaintiffs' Complaint focused on many federal agencies, but the District Court's preliminary injunction applies to three agencies: EPA, NEH, and NSF. The District Court focused the injunctions on these agencies because the named Plaintiffs in the Complaint had received grants from these three agencies. Plaintiffs are seeking to amend their Complaint to include plaintiffs receiving grants from Department of Defense, Department of Transportation, and National Institutes of Health. Plaintiffs' motion for leave to amend their Complaint is pending in the District Court.

Discovery taken in advance of the hearing on the Motion for Preliminary Injunction revealed that, since January 20, 2025, Defendants adopted a series of policies blacklisting categories of research and terminating thousands of previously awarded grants, including Plaintiffs', because they relate to now-prohibited research topics. ER-6. Defendants undertook this grant purge in accordance with "administration priorities" and for the express purpose of implementing President Trump's various Executive Orders, which directed the agencies to terminate funding for projects related to disfavored topics. ER-15. In doing so, Defendants acted at the direction of DOGE. ER-11.

Defendants' discovery responses further established that the agencies identified grants for termination through keyword and similar search processes, rather than through reasoned evaluation. ER-6; ER-16; ER-26. Grants were also selected for mass termination through spreadsheets, which categorized all open grants as consistent or inconsistent with administration (not agency) priorities. ER 15; ER-26. Some grants were identified for termination by DOGE staffers. ER-60

Once Defendants identified the grants for termination, notice was given through thousands of boilerplate termination letters. ER-6-7. None of the termination letters produced during discovery included an individualized discussion of the relevant project. *Id.* None indicated that the agencies took the reliance interests of the grant recipients into account. ER-20. The produced

documents also showed that agencies acted with haste, and their opaque process was error prone. ER-33-34. Defendants' production did not reveal what reasoning or criteria were used to identify grants for termination, including how or why any specific grant was deemed to relate to a blacklisted topic. *Id.*

On this record, the District Court granted Plaintiffs' Motion for Preliminary Injunction, finding that Plaintiffs were likely to succeed on their APA and First Amendment claims and that "the balance of equities and the public interest strongly favor the entry of a preliminary injunction." ER-7-8; ER-52-53. The District Court also certified two classes: (a) those whose grants were terminated by the Agency Defendants because the research ostensibly touched on blacklisted DEI topics (the "Equity Termination Class"), and (b) those whose grants were terminated by Agency Defendants via form letter without any grant-specific explanation (the "Form Termination Class"). ER-3-5.

The District Court denied Defendants' request for a stay pending appeal. ER-66-67. After waiting weeks, Defendants filed a notice of appeal and a motion to stay the preliminary injunction. ER-273-74; Dkt. No 7. Defendants' Motion sought a stay only as to two of the three Agency Defendants: EPA and NEH. Dkt. No. 7.[4]

---

[4] Defendants have filed a 28(j) letter asking that National Science Foundation be added to the appeal seeking a stay of the preliminary injunction. As requested by the Court, Plaintiffs will file a response to this letter.

23

On July 31, this Court held oral arguments on the stay request. On August 21, the Court issued its order denying a stay. *Thakur*, 2025 WL 2414835.

## SUMMARY OF THE ARGUMENT

The issues presented on this appeal of the preliminary injunction have almost entirely been decided by this Court in its *Thakur* order denying a stay of the preliminary injunction, which addresses the three matters presented on this appeal: (1) Did the District Court have jurisdiction? (2) Are Plaintiffs likely to succeed on the merits? (3) Did the District Court correctly balance the equities in issuing the preliminary injunction?

(1) There are two jurisdictional issues. First, do the Plaintiffs have standing? The District Court and this Court held that Plaintiffs have standing because they are injured by the violation of their First Amendment rights and by the termination of grants that will end their research. These harms are directly caused by the termination of grants and obviously would not have occurred without Defendants' actions. And, as has been shown by Defendants' compliance with the preliminary injunction, the grants are restored to Plaintiffs when the government is ordered to do so.

Second, the Tucker Act does not preclude district court jurisdiction in this case. In *Department of Education v. California*, 145 S.Ct. 966 (2025), and *National Institutes of Health v. American Public Health Association*, 2025 WL

24

2415669 (Aug. 21, 2025), the Supreme Court issued stays of district court orders that had granted preliminary injunctions against the termination of grants as violating the APA. The Supreme Court, in both rulings, found that the Court of Federal Claims had jurisdiction and that therefore the federal district courts were divested of jurisdiction.

Although this case, too, is about federal government agencies terminating grants, it is significantly different from the cases that were before the Supreme Court. The District Court here found that Defendants violated the First Amendment. There was no finding of a constitutional violation in either *Department of Education* or *National Institutes of Health*. This Court has expressly held that the Tucker Act does not bar jurisdiction over such constitutional claims. *United Aeronautical Corp. v. U. S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023). At the oral argument in this Court on July 31, 2025, the attorney for the United States conceded that the government's jurisdictional argument applied only to the claims under the APA, not to the First Amendment claims, and not to the Equity Termination Class.

As for the Form Termination Class, the Court of Federal Claims would have no jurisdiction to hear Plaintiffs' suit, because they are not parties to the agreements with the United States government. The law is clear that only parties to the contract with the United States may bring a claim for breach of contract in the

25

Court of Federal Claims. *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed.Cir. 1998). In fact, in *Community Legal Services in East Palo Alto v. United States Department of Health and Human Services*, 137 F.4th 932, 939 (9th Cir. 2025), this Court explained that "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." (quoting *Tootle v. Sec'y of Navy*, 446 F. 3d 167, 177 (D. C. Cir. 2006)). This Court thus held that the district court has jurisdiction where a matter could not be filed in the Court of Federal Claims, as is the case here. That makes this case easily distinguishable from *Department of Education* and *National Institutes of Health.*

(2) The District Court correctly found that Plaintiffs are substantially likely to prevail on the merits on both their First Amendment claim and their claim that Defendants violated the APA by acting in a manner that was arbitrary, capricious, and an abuse of discretion.

The Supreme Court has long held that the First Amendment prohibits the government from discriminating on the basis of viewpoint. As Justice Kennedy explained, "it is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring). In fact, the cases relied on by Defendants in their brief also stress that the government cannot punish speech based on the viewpoint

26

expressed. In *National Endowment of the Arts v. Finley*, 524 U.S. 569, 587 (1998) (citation modified), the Court explained that the government cannot "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" or "aim at the suppression of dangerous ideas" in the provision of subsidies. The Court emphasized that there is a First Amendment violation when the government uses its power to "drive certain ideas or viewpoints from the marketplace." *Id.*

Both the District Court and this Court found that is exactly what the Defendants did in terminating grants. As this Court stated: "Here, the record at this stage shows that the agencies selected grants for termination based on viewpoint." *Thakur*, 2025 WL 2414835, at *7.

Every case cited by Defendants involves *Congress* making a choice of what programs to create and fund. Not a single case cited by Defendants involves the President and federal agencies terminating grants based on their perceived viewpoint. There is no authority for Defendants' claim of unlimited presidential power to engage in viewpoint discrimination in terminating grants in violation of the First Amendment.

As for the APA, the District Court found that *en masse* termination of grants by form letter – without consideration of individual circumstances, including reliance interests, and without individualized explanation – was arbitrary,

capricious, and an abuse of discretion. The Supreme Court has explained that "agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Environmental Protection Agency,* 603 U.S. 279, 292 (2024). Defendants' actions terminating grants were neither reasonable nor reasonably explained, and often based on keyword searches. As this Court explained:

> On this limited record, we agree with the district court that the recipients of the form letter and the public were left to guess at the reasons for these terminations. The government conceded at oral argument that there is no record evidence that either agency considered the researchers' reliance interests. Nor is there evidence that the agencies considered the hundreds of millions of dollars taxpayers have invested in the grant projects that would be lost if the grants are terminated.

*Thakur*, 2025 WL 2414835, at *5.

(3) The District Court concluded that the balance of equities justified the injunction. This Court agreed. *Id.* at *7-8. The termination of grants causes great, irreparable harm to Plaintiffs. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The termination of grants, as the District Court found, means that research will stop, labs will close, staff will leave, and papers will not be published. This is truly irreparable injury: providing relief at the end of the litigation will be too late for these researchers and their research. Even if the

research is someday resumed, the discoveries will be delayed, as will be all that would follow from them.

By contrast, the government suffers little injury from the preliminary injunction. Funds are spent as Congress intended. If the funds are wrongly restored, Defendants have not shown that the money could not be recouped. *Thakur,* 2025 WL 2414835, at *5 n.8. There are mechanisms in the law to do that. *Dep't of Educ.*, 145 S.Ct. at 974 (Jackson, J., dissenting). Moreover, there is no harm to the government in stopping an illegal or unconstitutional government action. Defendants claim that the government is harmed because the preliminary injunction will interfere with the Executive Branch's chosen policy. But as this Court noted, this "argument rests on the assumption that the government's conduct is lawful . . . and the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Thakur,* 2025 WL 2414835, at *8 (citation modified).

Never before in American history has a President directed federal agencies to terminate billions of dollars of federal grants based on the viewpoint of the research and via form letters. No constitutional or statutory provision bestows such power on the President or federal agencies. The District Court's preliminary injunction should be affirmed.

## STANDARD OF REVIEW

This Court's "review of a grant of a preliminary injunction is 'limited and deferential.'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,* 98 F.4th 1180, 1188 (9th Cir. 2024) (citation omitted). This Court has explained: "We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion. Abuse-of-discretion review is highly deferential to the district court." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1141 (9th Cir. 2018) (citations omitted).

"Appellate review of a decision to grant . . . a preliminary injunction is restricted to determining whether the district court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact." *Nat'l Wildlife Fed'n v. Burlington N. R.R. Inc.*, 23 F.3d 1508, 1510 (9th Cir. 1994). "Mere disagreement with the district court's conclusions is not sufficient reason for us to reverse the district court's decision regarding a preliminary injunction." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005) .

## ARGUMENT

I.    **The District Court Has Jurisdiction.**

   A.    **Plaintiffs Have Standing.**

Defendants repeat the arguments with regard to standing that they advanced in their motion for a stay of the preliminary injunction and that this Court rejected.

30

As the District Court noted, "Article III requires a plaintiff to answer a basic question: 'What's it to you?'" ER-46 (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024)). In other words, plaintiffs "must have a 'personal stake' in the dispute," so that plaintiffs "do not sue the wrong parties and courts do not issue advisory opinions." ER-46; ER-52 (quoting *All. For Hippocratic Med.*, 602 U.S. at 379 and *Diamond Alternative Energy, LLC v. EPA*, 145 S.Ct. 2121, 2133 (2025). Here, as the District Court observed, "[i]t is hard to imagine who could have a more personal stake in this case than the researchers whose research was allegedly defunded as either dangerous or insufficiently important." ER-52.

The three elements of standing are injury in fact, causation, and redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs easily establish all three. As to injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (citation omitted). The District Court found that "Plaintiffs are asserting invasions of traditionally cognizable interests," including harms to Plaintiffs' careers, reputations, and constitutionally protected speech. ER-47. As to causation, "Agency Defendants' actions here are likely to cause a predictable disruption to Plaintiffs' research," which is "sufficient for causation." ER-51. As to

31

redressability, "the harm to Plaintiffs can be redressed by a reversal of the allegedly illegal grant terminations." ER-47.

Defendants contend that Plaintiffs lack standing because they (1) "are not themselves the grant recipients" and (2) "have not made the necessary showing" that their institutions will be unable to provide alternate funds. Brief for Appellants ("Br.App.") at 38-39. They say these failures mean that Plaintiffs lack standing and also render class-wide relief inappropriate. But the first argument is a red herring, and the second is false.

First, as the District Court noted, "Article III standing rules do not change simply because the alleged harm occurred through the termination of a contract with a third party." ER-48. Although Defendants suggest that "plaintiffs' injuries from the grant terminations are too attenuated" to confer standing, the District Court rejected that argument, applying the two-pronged analysis from the Supreme Court's recent *Diamond Alternative Energy* decision. "Plaintiffs' research is the 'object'" of the challenged government action," and even if it were not, "the grant terminations will 'likely' have a 'predictable effect' on the continued funding" of Plaintiffs' projects. ER-50-51.

Second, Defendants argue that some Plaintiffs and class members lack standing because they may have found replacement funding, rendering class-wide relief improper. Br.App. at 40. To make this point, Defendants focus on Plaintiff

46686\20565055.8

Thakur's and Plaintiff Foreman's efforts to obtain replacement funding, cherry-picking instances where they have found alternative sources. But Defendants have not shown that those Plaintiffs (or any others) replaced 100% of the terminated funds (they did not), and Defendants wholly ignore the significant opportunity cost of seeking alternative funding and the reputational harm of the terminations. ER-52-53 (discussing irreparable harm); *e.g.*, ER-98 at ¶ 25(a) ("Instead [of completing health analyses], I have had to spend significant time seeking alternate funding sources.") The fact that some Plaintiffs and class members may have found some limited alternative funding does not erase the opportunity costs and other injuries from termination.

This Court, in denying the Defendants' motion for a stay of the preliminary injunction, made exactly this point:

> As an initial matter, because standing in a Rule 23(b)(2) class is assessed at the time the complaint was filed, any future mitigation of Plaintiffs' injuries is immaterial to the standing analysis. Moreover, the government focuses solely on the prospect of some class members obtaining some replacement funding, and overlooks that the class representatives—*e.g.*, Dr. Christine Philliou, Dr. Neeta Thakur, and Dr. Nell Green Nylen—also allege injury in the form of opportunity costs associated with seeking alternative funding, disruptions to projects, and reputational harms associated with grant terminations.

*Thakur*, 2025 WL 2414835, at *4 (citations omitted).

Finally, that class members may have experienced different levels of harm is of no moment: The point of a Rule 23(b)(2) class is its focus on *defendants'*

33

conduct, not whether all class members were injured in the same way. *See* Fed. R. Civ. P. 23(b)(2); 2 Newberg & Rubenstein on Class Actions § 4.26; 4:28 (6th ed. 2025 update) ("many (b)(2) class actions challenge government actions on constitutional grounds…" (collecting cases)); *Parsons v. Ryan*, 754 F.3d 657, 676-78 (9th Cir. 2014); see *also Prantil v. Arkema France S.A.*, No. 4:17-cv-02960, 2022 WL 1570022, at *41 (S.D. Tex. May 18, 2022) ("The critical predicate of an injunctive class is common behavior by the defendant toward the class, not common effect on the class."). Rule 23(b)(2) was expressly designed to afford and enforce injunctive relief in constitutional cases such as this. 2 Newberg & Rubenstein on Class Actions § 4.26 (6th ed. 2025 update). All Plaintiffs have standing, and class-wide resolution is appropriate.

## B. The Tucker Act Does Not Preclude Review.

Defendants argue, as they did in their motion for a stay of the preliminary injunction, that the Court of Federal Claims has jurisdiction over Plaintiffs' claims and therefore, under the Tucker Act, the District Court did not have jurisdiction to issue a preliminary injunction. Br.App. at 25-32. This Court, in denying the motion for a stay of the preliminary injunction, expressly rejected this argument. *Thakur*, 2025 WL 2414835, at *6-7.

After this Court issued its decision denying the motion for a stay, the Supreme Court ruled in *National Institutes of Health v. American Public Health*

34

*Association*, No. 25A103, 2025 WL 2415669 (Aug. 21, 2025). The Supreme Court stayed a federal district court's preliminary injunction against the National Institutes of Health terminating grants as violating the APA. As Justice Barrett explained in a concurring opinion: "As today's order states, the District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims." *Id.* at *2. But on close examination, although there are similarities between this case and *National Institutes of Health* — both are challenges to arbitrary grant terminations — there are crucial differences.

> **1.      The District Court Has Jurisdiction Over the First Amendment and Other Constitutional and Statutory Claims.**

In *National Institutes of Health*, and its predecessor ruling *Department of Education*, the Supreme Court focused only on whether the federal district courts had jurisdiction to hear claims under the APA challenging grant terminations. The Court began its opinion in *National Institutes of Health* by stating: "The Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction." *Id* at *1 (citation omitted). Nothing in the Supreme Court's ruling even implies that the District Court lacks jurisdiction over claims under the Constitution or other federal statutes.

This Court has expressly held that the Tucker Act does not bar jurisdiction over such claims: "If rights and remedies are *statutorily* or *constitutionally* based,

then districts courts have jurisdiction." *United Aeronautical Corp.*, 80 F.4th at 1026 (emphasis in original).

In fact, at oral argument in this Court on July 31, 2025, the attorney for the United States explicitly said that the government's Tucker Act jurisdictional argument applied only to the APA claims, not to the First Amendment claims and to the Equity Termination Class. Nothing in *National Institutes of Health* changes that.

> **2.    Because the Court of Federal Claims Does Not Have Jurisdiction to Hear Plaintiffs' APA Claims, the Tucker Act Does Not Apply, and the District Court Has Jurisdiction.**

The premise of the government's argument – and the Supreme Court's rulings in *Department of Education* and *National Institutes of Health* – is that the federal district court lacked jurisdiction to hear the APA claims because there was jurisdiction in the Court of Federal Claims. But unlike *Department of Education* and *National Institutes of Health*, the Court of Federal Claims lacks jurisdiction to hear Plaintiffs' claims in this case.

As Defendants' stress in their brief, Plaintiffs are not parties to contracts with the United States. Br.App. at 38. The law is clear that only parties to contracts with the United States may bring a claim for breach of contract in the Court of Federal Claims. As the United States Court of Appeals for the Federal Circuit stated: "To maintain a cause of action pursuant to the Tucker Act that is based on a

contract, the contract must be between the plaintiff and the government." *Cienega Gardens*, 194 F.3d at 1239 (quoting *Ransom v. United States,* 900 F.2d 242, 244 (Fed. Cir. 1990)).

The law in this Circuit is clear that the Tucker Act does not apply in situations where the Court of Federal Claims would not have jurisdiction. In *Community Legal Services in East Palo Alto*, this Court declared: "But [t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act. For this reason, the D.C. Circuit has categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." 137 F.4th at 939 (citation modified). The Court explained: "The result requested by the Government would mean that no court has jurisdiction to hear plaintiffs' claims. Not only is this result contrary to common sense, but it also conflicts with the 'strong presumption favoring judicial review of administrative action' that is embodied in the APA." *Id.*

Indeed, that is exactly what the District Court held in denying Defendants' motion to stay the preliminary injunction:

> Plaintiffs do not have the right to sue under the Tucker Act because they are not parties to a government contract. If Plaintiffs' claims were sent to the Court of Federal Claims, binding precedent in that jurisdiction would require the suit to be dismissed for lack of jurisdiction and sent back to the district court. To "maintain a cause of action pursuant to the Tucker Act [in the Court of Federal Claims] that

37

is based on a contract, the contract must be between the plaintiff and the government." It is nonsensical to send Plaintiffs on a pointless round trip to the Court of Federal Claims

ER-41-42 (citation omitted).[5]

The government's position would mean that Plaintiffs – though personally injured and having standing – would have no forum in which they could sue. This would raise serious due process issues and be inconsistent with the strong presumption in favor of judicial review of administrative action. For example, in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 496 (1991), the Supreme Court spoke of the "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action" and said that therefore "it is most unlikely that Congress intended to foreclose all forms of meaningful judicial review." *See also Bowen v. Mich. Acad. of Family Physicians,* 476 U.S. 667, 670

---

[5] Nor can Defendants now claim that Plaintiffs are third party beneficiaries who can sue in the Court of Federal Claims. That court has said that third party beneficiary status as a basis for suit is an "exceptional privilege that should not be granted liberally." *Constructora Guzman, S.A. v. United States*, 161 Fed. Cl. 686, 692 (2022) (citation modified). More importantly, Defendants have expressly taken the position that Plaintiffs are not third-party beneficiaries. The Defendants wrote in their Opposition to the Motion for a Preliminary Injunction, at 20-21 (citations omitted) (emphasis added): "Plaintiffs are not in privity with the government and lack rights under these contracts—*they are neither parties nor intended third-party beneficiaries.* . . . Plaintiffs do not argue that they are intended beneficiaries, nor could they. . . . None of that is sufficient to make Plaintiffs intended third-party beneficiaries. Indeed, the Ninth Circuit has emphasized time and again just how rare it is for a third party to be an intended beneficiary under a Government contract."

38

(1986) ("strong presumption that Congress intends judicial review of administrative action."); *Abbott Lab'ys v. Gardner,* 387 U.S. 136, 140–41 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) ("[T]he Administrative Procedure Act . . . embodies the basic presumption of judicial review. . . . [O]nly upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.") (citation modified).

In neither *Department of Education* nor *National Institutes of Health* did the Supreme Court consider a situation where plaintiffs could not sue in the Court of Federal Claims. Because the Court of Federal Claims would have no jurisdiction to hear Plaintiffs' claims, since they are not parties to the grants with the United States, the Tucker Act does not apply and the District Court had jurisdiction to issue the preliminary injunction.

## II.    Plaintiffs Are Likely to Succeed on The Merits.

### A.    Plaintiffs Are Likely to Succeed on Their First Amendment Claims.

Defendants repeat exactly the same arguments as to the First Amendment as in their motion for a stay of the preliminary injunction. This Court, in denying that motion, expressly rejected these arguments:

> Here, the record at this stage shows that the agencies selected grants for termination based on viewpoint. Indeed, the government does not meaningfully dispute that DEI, DEIA, and environmental justice are

39

viewpoints. The agencies, the termination letters, and the Executive
Orders do not define these terms, but dictionary definitions
demonstrate that DEI, DEIA, and environmental justice are not
merely neutral topics. Instead, the terms convey the viewpoint that the
exclusion of historically disadvantaged groups is undesirable.

We are bound by the bedrock principle that the government cannot
"leverage its power to award subsidies on the basis of subjective
criteria into a penalty on disfavored viewpoints" or "aim at the
suppression of dangerous ideas" in the provision of subsidies. The
government does not dispute that it terminated the subject grants
because they promoted DEI, DEIA, or environmental justice. We
therefore conclude that the government has failed to make a strong
showing that the district court abused its discretion when it concluded
that the DEI Termination Class was likely to succeed on the merits of
its First Amendment claim.

*Thakur,* 2025 WL 2414835, at *6-7.

This resolves the First Amendment issue presented on this appeal.

Defendants concede that they engaged in viewpoint discrimination by

selecting specific grants for termination based on their content. *See* Br.App. at 13

("The government is no less entitled to cease funding controversial DEI programs

that the government no longer believes are in the public interest."); *id.* 18-19

(arguing the government's ability to terminate grants based on viewpoint). They

argue they are entitled to do it — recasting their viewpoint-based terminations as a

simple spending and policy decision — under Supreme Court law. Defendants are

wrong.

Contrary to Defendants' framing, none of the cases they cite provide the

government unfettered discretion to slash spending based on viewpoint. *Regan*

40

(cited in Br.App. at 12) held that notwithstanding the "especially broad latitude" for creating tax classifications, Congress could not "discriminate invidiously in its subsidies in such a way as to 'aim[ ] at the suppression of dangerous ideas.'" *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 547-48 (1983) (citation omitted).

In *National Endowment for the Arts v. Finley*, the Court explained that if an agency "were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case." 524 U.S. at 587. The *Finley* Court stressed that the government was not wielding its purse to "penal[ize] disfavored viewpoints," "manipulat[ing]" the subsidies "to have a coercive effect," or cancelling those subsidies to "drive certain ideas or views from the marketplace." *Id.*

But that is precisely what Defendants did here. The District Court found, on an undisputed preliminary record, that Defendants "terminated pre-existing grants — *en masse* across the federal government for touching on prohibited topics," terminations "which occurred across different agencies" and "do not appear tied to any particular government program advancing a government message." ER-24. They did so in compliance with the President's executive orders, requiring agencies to terminate "to the maximum extent allowed by law" "*all* … 'equity-related' grants or contracts" for the purpose of "end[ing] today" "diversity, equity,

41

and inclusion" programs, which the Order described as "immoral" and "shameful," as well as requiring agencies to terminate "*all* 'diversity,' 'equity,'… and like … programs[] or activities[,]" in order to "combat" and "end" "diversity, equity and inclusion programs," which are described as "dangerous, demeaning, and immoral." DEI Order; Discrimination Order. Defendants did so based on keyword searches related to "diversity, equity, or inclusion," as confirmed by Defendants' own declarations submitted to the Court. ER-25-26.

Defendants claim "[t]he district court was [] manifestly mistaken to equate the government's refusal to subsidize speech with an effort to censor or to suppress speech," (Br.App. at 13) without explaining how the court was wrong to find that their actions were censorship and suppression rather than a refusal to subsidize. The Executive Orders directing the grant terminations did not speak to a purpose of ceasing subsidization of DEI; their explicit purpose was "combating" and "ending" DEI as a whole, because the government now finds it "dangerous, demeaning, and immoral." 90 Fed. Reg. at 8633. It is hard to imagine a clearer statement that the government is engaged in viewpoint discrimination.

Defendants concede that they are precluded from using regulatory power to drive viewpoints from the marketplace, and that regulation aiming at the suppression of dangerous ideas "is subject to the most stringent First Amendment scrutiny." Br.App. at 14. But that is exactly what the government did here.

46686\20565055.8

Every case Defendants cite involves Congress exercising its power to choose the programs it creates and funds. Not a single case Defendants cite involves the President and federal agencies terminating grants awarded under such programs based on perceived viewpoint.

This Court, in denying the motion to stay the preliminary injunction, stressed exactly this distinction:

> Contrary to the government's argument, this case does not appear to be one in which an agency decided not to "fund a program." Rather, it is one in which more than a dozen agencies selected particular grants for termination regardless of the programs through which they were funded, based on their connection to DEI, DEIA, and environmental justice. Thus, we "confront a different case" than *Finley* (where plaintiffs brought a facial challenge to Congress's mandate that NEA consider standards of decency in awarding grants), *Rust* (where plaintiffs brought a facial challenge to HHS regulations interpreting Title X's prohibition on funding for abortion services), and *Regan* (where plaintiffs brought a facial challenge to the IRS's requirement that organizations refrain from lobbying to qualify for § 501(c)(3) tax-exempt status).

*Thakur*, 2025 WL 2414835, at *6.

Defendants do not argue that any statute or regulation authorizes grant terminations on the basis of DEI content. Instead, they urge that the President has unfettered discretion to halt previously appropriated and awarded funding because he dislikes the viewpoint perceived to be espoused in the grant recipients' work. Defendants cite no case for this proposition because there is none. No case ever has

43

held that the President may refuse to spend money appropriated by Congress because he disagrees with the viewpoint being supported by the funds.

Defendants pointedly ignore this Court's decision in *Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019). There, the Court explained that while a legislature's decision not to subsidize the exercise of a fundamental right does not infringe on the right, the Supreme Court has cautioned that "the case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'aim at the suppression of dangerous ideas.'" *Id*. at 898 (citation omitted). The rule this Court set out in *Koala* – that "the government may not withhold benefits for a censorious purpose" – applies here, especially because "the record includes unusually compelling allegations that the government acted with discriminatory intent." *Id*. at 898-99. As the District Court explained, the DEI and Discrimination Orders penalized Plaintiffs for a censorious purpose, and did not merely selectively defund future speech to advance a chosen message. ER-23. The Orders did this to penalize certain "dangerous ideas" by scuttling swaths of preexisting and ongoing federal research to "combat" and "end" diversity, equity, and inclusion programs that were described as "dangerous, demeaning, and immoral." 90 Fed. Reg. at 8633. As this Court ruled in denying the motion to stay the preliminary injunction, Plaintiffs have a substantial likelihood of prevailing on their First Amendment claims.

### B.    Plaintiffs Are Likely to Succeed on Their APA Claims.

### 1.    The Grant Terminations Were Unreasonable.

The Supreme Court has explained that an "agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio*, 603 U.S. at 292. By directing and effecting the *en masse* termination of grants, NSF, EPA, and NEH were not acting reasonably and certainly did not provide reasonable explanations. As this Court declared in denying a stay of the preliminary injunction:

> Because the letters left the recipients guessing as to the agencies' rationale, and there is no evidence that the agencies considered reliance interests before terminating the grants, the government has not "made a strong showing" that it is likely to succeed on the merits of its argument that the district court abused its discretion when it concluded that the termination of grants by form letters was likely arbitrary and capricious.

*Thakur*, 2025 WL 241483518, at *5.

In prohibiting arbitrary and capricious government actions, the APA requires federal agencies to engage in "reasoned decisionmaking" (*Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 16 (2020) (citation omitted)), meaning an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). An agency action is also arbitrary and capricious if, when departing from a prior policy, the

45

agency fails to (1) "display awareness that it is changing position " *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009); (2) "show that there are good reasons for the new policy," *id.*; or (3) "consider serious reliance interests." *FDA v. Wages & White Lion Invs*., L.L.C., 145 S. Ct. 898, 917 (2025).

Here, Defendants failed to conduct any individualized review of the hundreds of grants or the reliance interests of the grantees before sending the termination notices. Instead, Defendants identified certain topics (such as DEI) that they deemed newly inconsistent with agency policy, irrespective of the substance of individual grants, and then identified grants through keyword searches and terminated them through form letters. In other instances, grants with no apparent connection to DEI were inexplicably terminated. Illustrating the rushed nature of the terminations, the letters themselves are conflicting, contradictory, and rife with errors. "For example, the NEH form termination letters state that termination is pursuant to Executive Order No. 14217, but the NEH now states that was a 'mistake[].'" ER-33. Contrary to Defendants' argument, merely grouping grants into categories – *e.g.*, "High, Medium, Low, or No Connection" to forbidden topics – does not constitute a reasoned explanation for why that specific grant was so categorized and why it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

46

EPA's form termination letters exemplify the arbitrariness, vagueness, and ambiguity that have left class members in the dark as to the basis for their grants' cancellation. ER-97-98 at ¶ 24. The cookie-cutter letters note that the terminations may be based on any or all of a research project's: failure to exhibit merit, fairness, and excellence; duplication; waste, fraud, or abuse; or failure to fulfill the "best interests of the United States." ER-18. Terminating an agency-vetted, peer-reviewed project because it lacks "merit" or is not "excellent" is facially illogical; terminating it because it is "duplicative" requires explaining the research it purportedly duplicates; terminating a project because a researcher is alleged to have acted unfairly, abusively, or fraudulently is an extraordinary charge that cannot be rationally leveled without detailed evidence; and terminating a project because it is inconsistent with "the best interests of the United States" is standardless where those interests are nowhere defined. The APA's requirement of reasoned explanation—particularly, where an agency reverses its prior position— demands far more. *See Dep't of Commerce v. New York.,* 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement [] is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of reasoning.") (citation modified).

47

Furthermore, agencies must consider the fact that "chang[ing] course" on "longstanding policies may have 'engendered serious reliance interests.'" *Dep't of Homeland Security*, 591 U.S. at 30. That is certainly the case here. Plaintiffs and their institutions organize their affairs around multi-year grant awards—hiring staff, admitting students, purchasing equipment, recruiting study participants, contracting with vendors, and more. Shuttering these projects midstream destroys such studies.

Defendants all but concede they did not consider Plaintiffs' reliance interest when terminating the grants. *See* Br.App. at 37-38; *see also* ER-35 ("Defendants have had the opportunity to introduce evidence showing that they considered Plaintiffs' reliance interests prior to terminating their grants, but have not done so."). Instead, Defendants argue that Plaintiffs' reliance interests are irrelevant by again attempting to recast this claim as a breach of contract action. *See* Br.App. at 37-38. But in doing so, Defendants fail to engage with the actual issue on appeal: whether, under the APA, Defendants behaved unreasonably. Accordingly, Defendants' reliance on *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001) is inapposite: that was not an action brought under the APA, and the Court there never assessed whether reliance interests were implicated by the issues in that case.

Defendants also argue that any purported reliance interests were "clearly unreasonable" because the agencies had the discretion to terminate the grants as

48

priorities changed. Br.App. at 37. But as the District Court explained, the Supreme

Court already rejected a similar argument in *Department of Homeland Security*,

holding that while government disclaimers on the right to continued benefits go to

the "strength of [the] reliance interests," those interests must still be considered

before the benefits are withdrawn. 591 U.S. at 31 ("the Government . . . cites [no]

legal authority establishing that such features automatically preclude reliance

interests, and we are not aware of any."). So too here. The fact that Defendants did

not consider any reliance interests before terminating the grants is itself fatal, and it

constitutes grounds to affirm the District Court's conclusion that the agencies

likely acted unreasonably under the APA.

### 2. NEH and NSF's Actions Were Contrary to Law Under the APA.

The APA provides that courts must set aside agency action "not in

accordance with law" or "in excess of statutory . . . authority." 5 U.S.C.

§ 706(2)(A)&(C). The District Court held here that "NEH and NSF likely acted

contrary to their enabling statutes when terminating Plaintiffs' funding pursuant to

the Equity Termination Orders, because those terminations were based on

Plaintiffs' pursuit of the very goals that Congress had mandated." ER-27.

Congress directed NSF, through its enabling statute, to "[d]evelop

intellectual capital, both people and ideas, with particular emphasis on groups and

regions that traditionally have not participated fully in science, mathematics, and

46686\20565055.8

engineering." 42 U.S.C. § 1862k(b)(1). Congress likewise directed that NSF "shall award grants . . . to increase the participation of underrepresented populations in STEM fields," including "women," "minorities," and "persons with disabilities." *Id.* § 1862s-5(d)(1), 1885a, 1885b. Therefore, the District Court found that "[a] decision to terminate a grant *because* it was directed at broadening representation of an underrepresented group in STEM is directly contrary to Congress's mandates." ER-28 (emphasis in original).

Through NEH's enabling statute, Congress directed NEH to authorize grants specifically to "initiate and support programs and research . . . that reach, or reflect the *diversity* and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c) (emphasis added). Congress also directed NEH's Chair to "give particular regard to scholars, and educational and cultural institutions, that have *traditionally been underrepresented*." *Id.* (emphasis added).

Defendants urge that NSF's and NEH's enabling statutes do not "require the government to fund any particular grant." Br.App. at 21. However, Plaintiffs do not challenge NEH's initial award decisions. As the District Court found, "though the NEH's statute might not have required it fund any specific project, the NEH was not free to terminate grants *because* they advance 'diversity' or 'give

50

particular regard to [those] that have traditionally been underrepresented,' as mandated by Congress." ER-28-29 (emphasis in original).

Defendants also contend that whether Plaintiffs' grants implicate the enabling statute's mandates is a fact-intensive question not suitable for class-wide resolution. Br.App. at 24. They are wrong. A Rule 23(b)(2) class focuses on *defendants'* actions. *See* supra Section I.A. The question is whether Defendants took mass actions that were contrary to Congress's instructions. For both Classes, as the record below amply demonstrates, Defendants took uniform action in terminating grants, making class-wide resolution appropriate.

### 3.   Plaintiffs' Claims Are Reviewable Under the APA.

Relying on 2 C.F.R. Section 200.340(a)(4), Defendants contend that the terminations are "unreviewable" because the reallocation of funds is committed to agency discretion. App. Br at 32. Not so. While it is true that the APA bars judicial review for "agency action [that] is committed to agency discretion by law" (5 U.S.C. § 701(a)(2)), this Court expressly found that the agency decisions in this case are reviewable.

In denying Defendants' motion for a stay of the preliminary injunction, this Court held:

> An action is 'committed to agency discretion by law' only in 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.' Even where statutory language grants

51

> an agency unfettered discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which this court may review its exercise of discretion. Here, 2 C.F.R. § 200.340(a) provides uniform administrative requirements for the termination of federal grants, including those an agency terminates because they "no longer effectuat[e] ... agency priorities." § 200.340(a)(4). Sections 200.340, 200.341, 200.343, and 200.345 outline the requirements for termination, the notification requirements when grants are terminated, and the effects of suspension and termination of grants. These regulations provide a meaningful standard by which courts may review the agencies' exercise of discretion. We therefore reject the government's argument that the terminations are not reviewable and consider whether the form termination letters were arbitrary and capricious. 5 U.S.C. § 706(2)(A).

*Thakur*, 2025 WL 2414835, at *4.

Citing *Lincoln v. Vigil*, 508 U.S. 182 (1993), Defendants suggest that all decisions to discontinue a program funded by a lump sum appropriation are committed to agency discretion. But nothing in *Lincoln* absolves agencies of their obligations under Section 706(2)(A) when allocating resources to comply with detailed statutory requirements, such as those at issue here. *See id.* at 193 ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes.").

Moreover, Plaintiffs are not challenging a purely discretionary funding decision to allocate certain portions of appropriated funds to various entities, making this case unlike *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir.

2002) (explaining that, unlike in this case, "Congress left to the Secretary the decision about how the moneys . . . could best be distributed consistent with its general policy to provide emergency assistance . . . '[a]s soon as practicable.'"). Rather, Plaintiffs bring statutory and constitutional claims, alleging that Defendants arbitrarily and capriciously terminated funding for previously awarded grants midstream, without adequate reasons and in violation of specific statutory mandates. *Lincoln* and *Milk Train Inc* are therefore readily distinguishable: neither pertains to previously appropriated funds being completely withheld from their intended statutory purpose, as is the case here. *See also City & Cnty. of S.F. v. Trump*, 897 F. 3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

Defendants cite the "absence" of law on this issue as dispositive. Br.App. at 34. But they misapprehend the standard. "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Lab'ys*, 387 U.S. at 141. It is Defendants' burden to rebut the presumption that the agency action is reviewable. Defendants have not rebutted that presumption, nor can they.

Finally, Defendants' argument that prospective relief was improperly granted is beside the point. That issue has no bearing whatsoever on whether the

grant terminations themselves were reviewable. *See* Br.App. at 35-36. And in any event, the District Court did not purport to review "future actions," as the government contends. *Id.* at 35. Rather, the District Court reviewed the final actions already taken by Defendants, found they likely violated the APA, and therefore preliminarily enjoined Defendants from taking those exact same actions during the pendency of the litigation.

## III. The District Court Correctly Balanced the Equities in Issuing the Preliminary Injunction.

The District Court concluded that "both the balance of equities and the public interest strongly favor the entry of a preliminary injunction."[6] ER-53. This Court came to the same conclusion in denying a stay of the preliminary injunction. *Thakur,* 2025 WL 2414835, at *7-8.

On the one hand, the harms to the Plaintiffs from the termination of grants are enormous and irreparable. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. Additionally, as the District Court concluded,

> the record contains detailed and unrebutted evidence of the irreparable harm that Plaintiffs are already experiencing, including layoffs of team members, interruption of graduate programs, and the potential complete loss of projects, all of which will harm Plaintiffs' professional reputations. . . . Furthermore, when Plaintiffs' multi-year projects rely heavily on federal funding, "[a] total loss of federal

---

[6] As the District court Correctly noted, "These two factors merge when the federal government is a party." ER-53 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

> funding would be catastrophic, and the [Plaintiffs'] need for certainty renders damages inadequate." Plaintiffs have shown a likelihood of irreparable harm.

ER-53-54.

Nor can this harm be remedied by damages or restoring grants at the end of the litigation. The labs will have closed; the studies will have been halted; the staff will be gone. The research that would have occurred in that time will not have happened. There will be no way to know what might have been discovered if only the research had gone forward, and/or to provide compensation for what was lost.

On the other side of the balance, Defendants claim two harms, both of which this Court rejected as inadequate in denying the stay of the preliminary injunction. First, Defendants claim that the District Court's "order irreparably harms the public fisc." Br.App. at 42. The claim is that if the government is ordered to restore grants, it cannot recoup the money if ultimately it prevails in the litigation. The Supreme Court pointed to this in its rulings in *Department of Education*, 145 S.Ct. at 969, and *National Institutes of Health*, 2025 WL 2415669, at *1.

But there are legal mechanisms for the government to recoup funds if it ultimately prevails on the merits here. As Justice Jackson noted,

> the Government has various legal mechanisms to recoup these kinds of funds. *See, e.g.,* 20 U.S.C. §§ 1234a, 1234b; 2 C.F.R. § 200.346 (2024); *see also* J. Shaffer & D. Ramish, Federal Grant Practice § 36:29 (2024 ed.) ("In the end, the Government usually gets its money"). It is likely that, given the Department's new policy position with respect to terminations, it will be extra vigilant about recording

55

> any withdrawals made while the TRO is in effect, so that the money
> can be clawed back if appropriate. Thus, the alleged funding drain at
> which the Government gestures does not even appear to be
> irreparable.

*Dep't of Educ.*, 145 S.Ct. at 974 (Jackson, J., dissenting).

In *National Institutes of Health,* the Court said that the "plaintiffs'

contention that they lack resources to continue their research projects without

federal funding is inconsistent with the proposition that they have the resources to

make the Government whole for money already spent." 2025 WL 2415669, at *1.

But that is not so here. Plaintiffs do not have the resources to continue their

research if federal grants are terminated and there is no indication that there is any

source of funds to replace the federal money. ER-208-47 ¶¶ 177-80, 195-96, 218-

19, 301, 350, 354. If, however, ultimately the federal government prevails and

seeks to recoup the money, it could bring an action, using the above-described

mechanisms, to collect from the State of California. The fact that there is no

realistic chance that the State of California will provide funds to researchers to

make up for lost federal money does not mean that a collection action could not be

brought against it. And as this Court observed: "Even if the government may be

unable to recover at least some of the funds it disburses pursuant to the grants and

therefore may suffer some degree of irreparable harm, the remaining equitable

factors do not favor the government." *Thakur,* 2025 WL 2414835, at *7-8.

Defendants' other claim of harm is that "the injunctions interfere with the President's ability to execute core Executive Branch policies." Br.App. at 43. This Court, though, already rejected this argument when it stated: "This argument rests on the assumption that the government's conduct is lawful. But the government has not made a strong showing of a likelihood of success on the merits, and the government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Thakur,* 2025 WL 2414835, at *8.

This case is thus quite different from *Department of Education* and *National Institutes of Health*. Here, there are explicit District Court findings of irreparable harms to the Plaintiffs' First Amendment rights, not present in the other cases, and to individual Plaintiffs from the termination of funds. By contrast, there is no reason to believe that Defendants will suffer irreparable injuries from the preliminary injunction.

## **CONCLUSION**

For these reasons, the preliminary injunction should be affirmed.

August 26, 2025                    FARELLA BRAUN + MARTEL LLP

By: */s/ Donald E. Sobelman*
     Donald E. Sobelman

     DONALD E. SOBELMAN
     ANTHONY P. SCHOENBERG
     LINDA S. GILLERAN
     KYLE A. MCLORG
     DYLAN M. SILVA
     KATHERINE T. BALKOSKI
     FARELLA BRAUN + MARTEL LLP
     One Bush Street, Suite 900
     San Francisco, California 94104
     (415) 954-4400 Telephone
     dsobelman@fbm.com
     tschoenberg@fbm.com
     lgilleran@fbm.com
     kmclorg@fbm.com
     dmsilva@fbm.com
     kbalkoski@fbm.com

     ELIZABETH J. CABRASER
     RICHARD M. HEIMANN
     KEVIN R. BUDNER
     ANNIE M. WANLESS
     NABILA M. ABDALLAH
     LIEFF CABRASER HEIMANN &
     BERNSTEIN, LLP
     275 Battery Street, 29th Floor
     San Francisco, California 94111
     (415) 956-1000 Telephone
     ecabraser@lchb.com
     rheimann@lchb.com
     kbudner@lchb.com
     awanless@lchb.com
     nabdallah@lchb.com

ERWIN CHEMERINSKY
CLAUDIA POLSKY
U.C. BERKELEY SCHOOL OF LAW
215 Boalt Hall
Berkeley, California 94720-7200
(510) 642-6483 Telephone
(619) 238-1126 Facsimile
echemerinsky@law.berkeley.edu
cpolsky@law.berkeley.edu

*Attorneys for Plaintiffs-Appellees*

59

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** _____25-4249_____

I am the attorney or self-represented party.

**This brief contains 13,079 words,** including __0__ words manually counted

in any visual images, and excluding the items exempted by FRAP 32(f). The brief's

type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____*s/Donald E. Sobelman*_____ **Date** _____8/26/2025_____
*(use "s/[typed name]" to sign electronically-filed documents)*

**ADDENDUM**

**Except for the following, all applicable statutes and regulations are contained in the brief or addendum filed by Appellants Environmental Protection Agency, National Endowment For The Humanities, and National Science Foundation, at Docket Entry [26].**

# **TABLE OF CONTENTS**

**Page**

5 U.S.C. § 701(a)(2) ................................................................... A-1

5 U.S.C. § 706 ............................................................................ A-2

20 U.S.C. § 951 .......................................................................... A-3

20 U.S.C. § 1234a ...................................................................... A-5

20 U.S.C. § 1234b ...................................................................... A-9

42 U.S.C. § 1861 ........................................................................ A-12

42 U.S.C. § 1862s ...................................................................... A-13

42 U.S.C. § 1862s-5 ................................................................... A-14

42 U.S.C. § 1885a ...................................................................... A-23

42 U.S.C. § 1885b ...................................................................... A-25

Pub. L. 81-507, §§ 1, 3 .............................................................. A-26

2 C.F.R. § 200.340 ..................................................................... A-28

2 C.F.R. § 200.346 ..................................................................... A-30

**5 U.S.C. § 701(a)(2)**

(a)  This chapter applies, according to the provisions thereof, except to the extent that—

(1)  statutes preclude judicial review; or

(2)  agency action is committed to agency discretion by law.

**5 U.S.C. § 706**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1)  compel agency action unlawfully withheld or unreasonably delayed; and

(2)  hold unlawful and set aside agency action, findings, and conclusions found to be—

> (A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

> (B)  contrary to constitutional right, power, privilege, or immunity;

> (C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

> (D)  without observance of procedure required by law;

> (E)  unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

> (F)  unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**20 U.S.C. § 951**

The Congress finds and declares the following:

(1)  The arts and the humanities belong to all the people of the United States.

(2)  The encouragement and support of national progress and scholarship in the humanities and the arts, while primarily a matter for private and local initiative, are also appropriate matters of concern to the Federal Government.

(3)  advanced civilization must not limit its efforts to science and technology alone, but must give full value and support to the other great branches of scholarly and cultural activity in order to achieve a better understanding of the past, a better analysis of the present, and a better view of the future.

(4)  Democracy demands wisdom and vision in its citizens. It must therefore foster and support a form of education, and access to the arts and the humanities, designed to make people of all backgrounds and wherever located masters of their technology and not its unthinking servants.

(5)  It is necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of the humanities and the arts by local, State, regional, and private agencies and their organizations. In doing so, the Government must be sensitive to the nature of public sponsorship. Public funding of the arts and humanities is subject to the conditions that traditionally govern the use of public money. Such funding should contribute to public support and confidence in the use of taxpayer funds. Public funds provided by the Federal Government must ultimately serve public purposes the Congress defines.

(6)  The arts and the humanities reflect the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs and values of all persons and groups.

(7)  The practice of art and the study of the humanities require constant dedication and devotion. While no government can call a great artist or scholar into existence, it is necessary and appropriate for the Federal Government to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent.

(8)  The world leadership which has come to the United States cannot rest solely upon superior power, wealth, and technology, but must be solidly founded upon

worldwide respect and admiration for the Nation's high qualities as a leader in the realm of ideas and of the spirit.

(9)  Americans should receive in school, background and preparation in the arts and humanities to enable them to recognize and appreciate the aesthetic dimensions of our lives, the diversity of excellence that comprises our cultural heritage, and artistic and scholarly expression.

(10)  It is vital to a democracy to honor and preserve its multicultural artistic heritage as well as support new ideas, and therefore it is essential to provide financial assistance to its artists and the organizations that support their work.

(11)  To fulfill its educational mission, achieve an orderly continuation of free society, and provide models of excellence to the American people, the Federal Government must transmit the achievement and values of civilization from the past via the present to the future, and make widely available the greatest achievements of art.

(12)  In order to implement these findings and purposes, it is desirable to establish a National Foundation on the Arts and the Humanities.

**20 U.S.C. § 1234a**

(a)  Preliminary departmental decision; grounds of determination; notice requirements; prima facie case; amount of funds recoverable

(1)  Whenever the Secretary determines that a recipient of a grant or cooperative agreement under an applicable program must return funds because the recipient has made an expenditure of funds that is not allowable under that grant or cooperative agreement, or has otherwise failed to discharge its obligation to account properly for funds under the grant or cooperative agreement, the Secretary shall give the recipient written notice of a preliminary departmental decision and notify the recipient of its right to have that decision reviewed by the Office and of its right to request mediation.

(2)  In a preliminary departmental decision, the Secretary shall have the burden of establishing a prima facie case for the recovery of funds, including an analysis reflecting the value of the program services actually obtained in a determination of harm to the Federal interest. The facts to serve as the basis of the preliminary departmental decision may come from an audit report, an investigative report, a monitoring report, or other evidence. The amount of funds to be recovered shall be determined on the basis of section 1234b of this title.

(3)  For the purpose of paragraph (2), failure by a recipient to maintain records required by law, or to allow the Secretary access to such records, shall constitute a prima facie case.

(b)  Review of preliminary departmental decision; form and contents of application for review; inadequate preliminary decisions; duties of recipient to subrecipients after preliminary decision; burden of proof

(1)  A recipient that has received written notice of a preliminary departmental decision and that desires to have such decision reviewed by the Office shall submit to the Office an application for review not later than 60 days after receipt of notice of the preliminary departmental decision. The application shall be in the form and contain the information specified by the Office. As expeditiously as possible, the Office shall return to the Secretary for such action as the Secretary considers appropriate any preliminary departmental decision which the Office determines does not meet the requirements of subsection (a)(2).

(2)  In cases where the preliminary departmental decision requests a recovery of funds from a State recipient, that State recipient may not recover funds from an affected local educational agency unless that State recipient has—

A-5

(A)  transmitted a copy of the preliminary departmental decision to any affected subrecipient within 10 days of the date that the State recipient in a State administered program received such written notice; and

(B)  consulted with each affected subrecipient to determine whether the State recipient should submit an application for review under paragraph (1).

(3)  In any proceeding before the Office under this section, the burden shall be upon the recipient to demonstrate that it should not be required to return the amount of funds for which recovery is sought in the preliminary departmental decision under subsection (a).

(c)  Time for hearing

A hearing shall be set 90 days after receipt of a request for review of a preliminary departmental decision by the Office, except that such 90-day requirement may be waived at the discretion of the judge for good cause.

(d)  Review of findings of fact in preliminary decision; conclusiveness; remand; new or modified findings

(1)  Upon review of a decision of the Office by the Secretary, the findings of fact by the Office, if supported by substantial evidence, shall be conclusive. However, the Secretary, for good cause shown, may remand the case to the Office to take further evidence, and the Office may thereupon make new or modified findings of fact and may modify its previous action. Such new or modified findings of fact shall likewise be conclusive if supported by substantial evidence.

(2)  During the conduct of such review, there shall not be any ex parte contact between the Secretary and individuals representing the Department or the recipient.

(e)  Time for filing petition for review of preliminary decision

Parties to the proceeding shall have 30 days to file a petition for review of a decision of the administrative law judges with the Office of the Secretary.

(f)  Stay of collection or other adverse action by Secretary against recipient

(1)  If a recipient submits a timely application for review of a preliminary departmental decision, the Secretary shall take no collection action until the decision of the Office upholding the preliminary Department decision in whole or in part becomes final agency action under subsection (g).

(2)  If a recipient files a timely petition for judicial review under section 1234g of this title, the Secretary shall take no collection action until judicial review is completed.

(3)  The filing of an application for review under paragraph (1) or a petition for judicial review under paragraph (2) shall not affect the authority of the Secretary to take any other adverse action under this subchapter against the recipient.

(g)  Preliminary decision as final agency action

A decision of the Office regarding the review of a preliminary departmental decision shall become final agency action 60 days after the recipient receives written notice of the decision unless the Secretary either—

(1)  modifies or sets aside the decision, in whole or in part, in which case the decision of the Secretary shall become final agency action when the recipient receives written notice of the Secretary's action, or

(2)  remands the decision to the Office.

(h)  Publication of decisions as final agency actions

The Secretary shall publish decisions that have become final agency action under subsection (g) in the Federal Register or in another appropriate publication within 60 days.

(i)  Collection amounts and procedures

The amount of a preliminary departmental decision under subsection (a) for which review has not been requested in accordance with subsection (b), and the amount sustained by a decision of the Office or the Secretary which becomes final agency action under subsection (g), may be collected by the Secretary in accordance with chapter 37 of title 31.

(j)  Compromise of preliminary departmental decisions; preconditions; notice requirements

(1)  Notwithstanding any other provision of law, the Secretary may, subject to the notice requirements of paragraph (2), compromise any preliminary departmental decision under this section which does not exceed the amount agreed to be returned by more than $200,000, if the Secretary determines that (A) the collection of any or all or the amount thereof would not be practical or in the public interest, and (B)

A-7

the practice which resulted in the preliminary departmental decision has been corrected and will not recur.

(2)  Not less than 45 days prior to the exercise of the authority to compromise a preliminary departmental decision pursuant to paragraph (1), the Secretary shall publish in the Federal Register a notice of intention to do so. The notice shall provide interested persons an opportunity to comment on any proposed action under this subsection through the submission of written data, views, or arguments.

(k)  Limitation period respecting return of funds

No recipient under an applicable program shall be liable to return funds which were expended in a manner not authorized by law more than 5 years before the recipient received written notice of a preliminary departmental decision.

(l)  Foregoing of interest during period of administrative review

No interest shall be charged arising from a claim during the administrative review of the preliminary departmental decision.

**20 U.S.C. § 1234b**

(a)  Amount returned proportionate to extent of harm violation caused to an identifiable Federal interest; reduction; determination of identifiable Federal interest

(1)  recipient determined to have made an unallowable expenditure, or to have otherwise failed to discharge its responsibility to account properly for funds, shall be required to return funds in an amount that is proportionate to the extent of the harm its violation caused to an identifiable Federal interest associated with the program under which the recipient received the award. Such amount shall be reduced in whole or in part by an amount that is proportionate to the extent the mitigating circumstances caused the violation.

(2)  For the purpose of paragraph (1), an identifiable Federal interest includes, but is not limited to, serving only eligible beneficiaries; providing only authorized services or benefits; complying with expenditure requirements and conditions (such as set-aside, excess cost, maintenance of effort, comparability, supplement-not-supplant, and matching requirements); preserving the integrity of planning, application, recordkeeping, and reporting requirements; and maintaining accountability for the use of funds.

(b)  Reduction or waiver of amount based on mitigating circumstances; burden of proof; determination of mitigating circumstances; weight, etc., of written request for guidance

(1)  When a State or local educational agency is determined to have made an unallowable expenditure, or to have otherwise failed to discharge its responsibility to account properly for funds, and mitigating circumstances exist, as described in paragraph (2), the judge shall reduce such amount by an amount that is proportionate to the extent the mitigating circumstances caused the violation. Furthermore, the judge is authorized to determine that no recovery is justified when mitigating circumstances warrant. The burden of demonstrating the existence of mitigating circumstances shall be upon the State or local educational agency.

(2)  For the purpose of paragraph (1), mitigating circumstances exist only when it would be unjust to compel the recovery of funds because the State or local educational agency—

(A)  actually and reasonably relied upon erroneous written guidance provided by the Department;

A-9

(B)  made an expenditure or engaged in a practice after—

    (i)  the State or local educational agency submitted to the Secretary, in good faith, a written request for guidance with respect to the expenditure or practice at issue, and

    (ii)  a Department official did not respond within 90 days of receipt by the Department of such request; or

(C)  actually and reasonably relied upon a judicial decree issued to the recipient.

(3)  A written request for guidance as described in paragraph (2) sent by certified mail (return receipt requested) shall be conclusive proof of receipt by the Department.

(4)  If the Secretary responds to a written request for guidance described in paragraph (2)(B) more than 90 days after its receipt, the State or local educational agency that submitted the request shall comply with the guidance received at the earliest practicable time.

(5)  In order to demonstrate the existence of the mitigating circumstances described in paragraph (2)(B), the State or local educational agency shall demonstrate that—

(A)  the written request for guidance accurately described the proposed expenditure or practice and included the facts necessary for a determination of its legality; and

(B)  the written request for guidance contained a certification by the chief legal officer of the State educational agency that such officer had examined the proposed expenditure or practice and believed the proposed expenditure or practice was permissible under then applicable State and Federal law; and

(C)  the State or local educational agency reasonably believed that the proposed expenditure or practice was permissible under then applicable State and Federal law.

(6)  The Secretary shall disseminate to State educational agencies responses to written requests for guidance, described in paragraph (5), that reflect significant interpretations of applicable law or policy.

(c)  Review of written requests for guidance on periodic basis

A-10

The Secretary shall periodically review the written requests for guidance submitted under this section to determine the need for new or supplementary regulatory or other guidance under applicable programs.

**42 U.S.C. § 1861**

There is established in the executive branch of the Government an independent agency to be known as the National Science Foundation (hereinafter referred to as the "Foundation"). The Foundation shall consist of a National Science Board (hereinafter referred to as the "Board") and a Director.

**42 U.S.C. § 1862s**

(a)  Sense of Congress

It is the sense of Congress that—

(1)  sustained, predictable Federal funding of basic research is essential to United States leadership in science and technology;

(2)  the Foundation's intellectual merit and broader impacts criteria are appropriate for evaluating grant proposals, as concluded by the 2011 National Science Board Task Force on Merit Review;

(3)  evaluating proposals on the basis of the Foundation's intellectual merit and broader impacts criteria should be used to assure that the Foundation's activities are in the national interest as these reviews can affirm that—

    (A)  the proposals funded by the Foundation are of high quality and advance scientific knowledge; and

    (B)  the Foundation's grants address societal needs through basic research findings or through related activities; and

(4)  as evidenced by the Foundation's contributions to scientific advancement, economic growth, human health, and national security, its peer review and merit review processes have identified and funded scientifically and societally relevant basic research and should be preserved.

(b)  Merit review criteria

The Foundation shall maintain the intellectual merit and broader impacts criteria, among other specific criteria as appropriate, as the basis for evaluating grant proposals in the merit review process.

(c)  Updates

If after January 6, 2017, a change is made to the merit-review process, the Director shall submit a report to the appropriate committees of Congress not later than 30 days after the date of the change.

A-13

**42 U.S.C. § 1862s-5**

(a) Findings

Congress makes the following findings:

(1)  Economic projections by the Bureau of Labor Statistics indicate that by 2018, there could be 2,400,000 unfilled STEM jobs.

(2)  Women represent slightly more than half the United States population, and projections indicate that 54 percent of the population will be a member of a racial or ethnic minority group by 2050.

(3)  Despite representing half the population, women comprise only about 30 percent of STEM workers according to a 2015 report by the National Center for Science and Engineering Statistics.

(4)  A 2014 National Center for Education Statistics study found that underrepresented populations leave the STEM fields at higher rates than their counterparts.

(5)  The representation of women in STEM drops significantly at the faculty level. Overall, women hold only 25 percent of all tenured and tenure-track positions and 17 percent of full professor positions in STEM fields in our Nation's universities and 4-year colleges.

(6)  Black and Hispanic faculty together hold about 6.5 percent of all tenured and tenure-track positions and 5 percent of full professor positions.

(7)  Many of the numbers in the American Indian or Alaskan Native and Native Hawaiian or Other Pacific Islander categories for different faculty ranks were too small for the Foundation to report publicly without potentially compromising confidential information about the individuals being surveyed.

(b)  Sense of Congress

It is the sense of Congress that—

(1)  it is critical to our Nation's economic leadership and global competitiveness that the United States educate, train, and retain more scientists, engineers, and computer scientists;

A-14

(2) there is currently a disconnect between the availability of and growing demand for STEM-skilled workers;

(3) historically, underrepresented populations are the largest untapped STEM talent pools in the United States; and

(4) given the shifting demographic landscape, the United States should encourage full participation of individuals from underrepresented populations in STEM fields.

(c) Reaffirmation

The Director of the Foundation shall continue to support programs designed to broaden participation of underrepresented populations in STEM fields.

(d) Grants to broaden participation

(1) In general

The Director of the Foundation shall award grants on a competitive, merit-reviewed basis, to eligible entities to increase the participation of underrepresented populations in STEM fields, including individuals identified in section 1885a or section 1885b of this title.

(2) Center of excellence

(A) In general

Grants awarded under this subsection may include grants for the establishment of a Center of Excellence to collect, maintain, and disseminate information to increase participation of underrepresented populations in STEM fields.

(B) Purpose

The purpose of a Center of Excellence under this subsection is to promote diversity in STEM fields by building on the success of the INCLUDES programs, providing technical assistance, maintaining best practices, and providing related training at federally funded academic institutions.

(3) Research

As a component of improving participation of women in STEM fields, research funded by a grant under this subsection may include research on—

(A)  the role of teacher training and professional development, including effective incentive structures to encourage teachers to participate in such training and professional development, in encouraging or discouraging female students in prekindergarten through elementary school from participating in STEM activities;

(B)  the role of teachers in shaping perceptions of STEM in female students in prekindergarten through elementary school and discouraging such students from participating in STEM activities;

(C)  the role of other facets of the learning environment on the willingness of female students in prekindergarten through elementary school to participate in STEM activities, including learning materials and textbooks, seating arrangements, use of media and technology, classroom culture, and composition of students during group work;

(D)  the role of parents and other caregivers in encouraging or discouraging female students in prekindergarten through elementary school from participating in STEM activities;

(E)  the types of STEM activities that encourage greater participation by female students in prekindergarten through elementary school;

(F)  the role of mentorship and best practices in finding and utilizing mentors; and

(G)  the role of informal and after-school STEM learning opportunities on the perception of and participation in STEM activities of female students in prekindergarten through elementary school.

(e)  Support for increasing diversity among STEM faculty at institutions of higher education

(1)  In general

The Director of the Foundation shall make awards to institutions of higher education (or consortia thereof) for the development and assessment of innovative reform efforts designed to increase the recruitment, retention, and advancement of individuals from underrepresented minority groups in academic STEM careers, which may include implementing or expanding successful evidence-based practices.

(2)  Merit review; competition

Awards shall be made under this subsection on a merit-reviewed, competitive basis.

(3)  Use of funds

Activities supported by awards under this subsection may include—

(A)  institutional assessment activities, such as data analyses and policy review, in order to identify and address specific issues in the recruitment, retention, and advancement of faculty members from underrepresented minority groups;

(B)  assessments of distribution of mentoring and advising responsibilities among faculty, particularly for faculty from underrepresented minority groups, that may detract from time spent on research, publishing papers, and other activities required to achieve tenure status or promotion (or equivalents for non-tenure track faculty) and run a productive research program;

(C)  development and assessment of training courses for administrators and search committee members designed to ensure unbiased evaluation of candidates from underrepresented minority groups;

(D)  development and hosting of intra- or inter-institutional workshops to propagate best practices in recruiting, retaining, and advancing faculty members from underrepresented minority groups;

(E)  professional development opportunities for faculty members from underrepresented minority groups;

(F)  activities aimed at making undergraduate STEM students from underrepresented minority groups aware of opportunities for academic careers in STEM fields; and

(G)  activities to identify and engage exceptional graduate students and postdoctoral researchers from underrepresented minority groups at various stages of their studies and to encourage them to enter academic careers.

(4)  Selection process

(A)  Application

An institution of higher education (or a consortium of such institutions) seeking funding under this subsection shall submit an application to the Director of the Foundation at such time, in such manner, and containing such information and

assurances as such Director may require. The application shall include, at a minimum, a description of—

(i)  the reform effort that is being proposed for implementation by the institution of higher education;

(ii)  any available evidence of specific difficulties in the recruitment, retention, and advancement of faculty members from underrepresented minority groups in STEM academic careers within the institution of higher education submitting an application, and how the proposed reform effort would address such issues;

(iii)  support for the proposed reform effort by administrators of the institution, which may include details on previous or ongoing reform efforts;

(iv)  how the proposed reform effort may contribute to change in institutional culture and policy such that a greater value is placed on the recruitment, retention, and advancement of faculty members from underrepresented minority groups;

(v)  how the institution of higher education submitting an application plans to sustain the proposed reform effort beyond the duration of the award, if the effort proved successful; and

(vi)  how the success and effectiveness of the proposed reform effort will be evaluated and assessed in order to contribute to the national knowledge base about models for catalyzing institutional change.

(B)  Award distribution

The Director of the Foundation shall ensure, to the extent practicable, that awards under this section are made to a variety of types of institutions of higher education.

(5)  Authorization of appropriations

There are authorized to be appropriated to carry out this subsection $8,000,000 for each of fiscal years 2023 through 2027.

(f)  Support for broadening participation in undergraduate STEM education

(1)  In general

The Director of the Foundation shall make awards to institutions of higher education (or a consortium of such institutions) to implement or expand research-

A-18

based reforms in undergraduate STEM education for the purpose of recruiting and retaining students from minority groups who are underrepresented in STEM fields.

(2)  Merit review; competition

Awards shall be made under this subsection on a merit-reviewed, competitive basis.

(3)  Use of funds

Activities supported by awards under this subsection may include—

(A)  implementation or expansion of innovative, research-based approaches to broaden participation of underrepresented minority groups in STEM fields;

(B)  implementation or expansion of successful, research-based bridge, cohort, tutoring, or mentoring programs, including those involving community colleges and technical schools, designed to enhance the recruitment and retention of students from underrepresented minority groups in STEM fields;

(C)  implementation or expansion of outreach programs linking institutions of higher education and PreK–12 school systems in order to heighten awareness among precollege students from underrepresented minority groups of opportunities in college-level STEM fields and STEM careers;

(D)  implementation or expansion of faculty development programs focused on improving retention of undergraduate STEM students from underrepresented minority groups;

(E)  implementation or expansion of mechanisms designed to recognize and reward faculty members who demonstrate a commitment to increasing the participation of students from underrepresented minority groups in STEM fields;

(F)  expansion of successful reforms aimed at increasing the number of STEM students from underrepresented minority groups beyond a single course or group of courses to achieve reform within an entire academic unit, or expansion of successful reform efforts beyond a single academic unit or field to other STEM academic units or fields within an institution of higher education;

(G)  expansion of opportunities for students from underrepresented minority groups to conduct STEM research in industry, at Federal labs, and at international research institutions or research sites;

(H)  provision of stipends for students from underrepresented minority groups participating in research;

(I)  development of research collaborations between research-intensive universities and primarily undergraduate historically Black colleges and universities, Tribal Colleges or Universities, and minority serving institutions;

(J)  support for graduate students and postdoctoral fellows from underrepresented minority groups to participate in instructional or assessment activities at primarily undergraduate institutions, including primarily undergraduate historically Black colleges and universities, Tribal Colleges or Universities, and minority serving institutions and 2-year institutions of higher education; and

(K)  other activities consistent with paragraph (1), as determined by the Director of the Foundation.

(4)  Selection process

(A)  Application

An institution of higher education (or a consortium thereof) seeking an award under this subsection shall submit an application to the Director of the Foundation at such time, in such manner, and containing such information and assurances as such Director may require. The application shall include, at a minimum—

(i)  a description of the proposed reform effort;

(ii)  a description of the research findings that will serve as the basis for the proposed reform effort or, in the case of applications that propose an expansion of a previously implemented reform, a description of the previously implemented reform effort, including data about the recruitment, retention, and academic achievement of students from underrepresented minority groups;

(iii)  evidence of an institutional commitment to, and support for, the proposed reform effort, including a long-term commitment to implement successful strategies from the current reform beyond the academic unit or units included in the award proposal;

(iv)  a description of how the proposed reform effort may contribute to, or in the case of applications that propose an expansion of a previously implemented reforms has contributed to, change in institutional culture and policy such that a

A-20

greater value is placed on the recruitment, retention and academic achievement of students from underrepresented minority groups;

(v)  a description of existing or planned institutional policies and practices regarding faculty hiring, promotion, tenure, and teaching assignment that reward faculty contributions to improving the education of students from underrepresented minority groups in STEM; and

(vi)  how the success and effectiveness of the proposed reform effort will be evaluated and assessed in order to contribute to the national knowledge base about models for catalyzing institutional change,

(B)  Award distribution

The Director of the Foundation shall ensure, to the extent practicable, that awards under this subsection are made to a variety of types of institutions of higher education, including historically Black colleges and universities, Tribal Colleges or Universities, minority serving institutions, and 2-year institutions of higher education.

(5)  Education research

(A)  In general

All awards made under this subsection shall include an education research component that will support the design and implementation of a system for data collection and evaluation of proposed reform efforts in order to build the knowledge base on promising models for increasing recruitment and retention of students from underrepresented minority groups in STEM education at the undergraduate level across a diverse set of institutions.

(B)  Dissemination

The Director of the Foundation shall coordinate with the Committee on STEM Education of the National Science and Technology Council in disseminating the results of the research under this paragraph to ensure that best practices in broadening participation in STEM education at the undergraduate level are made readily available to all institutions of higher education, other Federal agencies that support STEM programs, non-Federal funders of STEM education, and the general public.

(6)  Authorization of appropriations

There are authorized to be appropriated to carry out this subsection $15,000,000 for each of fiscal years 2023 through 2027.

(g)  Accountability and dissemination

(1)  Evaluation

(A)  In general

Not later than 5 years after January 6, 2017, the Director of the Foundation shall evaluate the grants provided under this section.

(B)  Requirements

In conducting the evaluation under subparagraph (A), the Director shall—

(i)  use a common set of benchmarks and assessment tools to identify best practices and materials developed or demonstrated by the research; and

(ii)  to the extent practicable, combine the research resulting from the grant activity under subsection (e) with the current research on serving underrepresented students in grades kindergarten through 8.

(2)  Report on evaluations

Not later than 180 days after the completion of the evaluation under paragraph (1), the Director of the Foundation shall submit to the appropriate committees of Congress and make widely available to the public a report that includes—

(A)  the results of the evaluation; and

(B)  any recommendations for administrative and legislative action that could optimize the effectiveness of the program.

(h)  Coordination

In carrying out this section, the Director of the Foundation shall consult and cooperate with the programs and policies of other relevant Federal agencies to avoid duplication with and enhance the effectiveness of the program under this section.

**42 U.S.C. § 1885a**

The Foundation is authorized to—

(1)  support activities designed to—

(A)  increase the participation of women in courses of study at the undergraduate, graduate, and postgraduate levels leading to degrees in scientific and engineering fields;

(B)  encourage women to consider and prepare for careers in science and engineering; or

(C)  provide traineeship and fellowship opportunities for women in science and engineering;

(2)  support programs in science, engineering, and mathematics in elementary and secondary schools so as to stimulate the acquisition of knowledge, skills, and information by female students and to increase female student awareness of career opportunities requiring scientific and engineering skills;

(3)  support activities in continuing education in science and engineering which provide opportunities for women who—

(A)  are in the work force, or

(B) who are not in the work force because their careers have been interrupted, to acquire new knowledge, techniques, and skills in scientific and engineering fields;

(4)  undertake a comprehensive research program designed to increase public understanding of (A) the potential contribution of women in science and engineering and (B) the means to facilitate the participation and advancement of women in scientific and engineering careers;

(5)  establish a visiting women scientists and engineers program;

(6)  support activities designed to improve the availability and quality of public information concerning the importance of the participation of women in careers in science and engineering;

(7) support activities of museums and science centers which demonstrate potential to interest and involve women in science and engineering;

(8)  make grants, to be known as the National Research Opportunity Grants, to women scientists and engineers who (A) have received their doctorates within five years prior to the date of the award or (B) have received their doctorates, have had their careers interrupted, and are re-entering the work force within five years after such interruption;

(9) make grants to women eligible under paragraph (8) to assist such women in planning and developing a research project eligible for support under such paragraph;

(10)  provide support to individuals or academic institutions for full-time or part-time visiting professorships for women in science and engineering;

(11)  support demonstration project activities of individuals, public agencies, and private entities designed to encourage the employment and advancement of women in science and engineering; and

(12)  encourage its entrepreneurial programs to recruit and support women to extend their focus beyond the laboratory and into the commercial world.

**42 U.S.C. § 1885b**

(a)  The Foundation is authorized (1) to undertake or support a comprehensive science and engineering education program to increase the participation of minorities in science and engineering, and (2) to support activities to initiate research at minority institutions.

(b)  The Foundation is authorized to undertake or support programs and activities to encourage the participation of persons with disabilities in the science and engineering professions.

**Pub. L. 81-507, §§ 1, 3**

1. AN ACT

To promote the progress of science; to advance the national health, prosperity, and welfare; to secure the national defense; and for other purposes. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "National Science Foundation Act of 1950".

. . .

3. FUNCTIONS OF THE FOUNDATION

(a) The Foundation is authorized and directed—

(1) to develop and encourage the pursuit of a national policy for the promotion of basic research and education in the sciences;

(2) to initiate and support basic scientific research in the mathematical, physical, medical, biological, engineering, and other sciences, by making contracts or other arrangements (including grants, loans, and other forms of assistance) for the conduct of such basic scientific research and to appraise the impact of research upon industrial development and upon the general welfare;

(3) at the request of the Secretary of Defense, to initiate and support specific scientific research activities in connection with matters relating to the national defense by making contracts or other arrangements (including grants, loans, and other forms of assistance)for the conduct of such scientific research;

(4) to award, as provided in section, 10, scholarships and graduate fellowships in the mathematical, physical, medical, biological, engineering, and other sciences;

(5) to foster the interchange of scientific information among scientists in the United States and foreign countries;

(6) to evaluate scientific research programs undertaken by agencies of the Federal Government, and to correlate the Foundation's scientific research programs with those undertaken by individuals and by public and private research groups;

(7) to establish such special commissions as the Board may from time to time deem necessary for the purposes of this Act; and

(8)  to maintain a register of scientific and technical personnel and in other ways provide a central clearinghouse for information covering all scientific and technical personnel in the United States, including its Territories and possessions.

(b)  In exercising the authority and discharging the functions referred to in subsection (a) of this section, it shall be one of the objectives of the Foundation to strengthen basic research and education in the sciences, including independent research by individuals, throughout the United States, including its Territories and possessions, and to avoid undue concentration of such research and education.

(c)  The Foundation shall render an annual report to the President for submission on or before the 15th day of January of each year to the Congress, summarizing the activities of the Foundation and making such recommendations as it may deem appropriate. Such report shall include (1) minority views and recommendations if any, of members of the Board, and (2) information as to the acquisition and disposition by the Foundation of any patents and patent rights.

**2 C.F.R. § 200.340**

(a)  The Federal award may be terminated in part or its entirety as follows:

(1)  By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

(2)  By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated;

(3)  By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

(4)  By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

(b)  The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.

(c)  When the Federal agency terminates the Federal award prior to the end of the period of performance due to the recipient's material failure to comply with the terms and conditions of the Federal award, the Federal agency must report the termination in SAM.gov. A Federal agency must use the Contractor Performance Assessment Reporting System (CPARS) to enter information in SAM.gov.

(1)  The information required under paragraph (c) of this section is not to be reported in SAM.gov until the recipient has either:

> (i)  Exhausted its opportunities to object or challenge the decision (see § 200.342); or

> (ii)  Has not, within 30 calendar days after being notified of the termination, informed the Federal agency that it intends to appeal the decision to terminate.

(2)  If a Federal agency, after entering information about a termination in SAM.gov, subsequently:

>(i)  Learns that any of that information is erroneous, the Federal agency must correct the information in the system within three business days;

>(ii)  Obtains an update to that information that could be helpful to other Federal agencies, the Federal agency is strongly encouraged to amend the information in the system to incorporate the update in a timely way.

(3)  The Federal agency must not post any information that will be made publicly available in the non-public segment of SAM.gov that is covered by a disclosure exemption under the Freedom of Information Act (FOIA). When the recipient asserts within seven calendar days to the Federal agency which posted the information that a disclosure exemption under FOIA covers some of the information made publicly available, the Federal agency that posted the information must remove the posting within seven calendar days of receiving the assertion. Before reposting the releasable information, the Federal agency must resolve the issue in accordance with the agency's FOIA procedures.

(d) When the Federal award is terminated in part or its entirety, the Federal agency or pass-through entity and recipient or subrecipient remain responsible for compliance with the requirements in §§ 200.344 and 200.345.

**2 C.F.R. § 200.346**

Any Federal funds paid to the recipient or subrecipient in excess of the amount that the recipient or subrecipient is determined to be entitled to under the Federal award constitute a debt to the Federal Government. The Federal agency must collect all debts arising out of its Federal awards in accordance with the Standards for the Administrative Collection of Claims (31 CFR part 901).