**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| NEETA THAKUR, on behalf of themselves and all others similarly situated; KEN ALEX; NELL GREEN NYLEN; ROBERT HIRST; CHRISTINE PHILLIOU; JEDDA FOREMAN; ELI BERMAN; SUSAN HANDY, | No. 25-4249 <br><br> D.C. No. 3:25-cv-04737-RFL |
| *Plaintiffs - Appellees*, | ORDER |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF GOVERNMENT EFFICIENCY; AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation; NATIONAL ENDOWMENT FOR THE | |

HUMANITIES; MICHAEL
MCDONALD, in his official capacity
as Acting Chairman of the National
Endowment for the Humanities;
UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his
official capacity as Administrator of
the U.S. Environmental Protection
Agency; UNITED STATES
DEPARTMENT OF
AGRICULTURE; BROOKE
ROLLINS, in her official capacity as
Secretary of the U.S. Department of
Agriculture; AMERICORPS, aka the
Corporation for National and
Community Service; JENNIFER
BASTRESS TAHMASEBI, in her
official capacity as Interim Agency
Head of AmeriCorps; UNITED
STATES DEPARTMENT OF
DEFENSE; PETER HEGSETH, in
his official capacity as Secretary of
the U.S. Department of Defense;
UNITED STATES DEPARTMENT
OF EDUCATION; LINDA
MCMAHON, in her official capacity
as Secretary of the U.S. Department
of Education; UNITED STATES
DEPARTMENT OF ENERGY;
CHRIS WRIGHT, in his official
capacity as Secretary of Energy;
UNITED STATES DEPARTMENT

OF HEALTH AND HUMAN
SERVICES; ROBERT F.
KENNEDY, Jr., in his official
capacity as Secretary of the U.S.
Department of Health and Human
Services; UNITED STATES
CENTERS FOR DISEASE
CONTROL; MATTHEW
BUZZELLI, in his official capacity
as Acting Director of the Centers for
Disease Control; UNITED STATES
FOOD AND DRUG
ADMINISTRATION; MARTIN A.
MAKARY, in his official capacity as
Commissioner of the Food and Drug
Administration; UNITED STATES
NATIONAL INSTITUTES OF
HEALTH; JAYANTA
BHATTACHARYA, in his official
capacity as Director of the National
Institutes of Health; INSTITUTE OF
MUSEUM AND LIBRARY
SERVICES; KEITH SONDERLING,
in his official capacity as Acting
Director of the Institute of Museum
and Library Services; UNITED
STATES DEPARTMENT OF THE
INTERIOR; DOUG BURGUM, in
his official capacity as Secretary of
the Interior; UNITED STATES
DEPARTMENT OF STATE;
MARCO RUBIO, in his official
capacity as Secretary of the U.S.

4      THAKUR V. TRUMP

Department of State; UNITED
STATES DEPARTMENT OF
TRANSPORTATION; SEAN
DUFFY, in his official capacity as
Secretary for the U.S. Department of
Transportation,

           *Defendants - Appellants*.

Appeal from the United States District Court
for the Northern District of California
Rita F. Lin, District Judge, Presiding

Argued and Submitted July 31, 2025
San Francisco, California

Filed August 21, 2025

Before: Richard A. Paez, Morgan B. Christen, and Roopali
H. Desai, Circuit Judges.

## SUMMARY[*]

## Executive Orders

The panel denied the government's motion for a partial
stay pending appeal of the district court's preliminary
injunction ordering three government agencies to reinstate

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

University of California (UC) research grants that the agencies had terminated pursuant to certain Executive Orders.

The district court granted plaintiffs' motion for a preliminary injunction and provisionally certified two classes of UC researchers: (1) those whose research grants were terminated by form letter without any grant-specific explanation (the "Form Termination Class"); and (2) those whose research grants were terminated because of Executive Orders that directed agencies to eliminate diversity, equity, and inclusion ("DEI") and diversity, equity, inclusion, and accessibility ("DEIA") policies and terminate "equity-related" grants (the "DEI Termination Class"). On appeal, the government moved for a stay of the injunction only as it pertains to the research grants awarded by the Environmental Protection Agency and the National Endowment for the Humanities, so the panel limited its discussion to those two agencies.

The panel held that the government had not shown a likelihood of success on the merits of its arguments that (1) the district court lacked jurisdiction; (2) at least some plaintiffs lack standing; and (3) plaintiffs are not likely to succeed on the merits of their claims.

The panel first rejected the government's argument that the Tucker Act precluded the district court's jurisdiction over the Form Termination Class's Administrative Procedure Act ("APA") claim. Plaintiffs' APA claim was not derived from grants or any purported contract but rather was a statutory claim invoking the right to be free from arbitrary and capricious agency action. Moreover, plaintiffs sought—and the district court awarded—vacatur of the termination notices and reinstatement of the terminated

grants. These well-established APA remedies are not contractual in nature.

The panel next rejected the government's argument that at least some members of the Form Termination Class lacked Article III standing because they had not demonstrated a cognizable injury in fact. Where a class seeks injunctive relief, standing is satisfied when at least one named plaintiff satisfies the standing requirements, and here the class representatives had alleged sufficient injuries, including disruption to projects and reputational harm.

Addressing the merits as to the Form Termination Class, the panel held that the government had not made a strong showing that it was likely to succeed on the merits of its argument that the district court abused its discretion when it concluded that the termination of grants by form letters was likely arbitrary and capricious. The terminations were reviewable because federal regulations provide a meaningful standard by which courts may review the agencies' exercise of discretion. The form letters and the record provided little explanation for the termination decisions. The letters left the recipients guessing as to the agencies' rationale, and there was no evidence that the agencies considered reliance interests before terminating the grants.

As to the DEI Termination Class, the panel held that the government was not likely to succeed on the merits of its claim that the district court abused its discretion when it concluded that the agencies likely terminated the grants based on viewpoint, in violation of the First Amendment. The government does not dispute that it terminated the subject grants because they promoted DEI, DEIA, or environmental justice, in violation of the bedrock principle that the government cannot "leverage its power to

award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" or "aim at the suppression of dangerous ideas" in the provision of subsidies.

Finally, the panel held that the government failed to meet its burden to show that the remaining factors favored entry of a stay pending appeal. The panel rejected the government's arguments that the preliminary injunction risks irreparable harm to the government and the public interest by: (1) interfering with the President's ability to carry out core Executive Branch policies, and (2) compelling the government to disburse funds that it cannot recover.

## COUNSEL

Erwin Chemerinsky (argued) and Claudia Polsky, UC Berkeley School of Law, Berkeley, California; Linda S. Gilleran, Dylan Silva, Donald Sobelman, Anthony P. Schoenberg, Katherine T. Balkoski, and Kyle A. McLorg, Farella Braun & Martel LLP, San Francisco, California; Annie M. Wanless, Kevin R. Budner, Nabila Abdallah, Richard M. Heimann, and Elizabeth J. Cabraser, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, California; for Plaintiffs-Appellees.

Yaakov M. Roth (argued), Principal Deputy Assistant Attorney General; Derek Weiss, Daniel Tenny, and Mark R. Freeman, Attorneys, Appellate Staff; Kathryn Barragan, Trial Attorney; Eric D. McArthur, Deputy Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

8                          THAKUR V. TRUMP

## ORDER

CHRISTEN, Circuit Judge:

On June 23, 2025, the district court issued a class-wide preliminary injunction ordering three government agencies to reinstate research grants the agencies had terminated pursuant to certain Executive Orders. The government appealed and moved for a partial stay pending appeal of the preliminary injunction.[1] We deny the government's motion.

## FACTUAL BACKGROUND

Plaintiffs are six researchers at the University of California (UC) who applied for and received multi-year federal research grants from three agencies: the Environmental Protection Agency (EPA), the National Science Foundation (NSF), and the National Endowment for the Humanities (NEH).[2] On appeal, the government moves for a stay of the injunction only as it pertains to the research

---

[1] The government's motion for partial stay requested relief by August 4, 2025, but did not invoke this court's rule governing emergency motions. Fed. R. App. P. 27-3. Instead, the government invoked Rule 27-1(3), which permits a movant to request relief by a date certain to avoid irreparable harm. Fed. R. App. P. 27-1(3). The motion did not explain the government's need for a ruling by August 4, 2025. At oral argument, however, the government stated that there was no specific reason that relief was requested by that date, other than the general urgency to avoid irreparable harm.

[2] Plaintiffs have since amended their complaint to include additional plaintiffs who received funding from other agencies.

grants awarded by EPA and NEH, so we limit our discussion to those two agencies.[3]

In April 2025, EPA and NEH sent form letters to Plaintiffs informing them that their grants were terminated. The EPA form letter states: "the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities." The NEH form letter states: "[y]our grant no longer effectuates the agency's needs and priorities," and informs the recipient that "NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda."

Plaintiffs allege that these terminations resulted from agency implementation of at least eight Executive Orders the President issued in January and February 2025: Executive Orders 14173, 14151, 14168, 14154, 14217, 14238, 14158, and 14222. Executive Orders 14173 and 14151 (the "DEI Executive Orders") seek to eliminate diversity, equity, and inclusion ("DEI") and diversity, equity, inclusion, and accessibility ("DEIA") policies and initiatives from all aspects of the federal government. More specifically, Executive Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, states that "critical and influential institutions of American society," including the federal government and institutions of higher education, "have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of

---

[3] On August 19, 2025, the government filed a citation of supplemental authorities requesting that NSF join the arguments raised in the government's motion to stay the injunction. *See* Fed. R. App. P. 28(j). Because the government has not moved for NSF to join that motion, we do not address the request here.

10 THAKUR V. TRUMP

so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation." 90 Fed. Reg. 8633, 8633 (Jan. 21, 2025). This Executive Order directs the Office of Management and Budget (OMB) to "[e]xcise references to DEI and DEIA principles under whatever name they may appear," including federal grants. *Id.* at 8634. Executive Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, instructs "each agency, department, or commission head," to provide the director of OMB with a list of all "[f]ederal grantees who received [f]ederal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." 90 Fed. Reg. 8339, 8339–40 (Jan. 20, 2025). This Executive Order directs agency heads to assess the operational impact and cost of those specified grants and recommend action. *Id.* at 8340. It expressly directs agency heads to "terminate . . . all . . . 'equity-related' grants." *Id.* at 8339. Similarly, Executive Order No. 14168, titled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, directs that "federal funds shall not be used to promote gender ideology." 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025).

The remaining Executive Orders reflect the various mechanisms through which the administration seeks to refocus or reduce government spending, including the establishment of the Department of Government Efficiency (DOGE). For example, Executive Orders 14217, 14158, and 14222 instruct OMB and federal agencies to work with DOGE to review existing grants and terminate those considered unnecessary in an effort to reduce federal spending. 90 Fed. Reg. 10577, 10577 (Feb. 19, 2025); 90

Fed. Reg. 8441, 8441 (Jan. 20, 2025); 90 Fed. Reg. 11095, 11095–96 (Feb. 26, 2025).

## PROCEDURAL HISTORY

Plaintiffs filed suit on behalf of a proposed class of similarly situated UC researchers against sixteen agencies, alleging that the mass termination of grants violated separation of powers, the First and Fifth Amendments of the Constitution, and the Administrative Procedure Act (APA). Plaintiffs sought an order vacating the grant terminations and a preliminary injunction enjoining the agencies from giving effect to those terminations.

The district court granted Plaintiffs' motion for a preliminary injunction and provisionally certified two classes of UC researchers: (1) those whose research grants were terminated by form letter without any grant-specific explanation (the "Form Termination Class"); and (2) those whose research grants were terminated because of the DEI Executive Orders (the "DEI Termination Class"). The court concluded that the Form Termination Class was likely to succeed on its claim that the terminations were arbitrary and capricious, and that the DEI Termination Class was likely to succeed on its claims that the terminations violated the First Amendment and were contrary to the agencies' congressionally mandated directives. The government appealed and moved for a partial stay of the district court's injunction.

## ANALYSIS

We consider four factors when we decide whether to stay an injunction pending appeal: (1) has the stay applicant made a strong showing that she is likely to succeed on the merits; (2) will the applicant be irreparably injured absent a

stay; (3) will issuance of the stay substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The party seeking a stay pending appeal—here, the government—bears the burden of establishing that these factors favor a stay. *See id.* at 433–34. The government's motion challenges the injunction only as it applies to the EPA and NEH grants.

## I. Likelihood of success on the merits

The government's motion renews the arguments it made before the district court that: (1) the district court lacks jurisdiction; (2) at least some Plaintiffs lack standing; and (3) Plaintiffs are not likely to succeed on the merits of their claims.

### A. Jurisdiction

The government first argues that the Tucker Act precludes district court jurisdiction over the Form Termination Class's APA claim. We disagree.

The Tucker Act gives the Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Because this statute "grants consent to suit" and "impliedly forbids" declaratory and injunctive relief, it precludes bringing contract claims against the United States in federal district court pursuant to the APA's waiver of sovereign immunity. 5 U.S.C. § 702. *See Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645–46 (9th Cir. 1998). In other words, for contract claims against the United States

THAKUR V. TRUMP                    13

seeking more than $10,000, the Tucker Act confers exclusive jurisdiction on the Court of Federal Claims.[4] *Id.*

The Tucker Act "'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). To determine whether a claim is a disguised breach-of-contract claim, we apply the *Megapulse* test, which considers: (1) the source of the rights upon which the plaintiff bases its claims and (2) the type of relief sought (or appropriate). *N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994). If the plaintiff's rights and remedies, as alleged, "are *statutorily* or *constitutionally* based, then district[] courts have jurisdiction," but if those rights and remedies "are *contractually based* then only the Court of Federal Claims does." *United Aeronautical*, 80 F.4th at 1026 (emphasis in original).

Beginning with "the source of the rights upon which the plaintiff bases its claims," *id.*, Plaintiffs contend that the form termination notices, which did not state any reason specific to the recipient for termination of their grants, violated their right to be free from arbitrary and capricious agency action. *See* 5 U.S.C. § 706(2)(A). The source of that right is statutory, and it "existed prior to and apart from rights created under the contract." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (citation modified). Plaintiffs' APA claim is not premised on

---

[4] Pursuant to the Little Tucker Act, district courts have "concurrent jurisdiction with the claims court for actions not exceeding $10,000." *N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993) (en banc) (per curiam) (citing 28 U.S.C. § 1346(a)(2)).

14　　　　　　　　THAKUR V. TRUMP

any rights derived from their grants or any purported contract and thus resolving the claim does not require analyzing the terms of any grant or contract. Rather, Plaintiffs' APA argument is that the agencies, by sending form termination notices, failed to provide a reasoned explanation for their actions. *See* § 706(2)(A); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Contractual rights are not at issue.

As for the "type of relief sought," *United Aeronautical*, 80 F.4th at 1026, Plaintiffs sought—and the district court awarded—vacatur of the termination notices and reinstatement of the terminated grants. These well-established APA remedies are not contractual in nature. *See, e.g.*, *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (noting that "vacatur and remand is the default remedy under the APA").

The government insists that Plaintiffs seek specific performance pursuant to the grant agreements, an "explicitly contractual remedy." *See Crowley*, 38 F.4th at 1107. Thus, the government asserts that this part of the *Megapulse* test "boils down to whether [Plaintiffs] effectively seek[] to attain monetary damages." *Id.*

Defendants overlook that even if Plaintiffs' requested relief has the eventual effect of requiring the government to make payments pursuant to the grants, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *see also Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). Plaintiffs' request to effectively undo the grant terminations and return Plaintiffs to the status quo does not seek performance of a contractual

obligation. *Cf. Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*, 813 F.3d 1155, 1167 (9th Cir. 2015) (noting that "one cannot specifically perform something that is not a term in the contract"). Instead, Plaintiffs' APA claim seeks to ensure that the agencies' course of conduct complies with federal law. *See Bowen*, 487 U.S. at 905. At this preliminary stage, it appears that any payments due under the grants are "a mere by-product" of the district court's "primary function of reviewing" the government's interpretation of its statutory obligations pursuant to the APA. *Id.* at 910.

*Department of Education v. California*, upon which the government relies, does not compel a contrary conclusion. In *Department of Education*, the Supreme Court addressed a claim brought pursuant to the APA "to enforce a contractual obligation to pay money." 145 S. Ct. at 968. The claim fell within the scope of the Tucker Act because the temporary restraining order required "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue[d]." *Id.* Here, by contrast, Plaintiffs' requested relief does not "order [any] amount to be paid," nor does it seek a "finding that the Federal Government owed [Plaintiffs] . . . any amount of money." *Bowen*, 487 U.S. at 909–10. Instead, Plaintiffs request that the district court, based on the government's violation of the APA, "vacate the grant terminations and preliminarily enjoin Defendants from giving effect to those terminations." Such relief is not based on any conditions or obligations under the grant agreements. Indeed, the record does not reflect that Plaintiffs are even parties to the grant agreements. Accordingly, we conclude the government has not demonstrated that it is likely to succeed in showing that the district court lacked jurisdiction

to review the APA claims raised by the Form Termination Class.

## B. Standing

The government argues that at least some members of the Form Termination Class lack Article III standing because they have not demonstrated a cognizable injury in fact. Again, at this stage, the government has not made a strong showing that Plaintiffs lack standing.

To establish injury in fact, a plaintiff must show "that he suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Where the class seeks injunctive relief, the court "consider[s] only whether at least one named plaintiff satisfies the standing requirements for injunctive relief." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc).

Here, the government suggests that the class representatives have not been injured by every challenged grant termination. But "[a]ny issues regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are relevant only to class certification, not to standing." *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019) (citation omitted); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979 (9th Cir. 2011).

The government separately argues that not every member of the Form Termination Class has standing because class members will only suffer injury to the extent they are unable to replace any terminated federal funding. As an initial matter, because standing in a Rule 23(b)(2) class is assessed at the time the complaint was filed, any future

mitigation of Plaintiffs' injuries is immaterial to the standing analysis. *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014). Moreover, the government focuses solely on the prospect of some class members obtaining some replacement funding, and overlooks that the class representatives—*e.g.*, Dr. Christine Philliou, Dr. Neeta Thakur, and Dr. Nell Green Nylen—also allege injury in the form of opportunity costs associated with seeking alternative funding, disruptions to projects, and reputational harms associated with grant terminations.

Accordingly, we conclude the government has not demonstrated that it is likely to succeed in showing that the class representatives of the Form Termination Class lack Article III standing.

### C. Plaintiffs' likelihood of success

#### i. Form Termination Class

The government argues that the Form Termination Class is not likely to succeed on the merits of its APA claim because the agencies' decision to discontinue previously funded grants is committed to agency discretion and is not reviewable. The APA creates a "basic presumption of judicial review," rebutted only if the relevant statute precludes review or if the action is "committed to agency discretion by law." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22–23 (2018) (citations omitted); 5 U.S.C. § 701(a)(2). An action is "committed to agency discretion by law" only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser*, 586 U.S. at 23 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). "Even where statutory language grants an agency unfettered

discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which this court may review its exercise of discretion." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021) (quoting *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015)). Here, 2 C.F.R. § 200.340(a) provides uniform administrative requirements for the termination of federal grants, including those an agency terminates because they "no longer effectuat[e] . . . agency priorities." § 200.340(a)(4). Sections 200.340, 200.341, 200.343, and 200.345 outline the requirements for termination, the notification requirements when grants are terminated, and the effects of suspension and termination of grants. These regulations provide a meaningful standard by which courts may review the agencies' exercise of discretion. We therefore reject the government's argument that the terminations are not reviewable and consider whether the form termination letters were arbitrary and capricious. 5 U.S.C. § 706(2)(A).

Agencies are "free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025) (citation modified). The EPA form letter provides three disjunctive reasons for termination: (1) failure to exhibit "merit, fairness, and excellence;" (2) "fraud, abuse, waste, and duplication;" and (3) failure to "serve the best interests of the United States." The letter does not explain which rationale applies to the recipient of the form letter. Nor does it explain how research projects that were selected to receive federal funding after a competitive process now fail to exhibit merit, or describe what the research duplicates, or provide any

THAKUR V. TRUMP                    19

specific evidence supporting the allegation that any researcher acted abusively, fraudulently, or wastefully. The NEH form letter states only that the grant "no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement," and merely recites § 200.340.

The rest of the record also provides little explanation for the termination decisions. Michael McDonald, Acting Chairman of NEH, stated in his declaration that NEH selected grants for termination by identifying grants that were purportedly directed at "environmental justice" and "diversity, equity, and inclusion," among other terms, and categorizing grants as "High, Medium, Low, or No Connection" to the Executive Orders. Daniel Coogan, Deputy Assistant Administrator for Infrastructure and Extramural Resources in the EPA's Office of Mission Support, stated in his declaration that EPA's grant review process occurred "independent from any Executive Order," but the district court noted that this assertion was inconsistent with the EPA's public announcements. For example, on February 14, 2025, the EPA stated that it "has worked diligently to implement President Trump's executive orders, including the 'Ending Radical and Wasteful Government DEIA Programs and Preferencing,' as well as subsequent associated implementation memos." *EPA Administrator Lee Zeldin Cancels Nine More Contracts, Saving Nearly $60 Million*, EPA (Feb. 14, 2025), https://perma.cc/XJH9-8JKB.[5] On this limited record, we agree with the district court that the recipients of the form

---

[5] Additionally, on March 10, 2025, the EPA announced that it "cancelled grants and contracts related to DEI and environmental justice." *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B*, EPA (Mar. 10, 2025), https://perma.cc/3P2M-6PUY.

letter and the public were left to guess at the reasons for these terminations.

The government conceded at oral argument that there is no record evidence that either agency considered the researchers' reliance interests. Nor is there evidence that the agencies considered the hundreds of millions of dollars taxpayers have invested in the grant projects that would be lost if the grants are terminated. *See, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (requiring an agency that is "not writing on a blank slate" to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns"). In one of many examples, Dr. Neeta Thakur's $1.3 million grant to study the impact of wildfire smoke on California communities over the course of three years was terminated seven months before the study's projected end. As a result, the research that taxpayers have already funded will not be published. The government points to no evidence that EPA considered those facts when it terminated Dr. Thakur's research grant.

Because the letters left the recipients guessing as to the agencies' rationale, and there is no evidence that the agencies considered reliance interests before terminating the grants, the government has not "made a strong showing" that it is likely to succeed on the merits of its argument that the district court abused its discretion when it concluded that the termination of grants by form letters was likely arbitrary and capricious. *Nken*, 556 U.S. at 426.

### ii. DEI Termination Class

The government argues that the district court abused its discretion when it concluded that the DEI Termination Class was likely to succeed on the merits of its First Amendment

claim that the agencies unlawfully terminated their grants based on their viewpoint. The government relies on the significant flexibility it is afforded when acting as a patron to subsidize speech, as opposed to when it regulates speech as a sovereign. The government argues that it "can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest" to the exclusion of other activities. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549–50 (1983). In support, the government relies on *National Endowment for the Arts v. Finley* to argue that there is a First Amendment violation only when the government uses its sovereign power to "drive 'certain ideas or viewpoints from the marketplace'"—not when the government simply ceases funding those ideas or viewpoints. 524 U.S. 569, 587 (1998) (citation omitted).

In our view, the government misreads *Finley*. There, Congress amended the National Endowment for the Arts's (NEA) reauthorization bill to require that grant applications be evaluated by "taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (citation omitted). The Plaintiffs, performance artists who applied for grants, brought a facial challenge to the amendment and argued that it violated their First Amendment rights. *Id.* at 577, 580. Importantly, the Plaintiffs "d[id] not allege discrimination in any particular funding decision," and therefore, the Supreme Court "ha[d] no occasion . . . to address an as-applied challenge in a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination." *Id.* at 586–87. The Court explained that "[i]f the NEA were to leverage its power to award subsidies

on the basis of subjective criteria into a penalty on disfavored viewpoints, then [it] would confront a different case." *Id.* at 587. The Court went on to emphasize that "*even in the provision of subsidies*, the Government may not 'aim at the suppression of dangerous ideas.'" *Id.* (emphasis added) (citation modified) (quoting *Regan*, 461 U.S. at 550).

Contrary to the government's argument, this case does not appear to be one in which an agency decided not to "fund a program." *See Rust*, 500 U.S. at 193. Rather, it is one in which more than a dozen agencies selected particular grants for termination regardless of the programs through which they were funded, based on their connection to DEI, DEIA, and environmental justice. Thus, we "confront a different case" than *Finley* (where plaintiffs brought a facial challenge to Congress's mandate that NEA consider standards of decency in awarding grants), *Rust* (where plaintiffs brought a facial challenge to HHS regulations interpreting Title X's prohibition on funding for abortion services), and *Regan* (where plaintiffs brought a facial challenge to the IRS's requirement that organizations refrain from lobbying to qualify for § 501(c)(3) tax-exempt status). Plaintiffs' as-applied challenge is closer to *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995). In that case, the University of Virginia made funds available to cover printing costs for student newspapers. *Id.* at 843. The University denied a Christian newspaper's application for funds because the newspaper engaged in "religious activity" by "promot[ing] or manifest[ing] a particular belie[f] in or about a deity or an ultimate reality," conduct prohibited by the University's guidelines for student activity funding. *Id.* at 827. The Court concluded that the University "d[id] not exclude religion as a subject matter" but "select[ed] for disfavored treatment those student journalistic efforts with

religious editorial viewpoints." *Id.* at 831, 833, 835 ("[W]hen the State is the speaker, it may make content-based choices," but "[h]aving offered to pay the third-party contractors on behalf of private speakers who convey their own messages, the [State] may not silence the expression of selected viewpoints.").

Here, the record at this stage shows that the agencies selected grants for termination based on viewpoint. Indeed, the government does not meaningfully dispute that DEI, DEIA, and environmental justice are viewpoints. The agencies, the termination letters, and the Executive Orders do not define these terms, but dictionary definitions demonstrate that DEI, DEIA, and environmental justice are not merely neutral topics. Instead, the terms convey the viewpoint that the exclusion of historically disadvantaged groups is undesirable. *diversity, equity and inclusion*, Merriam-Webster, https://perma.cc/84ZW-7JSR (last visited Aug. 12, 2025) ("a set of values and related policies and practices focused on establishing a group culture of equitable and inclusive treatment and on attracting and retaining a diverse group of participants, including people who have historically been excluded or discriminated against"); *diversity, equity and inclusion*, Cambridge English Dictionary, https://perma.cc/M2GS-L4UT (last visited Aug. 12, 2025) ("the idea that all people should have equal rights and treatment and be welcomed and included, so that they do not experience any disadvantage because of belonging to a particular group, and that each person should be given the same opportunities as others according to their needs"); *environmental justice*, Cambridge English Dictionary, https://perma.cc/V5CK-Z2GP (last visited Aug. 12, 2025) ("the idea that all groups of people deserve to live in a clean and safe environment").

We are bound by the bedrock principle that the government cannot "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" or "aim at the suppression of dangerous ideas" in the provision of subsidies. *Finley*, 524 U.S. at 587 (citation modified) (quoting *Regan*, 461 U.S. at 550). The government does not dispute that it terminated the subject grants because they promoted DEI, DEIA, or environmental justice. We therefore conclude that the government has failed to make a strong showing that the district court abused its discretion when it concluded that the DEI Termination Class was likely to succeed on the merits of its First Amendment claim.

The agencies' implementation of the DEI Executive Orders reinforces our conclusion. McDonald's declaration states that NEH staff reviewed open grants in light of the DEI Executive Orders, and NEH's "policy for selecting grants for termination at NEH focused first on identifying open grants that focused on or promoted (in whole or in part) 'environmental justice,' 'diversity, equity, and inclusion,' or 'diversity, equity, inclusion and accessibility,' and 'gender ideology.'" NEH created and used spreadsheets that identified grants as "either 'High, Medium, Low, or No Connection' in terms of the Executive Orders." Coogan's declaration states that the grant termination process "began by looking at grant titles and project descriptions." Although his declaration states that the EPA reviewed and terminated grants "independent from" the Executive Orders, the EPA's public announcements state the opposite. For example, on March 10, 2025, the EPA announced that it "cancelled grants and contracts related to DEI and environmental justice." *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th*

*Round of Cuts with DOGE, Saving Americans More than $1.7B*, EPA (Mar. 10, 2025), https://perma.cc/3P2M-6PUY

Because the current record suggests that the government aimed at the suppression of speech that views DEI, DEIA, and environmental justice favorably, the government has not shown that it is likely to succeed on the merits of its claim that the district court abused its discretion when it concluded the agencies likely terminated the grants based on viewpoint.**[6]**

## II. Remaining *Nken* factors

The government argues that the preliminary injunction risks irreparable harm to the government and the public interest by: (1) interfering with the President's ability to carry out core Executive Branch policies, and (2) compelling the government to disburse funds that it cannot recover.**[7]**

The government first argues the district court's preliminary injunction will interfere with the Executive Branch's chosen policy agenda. This argument rests on the assumption that the government's conduct is lawful. But the government has not made a strong showing of a likelihood of success on the merits, and the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th

---

[6] Because we conclude the government failed to show that it was likely to succeed on the merits of its claim that the district court abused its discretion when it concluded that Plaintiffs were likely to succeed on their First Amendment claim, we do not reach the government's argument challenging the class's claim that the terminations were contrary to NEH's enabling statute.

[7] To the extent the government argues that the third and fourth factors merge, that is so when the government is the party opposing a stay, rather than the party seeking one. *See Nken*, 556 U.S. at 435.

Cir. 2013). Moreover, we have rejected the assertion that "the irreparable harm standard is satisfied by the fact of executive action alone." *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020). The government's first claimed harm is not irreparable because the government "may yet pursue and vindicate its interests in the full course of this litigation." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam).

The government also contends that it will be irreparably harmed because the district court's preliminary injunction requires it to disburse money it may never recover. For support, the government principally relies on *Department of Education*, where the plaintiffs did "not refute[] the Government's representation that it [was] unlikely to recover the grant funds once they [were] disbursed." 145 S. Ct. at 968–69.

Even if the government may be unable to recover at least some of the funds it disburses pursuant to the grants and may therefore suffer some degree of irreparable harm, *see id.*, the remaining equitable factors do not favor the government.**[8]** Unlike in *Department of Education*, where the plaintiffs conceded that they could "keep their programs running" in the absence of grant funding, *id.*, Plaintiffs have established that the termination of grants will result in layoffs, interruptions to graduate programs, destruction of research

---

[8] In *Department of Education*, the Supreme Court relied on the government's factual representation—reflected in a declaration submitted in the district court—that funds disbursed pursuant to the grants at issue would be difficult to recover. 145 S. Ct. at 969. The government submitted no comparable evidence here. Further, unlike in *Department of Education*, Plaintiffs here contend—and the Government does not meaningfully contest—that there are "existing mechanisms to recoup funds."

projects, and injury to Plaintiffs' professional reputations. Further, if research projects are lost due to grant funding being halted midstream, the public will obtain no benefit from research in which substantial funds have already been invested—a significant waste of taxpayer dollars. Thus, Plaintiffs have shown that entry of a stay will result in considerable harm to Plaintiffs and the public.

The government failed to meet its burden to show that the remaining *Nken* factors favor entry of a stay pending appeal.

## CONCLUSION

The government's motion for partial stay pending appeal (Dkt. No. 7) is **DENIED.**