No. 25-4249

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

NEETA THAKUR, on behalf of themselves
and all others similarly situated; et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; et al.,

Defendants-Appellants,

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-04737

## MOTION FOR PANEL RECONSIDERATION
## OR RECONSIDERATION EN BANC
## OF PUBLISHED ORDER DENYING STAY PENDING APPEAL

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney
General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

DANIEL TENNY
SOPHIA SHAMS
*Attorneys, Appellate Staff
Civil Division, Room 7213
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-514-2495*

# TABLE OF CONTENTS

**Page**

RULE 40 STATEMENT ................................................................................ 1

INTRODUCTION ......................................................................................... 2

BACKGROUND ........................................................................................... 3

ARGUMENT ................................................................................................ 8

I.     The Supreme Court's Recent Stay Decision Makes Clear That The
       District Courts Likely Lacks Jurisdiction To Enjoin The Government's
       Grant Terminations On APA Grounds. ............................................... 8

II.    The Equities Decisively Support A Stay ........................................... 14

CONCLUSION ........................................................................................... 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004) ........................................ 9

*American Pub. Health Ass'n v. National Insts. of Health*,
    145 F.4th 39 (1st Cir. 2025) ........................................ 8, 9, 12, 13

*Block v. Community Nutrition Inst.*,
    467 U.S. 340 (1984) ........................................ 14

*Climate United Fund v. Citibank, N.A.*,
    No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) ................ 11, 16

*Department of Educ. v. California*,
    145 S. Ct. 966 (2025) ........................................ 1, 7

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ........................................ 14

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ........................................ 7, 11

*National Insts. of Health v. American Pub. Health Ass'n*,
    No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) .......... 1, 2, 8, 9, 10,
    11, 12, 13, 15, 16

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................ 14

*Trump v. Boyle*,
    145 S. Ct. 2653 (2025) ........................................ 15

**Statutes:**

Administrative Procedure Act (APA),
    5 U.S.C. § 702 ........................................ 9

28 U.S.C. § 1491(a)(1) ........................................ 10

**Regulatory Materials:**

2 C.F.R. § 200.309 ........................................................................... 4

2 C.F.R. § 200.339(c) ...................................................................... 4

2 C.F.R. § 200.343 ........................................................................... 4

Exec. Order No. 14151, § 2(b)(i),
    90 Fed. Reg. 8339 (Jan. 29, 2025) ........................................... 3

Exec. Order No. 14173, § 3(c)(iii),
    90 Fed. Reg. 8633 (Jan. 31, 2025) ........................................... 3

## RULE 40 STATEMENT

Review by the panel, or the full Court if necessary, is appropriate because the stay order involves questions of exceptional importance and conflicts with the Supreme Court's later-issued order in *National Institutes of Health v. American Public Health Ass'n (NIH)*, No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) (per curiam).

In the present case, the district court issued an order vacating the government's notices terminating various research-related grants and restoring those grants. The panel denied the government's motion to stay that order, holding in part that the district court likely had jurisdiction under the Administrative Procedure Act (APA) to issue its order. Later on the same day that the panel issued its decision, the Supreme Court in a case plaintiffs have described as "nearly identical" came to the opposite conclusion and stayed a district court order that had similarly vacated grant terminations under the APA. *NIH*, 2025 WL 2415669, at *1. The Court held that the APA's "limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* (cleaned up). Instead, such claims must be brought under the Tucker Act in the Court of Federal Claims. *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam).

The Supreme Court's decision, and its decision to intervene in a materially identical case, make clear that the panel should revisit its decision or, in the alternative, that its decision should be reconsidered by the full Court.

## INTRODUCTION

This request for reconsideration arises because later on the same day that the panel issued its decision in this case, the Supreme Court issued an opinion that directly contradicts the panel's holding. In particular, the panel concluded that the district court likely had jurisdiction to hear plaintiffs' APA claims challenging the government's terminations of various research-related grants, and on that basis denied the government's motion for a stay. But later that same day, the Supreme Court issued an order staying a substantially similar district-court order on the ground that the Tucker Act likely precludes APA claims challenging the government's grant terminations. *NIH*, No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025).

The Supreme Court's decision in *NIH* makes clear that the government is entitled to a stay. The facts of *NIH*, plaintiffs themselves have acknowledged, are almost identical to the facts here. Both cases involve APA claims challenging agency terminations of various research-related grants as arbitrary and capricious. And in both cases, the relief ordered vacated those terminations and effectively reinstated the grants. On these facts, the Supreme Court has been clear: the government is likely to succeed in showing that plaintiffs' claims belong in the Court of Federal Claims, not district court, and is entitled to a stay pending appeal.

2

The Supreme Court's decision in *NIH* squarely rejects the arguments accepted by the panel, which had been adopted by the First Circuit and raised by the plaintiffs in the Supreme Court in that case. And *NIH* solidifies that the equities favor a stay in cases like this one. The district court's order effectively requires the government to pay funds pursuant to the grant agreements, funds which the government is unlikely to recover even if it ultimately prevails on the merits. The irreparable harm to the government and public fisc far outweighs any harm to plaintiffs, warranting a stay.[1]

## BACKGROUND

**1.** In the days after his inauguration, the President issued several Executive Orders setting forth his Administration's priorities. The Order "Ending Radical and Wasteful Government [Diversity, Equity, and Inclusion (DEI)] Programs and Preferencing" instructed agencies to "terminate, to the maximum extent allowed by law, … 'equity-related' grants or contracts." Exec. Order No. 14151, § 2(b)(i), 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025). The Order "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" similarly ordered the termination of certain DEI-related "mandates, requirements, programs, or activities, as appropriate." Exec. Order No. 14173, § 3(c)(iii), 90 Fed. Reg. 8633, 8634 (Jan. 31, 2025). Other Executive

---

[1] This motion relates only to part of the district court's order, relating to the "Form Termination Class." Although the government also disputes the panel's holding as it applies to the Equity Termination Class, there has not been intervening law on that issue. The government will therefore raise arguments as to the Equity Termination Class in its merits briefing.

Orders "instruct[ed] federal agencies to terminate, review, or revise federal grants" for additional reasons.  ER-13 (discussing Executive Orders 14168, 14154, 14217, 14238, 14158, and 14222).

**2.**  Accordingly, federal agencies reviewed their existing grant portfolios.  The agencies' grant programs are highly selective, with the EPA, for example, funding only 11% of the applications it receives.  ER-11-12.  The agencies exercise significant discretion when determining which grants to fund or continue funding based on how the projects advance agency goals.

Federal regulations generally specify the conditions under which awarded grants may be terminated.  *See, e.g.*, 2 C.F.R. §§ 200.309, .339(c), .343.  Section 200.340, simply titled "[t]ermination," reserves authority to terminate grants "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  Awardees are thus informed that awards may be terminated based on changed priorities.

As relevant here, the agencies invoked this authority to terminate certain grants they concluded no longer aligned with agency priorities.  Most centrally, some agencies declined to continue to fund grants that they concluded were inconsistent with the President's priorities as expressed in Executive Orders.

**3.**  The relevant named plaintiffs for the preliminary injunction on appeal are six individual faculty members or researchers at UC institutions who were listed on grant applications terminated by the NEH, NSF, or EPA.  ER-166.  None of the

4

named plaintiffs received any such grant directly. They moved to certify a class of all similarly situated UC researchers, Dkt. 18, and sought an order requiring the reinstatement of grants by 16 federal agencies, Dkt. 7.

The district court certified two overlapping classes. As relevant here, the Form Termination Class covers grants "that are terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake, from and after January 20, 2025." ER-56-57.

The district court also granted plaintiffs' request for an injunction requiring the reinstatement of grants. For the Form Termination Class, the court rejected the government's reliance on the Tucker Act, which generally precludes APA claims premised on contracts with the government, for two reasons. First, the court concluded that a claim that contract "terminations [were] carried out in an arbitrary and capricious manner does not rest on a contention that Defendants breached a contract." ER-42-43. Second, the court reasoned that even if the Tucker Act bars claims by grant recipients, the court could resolve similar claims by nonparties to the grants. ER-42-43. Having found jurisdiction, the court concluded "Plaintiffs are … likely to succeed in showing that the mass grant terminations carried out via form letters were conducted in a manner that was arbitrary and capricious." ER-30. And the court further determined that the equities weighed in favor of injunctive

relief, as plaintiffs faced irreparable harm if they could not receive federal funding from the grants.

The district court limited the injunction to the three defendant agencies (EPA, NEH, and NSF) who had terminated a grant which listed a plaintiff named in the then-operative complaint. ER-64-65. Plaintiffs have since amended their complaint and sought injunctive relief against additional agencies—Department of Defense, Department of Transportation, and National Institutes for Health—on the same basic theories.[2]

The district court denied the government's request for a stay pending appeal. ER-66-67.

**4.** The government sought a stay of the district court's injunction, which a panel of this Court denied.[3]

Relevant here, the panel rejected the government's argument that the Tucker Act precludes district-court jurisdiction over the Form Termination Class's APA claim. Although it recognized that the "Tucker Act impliedly forbids … disguised breach-of-contract claim[s]" seeking injunctive and declaratory relief, the panel concluded that the Form Termination Class's APA claim did not sound in contract.

---

[2] Plaintiffs' motions for additional injunctions against the three new agencies are pending.

[3] The government initially did not seek relief on behalf of NSF, but once the district court interpreted its injunction broadly to prohibit subsequent suspensions of grants by NSF, the government requested that the injunction be stayed as to NSF on the same grounds that applied to the other movants.

Op. 13 (cleaned up). Specifically, the panel applied the two-part *Megapulse* test, which considers "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)" to assess whether "a particular action" is "at its essence a contract action." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted). The panel determined that "the source of [plaintiffs'] right is statutory" rather than contractual, Op. 13, and that the relief awarded—vacatur of the termination notices and reinstatement of the grants—consisted of "well-established APA remedies" and was "not contractual in nature," Op. 14. The panel acknowledged that this "relief has the eventual effect of requiring the government to make payments pursuant to the grants" but considered this to be a "mere by-product" of the relief sought. Op. 14-15.

The panel also rejected the argument that the Supreme Court's decision in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), compelled a stay. That case, the panel concluded, involved an order requiring the government to pay grant obligations, while plaintiffs' requested relief "does not order any amount to be paid" and "is not based on any conditions or obligations under the grant agreements." Op. 15 (cleaned up). The panel accordingly held that the government did not demonstrate that the district court likely lacked jurisdiction to review the Form Termination Class's APA claims. Op. 15-16.

7

## ARGUMENT

### I.   The Supreme Court's Recent Stay Decision Makes Clear That the District Court Likely Lacks Jurisdiction To Enjoin The Government's Grant Terminations On APA Grounds.

The panel denied the government's request for a stay on the ground that plaintiff-researchers could seek reinstatement of research grants in district court through the APA.  But just hours after that ruling, the Supreme Court said the opposite in a case that plaintiffs here called "nearly identical."  Opp'n Stay Mot. 8. The Court granted a stay on the basis that such challenges to grant terminations must be pursued in the Court of Federal Claims, and its reasoning rejects various arguments upon which the panel relied.  A straightforward application of that intervening authority requires reconsideration of the panel's stay denial.

**A.**  Later on the same day the panel issued its stay ruling in this case, the Supreme Court granted a stay in *National Institutes of Health v. American Public Health Association*, No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) (per curiam), a case plaintiffs have described as "nearly identical" to this one, Opp. Stay Mot. 8.

There, the plaintiffs brought APA claims alleging that the government's terminations of their DEI-related research grants were arbitrary and capricious, and the district court vacated the terminations on those grounds.  *American Pub. Health Ass'n v. National Insts. of Health*, 145 F.4th 39, 43-44, 47 (1st Cir. 2025).  The First Circuit denied the government's request for a stay, concluding that the district court "likely had jurisdiction to enter the orders … to set aside an agency's actions as

8

arbitrary and capricious," and that "the fact that the orders may result in the disbursement of funds did not divest the court of its jurisdiction." *Id.* at 52 (cleaned up).

The Supreme Court disagreed and stayed the district court's judgment "vacating the Government's termination of various research-related grants." *NIH*, 2025 WL 2415669, at *1. Citing its recent decision in *Department of Education*, the Court held that the APA's "limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* (cleaned up). And it further determined that the government faced irreparable harm given that "plaintiffs do not state that they will repay grant money if the Government ultimately prevails." *Id.*

The Supreme Court's reasoning stems from the fact that although the APA provides a limited waiver of the government's sovereign immunity for suits challenging final agency action and "seeking relief other than money damages," the "Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted); *see also* 5 U.S.C. § 702 (providing that APA's waiver of sovereign immunity does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought"). Congress has instead

9

vested the Court of Federal Claims with exclusive jurisdiction over most contract claims against the United States. *See* 28 U.S.C. § 1491(a)(1).

**B.** *NIH* "squarely control[s]" this case. *NIH*, 2025 WL 2415669, at *5 (Gorsuch, concurring in part and dissenting in part) (quotation omitted). Like in *NIH*, the Form Termination Class's APA claims challenge grant terminations as arbitrary and capricious. Their claims are thus "based on the research-related grants" through which they receive federal funds. *Id.* at *1 (per curiam) (quotation omitted). And as in *NIH*, the district court—by vacating the government's termination of the grant agreements and reinstating the grants so that plaintiffs may continue to receive federal funding through those grants—ordered "relief designed to enforce [an] obligation to pay money pursuant to" the research-related grants. *Id.* (quotation omitted).

The panel here acted without the benefit of *NIH*, but that decision makes clear that the government's motion for a stay should have been granted in relevant part. The panel determined that plaintiffs' APA claim is statutory because it is "not premised on any rights derived from their grants or any purported contract" but rather stems from a "right to be free from arbitrary and capricious agency action." Op. 13. But the Supreme Court concluded in *NIH* that the APA's waiver of sovereign immunity did not extend to claims challenging substantially similar agency grant terminations as arbitrary and capricious because such claims are "based on the research-related grants." *NIH*, 2025 WL 2415669, at *1 (quotation omitted); *see also*

*Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 n.34 (D.C. Cir. 1982) (noting that it is "hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA" (quotation omitted)). As the D.C. Circuit recognized just this week, it is clear after *NIH* that a general right to be free from arbitrary-and-capricious decisionmaking cannot be the source of the right upon which plaintiffs' claim is premised. *See Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881, *8 (D.C. Cir. Sept. 2, 2025) (relying on *Department of Education* and *NIH* to conclude that an "arbitrary and capricious challenge to … grant terminations is a disguised contract claim that cannot be heard in district court").

Applying that logic here, the Form Termination Class's claim is premised on the asserted right to receive federal funds, which stems from the grant agreements. That plaintiffs are not themselves parties to the agreements makes no difference. "The core of plaintiffs' suit alleges that the Government unlawfully terminated the[] grants. That is a breach of contract claim. And under the Tucker Act, such claims must be brought in the Court of Federal Claims, not federal district court." *NIH*, 2025 WL 2415669, at *5 (Kavanaugh, J., concurring in part and dissenting in part).

The panel also reasoned that the relief requested and ordered "are not contractual in nature." Op. 14. The panel acknowledged that the district court's order vacating the termination notices and reinstating the grants "has the eventual effect of requiring the government to make payments pursuant to the grants," but it

considered this "a mere by-product" of the order. Op. 14-15 (quotation omitted). The Supreme Court's *NIH* decision rejected that logic. As one of the concurring opinions further explained, an "order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants." *NIH*, 2025 WL 2415669, at *4 (Gorsuch, J., concurring in part and dissenting in part). That is especially true here, as plaintiffs themselves acknowledge that the aim of their requested relief is to have the grant agreements reinstated so that they may continue to receive funds paid out by the government under those agreements. *See* Opp'n Stay Mot. 23-24 (arguing that the preliminary injunction is necessary for plaintiffs to continue to receive funding). Such "relief designed to enforce [an] obligation to pay money pursuant to those grants" falls outside the APA's "limited waiver of sovereign immunity." *NIH*, 2025 WL 2415669, at *1 (cleaned up).

The panel's decision to discount *Department of Education* has thus been overtaken by the Supreme Court's subsequent decision in *NIH*. The panel's determination that *Department of Education* was distinguishable because it involved relief requiring "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue[]," while relief vacating terminated grants supposedly does not, Op. 15 (quotation omitted), echoes the First Circuit's since-rejected reasoning in *NIH*. *See American Pub. Health Ass'n*, 145 F.4th at 51 (purporting to distinguish *Department of Education* on the ground that in that case "the Supreme Court

12

construed the district court as having ordered the Government to pay out past-due grant obligations" (quotation marks omitted)).  In *NIH*, the Supreme Court made clear that *Department of Education* "cannot be so easily circumvented."  *NIH*, 2025 WL 2415669, at *4 (Gorsuch, J., concurring in part and dissenting in part); *see also id.* at *1 (per curiam) (relying on *Department of Education* in granting a stay); *id.* at *2 n.1 (Barrett, J., concurring) (noting that the "objection … to sending the grant-termination claims to the [Court of Federal Claims]" was "already addressed" by *Department of Education*).

C.  Despite having previously described *NIH* as "nearly identical" to this one, Opp'n Stay Mot. 8, plaintiffs wrote a letter after the *NIH* decision issued in which they sought to distinguish the case on the ground that they are not themselves parties to the grant agreements—a rationale that the panel did not invoke in denying a stay. But that does not distinguish the case at all.  Several of the plaintiffs in *NIH* were also not themselves parties to the grants but rather indirect recipients of grant funding. *American Pub. Health Ass'n*, 145 F.4th at 44 ("The plaintiffs in the first case are private research and advocacy organizations and individual researchers who receive NIH funding.").  And the plaintiffs in *NIH* resisted a stay in the Supreme Court on that precise ground.  *See* APHA Plaintiffs' Stay Opposition at 28-29, *NIH*, No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) (arguing that because some of the plaintiffs are indirect beneficiaries of grant funding, they should have a right to review because otherwise "no court will have jurisdiction to hear [their] claims").  The issue was thus raised by the *NIH* plaintiffs as a means of avoiding Tucker Act preclusion, and the

13

Supreme Court did not accept that argument. Instead, the Court held that the district court likely lacked jurisdiction over all the plaintiffs' APA claims, without regard to whether they were direct or indirect recipients of grant funding.

That conclusion reflects that it would not be logical to allow indirect recipients of grant funding to bring APA claims challenging the government's grant terminations while barring direct recipients of the grants from bringing those same claims. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (explaining that the APA's preemption-carveout provision "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes"). As the Supreme Court has long recognized, when Congress establishes a remedial scheme with limitations on the parties who can seek relief, the proper inference is not that other parties can seek relief without regard to the remedial scheme's limitations, but rather that other parties cannot seek relief at all. *See Block v. Community Nutrition Inst.*, 467 U.S. 340, 345-47, 349 (1984) (declining APA review over a challenge to the Agricultural Marketing Agreement Act of 1937 because by limiting challenges to the Act to a particular class, the Act "impliedly precluded" judicial review over similar challenges by those outside the class).

## II.  The Equities Decisively Support A Stay.

The harms to the government and public interest, which "merge" here, *Nken v. Holder*, 556 U.S. 418, 435 (2009), weigh decisively in favor of a stay. On this point too, *NIH* clarifies the law in a way that requires reconsideration of the panel's order.

14

First, the district court's preliminary injunction risks irreparable harm to the government and to the public interest by requiring the payment of money that the government may never recover. "[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds cannot be recouped and are thus irrevocably expended." *NIH*, 2025 WL 2415669, at *1 (quotation omitted). Thus, the Supreme Court held in *NIH* that the government faced irreparable harm because the "plaintiffs d[id] not state that they w[ould] repay grant money if the Government ultimately prevails." *Id.* This decision must "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025); *see also NIH*, 2025 WL 2415669, at *4 (Gorsuch, J., concurring in part and dissenting in part) (explaining that the Supreme Court's emergency orders in cases like *Department of Education* "bind[] lower courts as a matter of vertical *stare decisis*").

And this is a like case. The district court's order vacating the termination notices and requiring the agencies to continue to make payments pursuant to the grants will irreparably harm the public fisc. As in *NIH*, plaintiffs have not promised to return withdrawn funds, and the government is unlikely to be able to recover the funds disbursed to nonparty grant recipients. The panel's suggestion (Op. 26 n.8) that the government needed to submit a declaration stating that it would be unable to recover any grant funds disbursed is belied by *NIH*, in which the government also did not provide any such declarations, but the Supreme Court in any event recognized that the government faced irreparable harm because the "plaintiffs d[id] not state that

15

they w[ould] repay grant money if the Government ultimately prevails." *NIH*, 2025 WL 2415669, at *1. And given the millions of dollars that the government is unlikely to be able to recover, the $100 injunction bond fails to protect against the government's substantially larger injuries.

Plaintiffs' alleged monetary harms, by contrast, will be resolved should the grant recipients who employ plaintiffs ultimately prevail in the Court of Federal Claims. Although plaintiffs assert that they face impending harm from labs being shut down and research being halted, those too are remediable given that plaintiffs may be able to recover any lost funds and therefore reinstate any lost projects. And in any event, plaintiffs' alleged harms cannot overcome the irrecoverable loss of funds that the government and public face, which the Supreme Court has already held warrants a stay. *NIH*, 2025 WL 2415669, at *1; *see also Climate United*, 2025 WL 2502881, at *13.

16

## CONCLUSION

The Court should vacate the panel's prior order in relevant part and grant a stay of the district court's order as to the Form Termination Class.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

YAAKOV M. ROTH
   *Principal Deputy Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

DANIEL TENNY

   *s/ Sophia Shams*
SOPHIA SHAMS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7213*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *202-514-2495*
   *sophia.shams@usdoj.gov*

September 2025

17

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Ninth Circuit Rule 40-1, this motion contains 3,984 words, and it complies with Federal Rule of Appellate Procedure 32(a)(4)-(6) because it was prepared in a proportionally spaced typeface using Word for Microsoft 365 in Garamond 14-point font.

*s/ Sophia Shams*

Sophia Shams

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate case management system (ACMS).

*s/ Sophia Shams*

Sophia Shams

**ADDENDUM**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NEETA THAKUR, on behalf of themselves and all others similarly situated; KEN ALEX; NELL GREEN NYLEN; ROBERT HIRST; CHRISTINE PHILLIOU; JEDDA FOREMAN; ELI BERMAN; SUSAN HANDY, | No. 25-4249 D.C. No. 3:25-cv-04737-RFL |
| *Plaintiffs - Appellees*, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF GOVERNMENT EFFICIENCY; AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation; NATIONAL ENDOWMENT FOR THE | ORDER |

HUMANITIES; MICHAEL
MCDONALD, in his official capacity
as Acting Chairman of the National
Endowment for the Humanities;
UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his
official capacity as Administrator of
the U.S. Environmental Protection
Agency; UNITED STATES
DEPARTMENT OF
AGRICULTURE; BROOKE
ROLLINS, in her official capacity as
Secretary of the U.S. Department of
Agriculture; AMERICORPS, aka the
Corporation for National and
Community Service; JENNIFER
BASTRESS TAHMASEBI, in her
official capacity as Interim Agency
Head of AmeriCorps; UNITED
STATES DEPARTMENT OF
DEFENSE; PETER HEGSETH, in
his official capacity as Secretary of
the U.S. Department of Defense;
UNITED STATES DEPARTMENT
OF EDUCATION; LINDA
MCMAHON, in her official capacity
as Secretary of the U.S. Department
of Education; UNITED STATES
DEPARTMENT OF ENERGY;
CHRIS WRIGHT, in his official
capacity as Secretary of Energy;
UNITED STATES DEPARTMENT

A2

OF HEALTH AND HUMAN
SERVICES; ROBERT F.
KENNEDY, Jr., in his official
capacity as Secretary of the U.S.
Department of Health and Human
Services; UNITED STATES
CENTERS FOR DISEASE
CONTROL; MATTHEW
BUZZELLI, in his official capacity
as Acting Director of the Centers for
Disease Control; UNITED STATES
FOOD AND DRUG
ADMINISTRATION; MARTIN A.
MAKARY, in his official capacity as
Commissioner of the Food and Drug
Administration; UNITED STATES
NATIONAL INSTITUTES OF
HEALTH; JAYANTA
BHATTACHARYA, in his official
capacity as Director of the National
Institutes of Health; INSTITUTE OF
MUSEUM AND LIBRARY
SERVICES; KEITH SONDERLING,
in his official capacity as Acting
Director of the Institute of Museum
and Library Services; UNITED
STATES DEPARTMENT OF THE
INTERIOR; DOUG BURGUM, in
his official capacity as Secretary of
the Interior; UNITED STATES
DEPARTMENT OF STATE;
MARCO RUBIO, in his official
capacity as Secretary of the U.S.

A3

Department of State; UNITED
STATES DEPARTMENT OF
TRANSPORTATION; SEAN
DUFFY, in his official capacity as
Secretary for the U.S. Department of
Transportation,

*Defendants - Appellants.*

Appeal from the United States District Court
for the Northern District of California
Rita F. Lin, District Judge, Presiding

Argued and Submitted July 31, 2025
San Francisco, California

Filed August 21, 2025

Before: Richard A. Paez, Morgan B. Christen, and Roopali
H. Desai, Circuit Judges.

---

**SUMMARY**[*]

---

**Executive Orders**

The panel denied the government's motion for a partial
stay pending appeal of the district court's preliminary
injunction ordering three government agencies to reinstate

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

University of California (UC) research grants that the agencies had terminated pursuant to certain Executive Orders.

The district court granted plaintiffs' motion for a preliminary injunction and provisionally certified two classes of UC researchers: (1) those whose research grants were terminated by form letter without any grant-specific explanation (the "Form Termination Class"); and (2) those whose research grants were terminated because of Executive Orders that directed agencies to eliminate diversity, equity, and inclusion ("DEI") and diversity, equity, inclusion, and accessibility ("DEIA") policies and terminate "equity-related" grants (the "DEI Termination Class"). On appeal, the government moved for a stay of the injunction only as it pertains to the research grants awarded by the Environmental Protection Agency and the National Endowment for the Humanities, so the panel limited its discussion to those two agencies.

The panel held that the government had not shown a likelihood of success on the merits of its arguments that (1) the district court lacked jurisdiction; (2) at least some plaintiffs lack standing; and (3) plaintiffs are not likely to succeed on the merits of their claims.

The panel first rejected the government's argument that the Tucker Act precluded the district court's jurisdiction over the Form Termination Class's Administrative Procedure Act ("APA") claim. Plaintiffs' APA claim was not derived from grants or any purported contract but rather was a statutory claim invoking the right to be free from arbitrary and capricious agency action. Moreover, plaintiffs sought—and the district court awarded—vacatur of the termination notices and reinstatement of the terminated

grants. These well-established APA remedies are not contractual in nature.

The panel next rejected the government's argument that at least some members of the Form Termination Class lacked Article III standing because they had not demonstrated a cognizable injury in fact. Where a class seeks injunctive relief, standing is satisfied when at least one named plaintiff satisfies the standing requirements, and here the class representatives had alleged sufficient injuries, including disruption to projects and reputational harm.

Addressing the merits as to the Form Termination Class, the panel held that the government had not made a strong showing that it was likely to succeed on the merits of its argument that the district court abused its discretion when it concluded that the termination of grants by form letters was likely arbitrary and capricious. The terminations were reviewable because federal regulations provide a meaningful standard by which courts may review the agencies' exercise of discretion. The form letters and the record provided little explanation for the termination decisions. The letters left the recipients guessing as to the agencies' rationale, and there was no evidence that the agencies considered reliance interests before terminating the grants.

As to the DEI Termination Class, the panel held that the government was not likely to succeed on the merits of its claim that the district court abused its discretion when it concluded that the agencies likely terminated the grants based on viewpoint, in violation of the First Amendment. The government does not dispute that it terminated the subject grants because they promoted DEI, DEIA, or environmental justice, in violation of the bedrock principle that the government cannot "leverage its power to

A6

award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" or "aim at the suppression of dangerous ideas" in the provision of subsidies.

Finally, the panel held that the government failed to meet its burden to show that the remaining factors favored entry of a stay pending appeal. The panel rejected the government's arguments that the preliminary injunction risks irreparable harm to the government and the public interest by: (1) interfering with the President's ability to carry out core Executive Branch policies, and (2) compelling the government to disburse funds that it cannot recover.

---

**COUNSEL**

Erwin Chemerinsky (argued) and Claudia Polsky, UC Berkeley School of Law, Berkeley, California; Linda S. Gilleran, Dylan Silva, Donald Sobelman, Anthony P. Schoenberg, Katherine T. Balkoski, and Kyle A. McLorg, Farella Braun & Martel LLP, San Francisco, California; Annie M. Wanless, Kevin R. Budner, Nabila Abdallah, Richard M. Heimann, and Elizabeth J. Cabraser, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, California; for Plaintiffs-Appellees.

Yaakov M. Roth (argued), Principal Deputy Assistant Attorney General; Derek Weiss, Daniel Tenny, and Mark R. Freeman, Attorneys, Appellate Staff; Kathryn Barragan, Trial Attorney; Eric D. McArthur, Deputy Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

# ORDER

CHRISTEN, Circuit Judge:

On June 23, 2025, the district court issued a class-wide preliminary injunction ordering three government agencies to reinstate research grants the agencies had terminated pursuant to certain Executive Orders. The government appealed and moved for a partial stay pending appeal of the preliminary injunction.[1] We deny the government's motion.

## FACTUAL BACKGROUND

Plaintiffs are six researchers at the University of California (UC) who applied for and received multi-year federal research grants from three agencies: the Environmental Protection Agency (EPA), the National Science Foundation (NSF), and the National Endowment for the Humanities (NEH).[2] On appeal, the government moves for a stay of the injunction only as it pertains to the research

---

[1] The government's motion for partial stay requested relief by August 4, 2025, but did not invoke this court's rule governing emergency motions. Fed. R. App. P. 27-3. Instead, the government invoked Rule 27-1(3), which permits a movant to request relief by a date certain to avoid irreparable harm. Fed. R. App. P. 27-1(3). The motion did not explain the government's need for a ruling by August 4, 2025. At oral argument, however, the government stated that there was no specific reason that relief was requested by that date, other than the general urgency to avoid irreparable harm.

[2] Plaintiffs have since amended their complaint to include additional plaintiffs who received funding from other agencies.

grants awarded by EPA and NEH, so we limit our discussion to those two agencies.[3]

In April 2025, EPA and NEH sent form letters to Plaintiffs informing them that their grants were terminated. The EPA form letter states: "the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities." The NEH form letter states: "[y]our grant no longer effectuates the agency's needs and priorities," and informs the recipient that "NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda."

Plaintiffs allege that these terminations resulted from agency implementation of at least eight Executive Orders the President issued in January and February 2025: Executive Orders 14173, 14151, 14168, 14154, 14217, 14238, 14158, and 14222. Executive Orders 14173 and 14151 (the "DEI Executive Orders") seek to eliminate diversity, equity, and inclusion ("DEI") and diversity, equity, inclusion, and accessibility ("DEIA") policies and initiatives from all aspects of the federal government. More specifically, Executive Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, states that "critical and influential institutions of American society," including the federal government and institutions of higher education, "have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of

---

[3] On August 19, 2025, the government filed a citation of supplemental authorities requesting that NSF join the arguments raised in the government's motion to stay the injunction. *See* Fed. R. App. P. 28(j). Because the government has not moved for NSF to join that motion, we do not address the request here.

so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation." 90 Fed. Reg. 8633, 8633 (Jan. 21, 2025). This Executive Order directs the Office of Management and Budget (OMB) to "[e]xcise references to DEI and DEIA principles under whatever name they may appear," including federal grants. *Id.* at 8634. Executive Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, instructs "each agency, department, or commission head," to provide the director of OMB with a list of all "[f]ederal grantees who received [f]ederal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." 90 Fed. Reg. 8339, 8339–40 (Jan. 20, 2025). This Executive Order directs agency heads to assess the operational impact and cost of those specified grants and recommend action. *Id.* at 8340. It expressly directs agency heads to "terminate . . . all . . . 'equity-related' grants." *Id.* at 8339. Similarly, Executive Order No. 14168, titled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, directs that "federal funds shall not be used to promote gender ideology." 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025).

The remaining Executive Orders reflect the various mechanisms through which the administration seeks to refocus or reduce government spending, including the establishment of the Department of Government Efficiency (DOGE). For example, Executive Orders 14217, 14158, and 14222 instruct OMB and federal agencies to work with DOGE to review existing grants and terminate those considered unnecessary in an effort to reduce federal spending. 90 Fed. Reg. 10577, 10577 (Feb. 19, 2025); 90

Fed. Reg. 8441, 8441 (Jan. 20, 2025); 90 Fed. Reg. 11095, 11095–96 (Feb. 26, 2025).

## PROCEDURAL HISTORY

Plaintiffs filed suit on behalf of a proposed class of similarly situated UC researchers against sixteen agencies, alleging that the mass termination of grants violated separation of powers, the First and Fifth Amendments of the Constitution, and the Administrative Procedure Act (APA). Plaintiffs sought an order vacating the grant terminations and a preliminary injunction enjoining the agencies from giving effect to those terminations.

The district court granted Plaintiffs' motion for a preliminary injunction and provisionally certified two classes of UC researchers: (1) those whose research grants were terminated by form letter without any grant-specific explanation (the "Form Termination Class"); and (2) those whose research grants were terminated because of the DEI Executive Orders (the "DEI Termination Class"). The court concluded that the Form Termination Class was likely to succeed on its claim that the terminations were arbitrary and capricious, and that the DEI Termination Class was likely to succeed on its claims that the terminations violated the First Amendment and were contrary to the agencies' congressionally mandated directives. The government appealed and moved for a partial stay of the district court's injunction.

## ANALYSIS

We consider four factors when we decide whether to stay an injunction pending appeal: (1) has the stay applicant made a strong showing that she is likely to succeed on the merits; (2) will the applicant be irreparably injured absent a

A11

stay; (3) will issuance of the stay substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The party seeking a stay pending appeal—here, the government—bears the burden of establishing that these factors favor a stay. *See id.* at 433–34. The government's motion challenges the injunction only as it applies to the EPA and NEH grants.

## I. Likelihood of success on the merits

The government's motion renews the arguments it made before the district court that: (1) the district court lacks jurisdiction; (2) at least some Plaintiffs lack standing; and (3) Plaintiffs are not likely to succeed on the merits of their claims.

### A. Jurisdiction

The government first argues that the Tucker Act precludes district court jurisdiction over the Form Termination Class's APA claim. We disagree.

The Tucker Act gives the Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Because this statute "grants consent to suit" and "impliedly forbids" declaratory and injunctive relief, it precludes bringing contract claims against the United States in federal district court pursuant to the APA's waiver of sovereign immunity. 5 U.S.C. § 702. *See Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645–46 (9th Cir. 1998). In other words, for contract claims against the United States

A12

seeking more than $10,000, the Tucker Act confers exclusive jurisdiction on the Court of Federal Claims.[4] *Id.*

The Tucker Act "'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). To determine whether a claim is a disguised breach-of-contract claim, we apply the *Megapulse* test, which considers: (1) the source of the rights upon which the plaintiff bases its claims and (2) the type of relief sought (or appropriate). *N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994). If the plaintiff's rights and remedies, as alleged, "are *statutorily* or *constitutionally* based, then district[] courts have jurisdiction," but if those rights and remedies "are *contractually based* then only the Court of Federal Claims does." *United Aeronautical*, 80 F.4th at 1026 (emphasis in original).

Beginning with "the source of the rights upon which the plaintiff bases its claims," *id.*, Plaintiffs contend that the form termination notices, which did not state any reason specific to the recipient for termination of their grants, violated their right to be free from arbitrary and capricious agency action. *See* 5 U.S.C. § 706(2)(A). The source of that right is statutory, and it "existed prior to and apart from rights created under the contract." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (citation modified). Plaintiffs' APA claim is not premised on

---

[4] Pursuant to the Little Tucker Act, district courts have "concurrent jurisdiction with the claims court for actions not exceeding $10,000." *N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993) (en banc) (per curiam) (citing 28 U.S.C. § 1346(a)(2)).

any rights derived from their grants or any purported contract and thus resolving the claim does not require analyzing the terms of any grant or contract. Rather, Plaintiffs' APA argument is that the agencies, by sending form termination notices, failed to provide a reasoned explanation for their actions. *See* § 706(2)(A); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Contractual rights are not at issue.

As for the "type of relief sought," *United Aeronautical*, 80 F.4th at 1026, Plaintiffs sought—and the district court awarded—vacatur of the termination notices and reinstatement of the terminated grants. These well-established APA remedies are not contractual in nature. *See, e.g.*, *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (noting that "vacatur and remand is the default remedy under the APA").

The government insists that Plaintiffs seek specific performance pursuant to the grant agreements, an "explicitly contractual remedy." *See Crowley*, 38 F.4th at 1107. Thus, the government asserts that this part of the *Megapulse* test "boils down to whether [Plaintiffs] effectively seek[] to attain monetary damages." *Id.*

Defendants overlook that even if Plaintiffs' requested relief has the eventual effect of requiring the government to make payments pursuant to the grants, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *see also Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). Plaintiffs' request to effectively undo the grant terminations and return Plaintiffs to the status quo does not seek performance of a contractual

A14

obligation. *Cf. Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*, 813 F.3d 1155, 1167 (9th Cir. 2015) (noting that "one cannot specifically perform something that is not a term in the contract"). Instead, Plaintiffs' APA claim seeks to ensure that the agencies' course of conduct complies with federal law. *See Bowen*, 487 U.S. at 905. At this preliminary stage, it appears that any payments due under the grants are "a mere by-product" of the district court's "primary function of reviewing" the government's interpretation of its statutory obligations pursuant to the APA. *Id.* at 910.

*Department of Education v. California*, upon which the government relies, does not compel a contrary conclusion. In *Department of Education*, the Supreme Court addressed a claim brought pursuant to the APA "to enforce a contractual obligation to pay money." 145 S. Ct. at 968. The claim fell within the scope of the Tucker Act because the temporary restraining order required "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue[d]." *Id.* Here, by contrast, Plaintiffs' requested relief does not "order [any] amount to be paid," nor does it seek a "finding that the Federal Government owed [Plaintiffs] . . . any amount of money." *Bowen*, 487 U.S. at 909–10. Instead, Plaintiffs request that the district court, based on the government's violation of the APA, "vacate the grant terminations and preliminarily enjoin Defendants from giving effect to those terminations." Such relief is not based on any conditions or obligations under the grant agreements. Indeed, the record does not reflect that Plaintiffs are even parties to the grant agreements. Accordingly, we conclude the government has not demonstrated that it is likely to succeed in showing that the district court lacked jurisdiction

A15

to review the APA claims raised by the Form Termination Class.

## B. Standing

The government argues that at least some members of the Form Termination Class lack Article III standing because they have not demonstrated a cognizable injury in fact. Again, at this stage, the government has not made a strong showing that Plaintiffs lack standing.

To establish injury in fact, a plaintiff must show "that he suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Where the class seeks injunctive relief, the court "consider[s] only whether at least one named plaintiff satisfies the standing requirements for injunctive relief." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc).

Here, the government suggests that the class representatives have not been injured by every challenged grant termination. But "[a]ny issues regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are relevant only to class certification, not to standing." *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019) (citation omitted); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979 (9th Cir. 2011).

The government separately argues that not every member of the Form Termination Class has standing because class members will only suffer injury to the extent they are unable to replace any terminated federal funding. As an initial matter, because standing in a Rule 23(b)(2) class is assessed at the time the complaint was filed, any future

A16

mitigation of Plaintiffs' injuries is immaterial to the standing analysis. *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014). Moreover, the government focuses solely on the prospect of some class members obtaining some replacement funding, and overlooks that the class representatives—*e.g.*, Dr. Christine Philliou, Dr. Neeta Thakur, and Dr. Nell Green Nylen—also allege injury in the form of opportunity costs associated with seeking alternative funding, disruptions to projects, and reputational harms associated with grant terminations.

Accordingly, we conclude the government has not demonstrated that it is likely to succeed in showing that the class representatives of the Form Termination Class lack Article III standing.

### C. Plaintiffs' likelihood of success

#### i. Form Termination Class

The government argues that the Form Termination Class is not likely to succeed on the merits of its APA claim because the agencies' decision to discontinue previously funded grants is committed to agency discretion and is not reviewable. The APA creates a "basic presumption of judicial review," rebutted only if the relevant statute precludes review or if the action is "committed to agency discretion by law." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22–23 (2018) (citations omitted); 5 U.S.C. § 701(a)(2). An action is "committed to agency discretion by law" only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser*, 586 U.S. at 23 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). "Even where statutory language grants an agency unfettered

A17

discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which this court may review its exercise of discretion." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021) (quoting *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015)). Here, 2 C.F.R. § 200.340(a) provides uniform administrative requirements for the termination of federal grants, including those an agency terminates because they "no longer effectuat[e] . . . agency priorities." § 200.340(a)(4). Sections 200.340, 200.341, 200.343, and 200.345 outline the requirements for termination, the notification requirements when grants are terminated, and the effects of suspension and termination of grants. These regulations provide a meaningful standard by which courts may review the agencies' exercise of discretion. We therefore reject the government's argument that the terminations are not reviewable and consider whether the form termination letters were arbitrary and capricious. 5 U.S.C. § 706(2)(A).

Agencies are "free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025) (citation modified). The EPA form letter provides three disjunctive reasons for termination: (1) failure to exhibit "merit, fairness, and excellence;" (2) "fraud, abuse, waste, and duplication;" and (3) failure to "serve the best interests of the United States." The letter does not explain which rationale applies to the recipient of the form letter. Nor does it explain how research projects that were selected to receive federal funding after a competitive process now fail to exhibit merit, or describe what the research duplicates, or provide any

specific evidence supporting the allegation that any researcher acted abusively, fraudulently, or wastefully. The NEH form letter states only that the grant "no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement," and merely recites § 200.340.

The rest of the record also provides little explanation for the termination decisions. Michael McDonald, Acting Chairman of NEH, stated in his declaration that NEH selected grants for termination by identifying grants that were purportedly directed at "environmental justice" and "diversity, equity, and inclusion," among other terms, and categorizing grants as "High, Medium, Low, or No Connection" to the Executive Orders. Daniel Coogan, Deputy Assistant Administrator for Infrastructure and Extramural Resources in the EPA's Office of Mission Support, stated in his declaration that EPA's grant review process occurred "independent from any Executive Order," but the district court noted that this assertion was inconsistent with the EPA's public announcements. For example, on February 14, 2025, the EPA stated that it "has worked diligently to implement President Trump's executive orders, including the 'Ending Radical and Wasteful Government DEIA Programs and Preferencing,' as well as subsequent associated implementation memos." *EPA Administrator Lee Zeldin Cancels Nine More Contracts, Saving Nearly $60 Million*, EPA (Feb. 14, 2025), https://perma.cc/XJH9-8JKB.[5] On this limited record, we agree with the district court that the recipients of the form

---

[5] Additionally, on March 10, 2025, the EPA announced that it "cancelled grants and contracts related to DEI and environmental justice." *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B*, EPA (Mar. 10, 2025), https://perma.cc/3P2M-6PUY.

letter and the public were left to guess at the reasons for these terminations.

The government conceded at oral argument that there is no record evidence that either agency considered the researchers' reliance interests.  Nor is there evidence that the agencies considered the hundreds of millions of dollars taxpayers have invested in the grant projects that would be lost if the grants are terminated.  *See, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (requiring an agency that is "not writing on a blank slate" to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").  In one of many examples, Dr. Neeta Thakur's $1.3 million grant to study the impact of wildfire smoke on California communities over the course of three years was terminated seven months before the study's projected end.  As a result, the research that taxpayers have already funded will not be published.  The government points to no evidence that EPA considered those facts when it terminated Dr. Thakur's research grant.

Because the letters left the recipients guessing as to the agencies' rationale, and there is no evidence that the agencies considered reliance interests before terminating the grants, the government has not "made a strong showing" that it is likely to succeed on the merits of its argument that the district court abused its discretion when it concluded that the termination of grants by form letters was likely arbitrary and capricious.  *Nken*, 556 U.S. at 426.

### ii.  DEI Termination Class

The government argues that the district court abused its discretion when it concluded that the DEI Termination Class was likely to succeed on the merits of its First Amendment

claim that the agencies unlawfully terminated their grants based on their viewpoint. The government relies on the significant flexibility it is afforded when acting as a patron to subsidize speech, as opposed to when it regulates speech as a sovereign. The government argues that it "can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest" to the exclusion of other activities. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549–50 (1983). In support, the government relies on *National Endowment for the Arts v. Finley* to argue that there is a First Amendment violation only when the government uses its sovereign power to "drive 'certain ideas or viewpoints from the marketplace'"—not when the government simply ceases funding those ideas or viewpoints. 524 U.S. 569, 587 (1998) (citation omitted).

In our view, the government misreads *Finley*. There, Congress amended the National Endowment for the Arts's (NEA) reauthorization bill to require that grant applications be evaluated by "taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (citation omitted). The Plaintiffs, performance artists who applied for grants, brought a facial challenge to the amendment and argued that it violated their First Amendment rights. *Id.* at 577, 580. Importantly, the Plaintiffs "d[id] not allege discrimination in any particular funding decision," and therefore, the Supreme Court "ha[d] no occasion . . . to address an as-applied challenge in a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination." *Id.* at 586–87. The Court explained that "[i]f the NEA were to leverage its power to award subsidies

on the basis of subjective criteria into a penalty on disfavored viewpoints, then [it] would confront a different case." *Id.* at 587. The Court went on to emphasize that "*even in the provision of subsidies*, the Government may not 'aim at the suppression of dangerous ideas.'" *Id.* (emphasis added) (citation modified) (quoting *Regan*, 461 U.S. at 550).

Contrary to the government's argument, this case does not appear to be one in which an agency decided not to "fund a program." *See Rust*, 500 U.S. at 193. Rather, it is one in which more than a dozen agencies selected particular grants for termination regardless of the programs through which they were funded, based on their connection to DEI, DEIA, and environmental justice. Thus, we "confront a different case" than *Finley* (where plaintiffs brought a facial challenge to Congress's mandate that NEA consider standards of decency in awarding grants), *Rust* (where plaintiffs brought a facial challenge to HHS regulations interpreting Title X's prohibition on funding for abortion services), and *Regan* (where plaintiffs brought a facial challenge to the IRS's requirement that organizations refrain from lobbying to qualify for § 501(c)(3) tax-exempt status). Plaintiffs' as-applied challenge is closer to *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995). In that case, the University of Virginia made funds available to cover printing costs for student newspapers. *Id.* at 843. The University denied a Christian newspaper's application for funds because the newspaper engaged in "religious activity" by "promot[ing] or manifest[ing] a particular belie[f] in or about a deity or an ultimate reality," conduct prohibited by the University's guidelines for student activity funding. *Id.* at 827. The Court concluded that the University "d[id] not exclude religion as a subject matter" but "select[ed] for disfavored treatment those student journalistic efforts with

religious editorial viewpoints." *Id.* at 831, 833, 835 ("[W]hen the State is the speaker, it may make content-based choices," but "[h]aving offered to pay the third-party contractors on behalf of private speakers who convey their own messages, the [State] may not silence the expression of selected viewpoints.").

Here, the record at this stage shows that the agencies selected grants for termination based on viewpoint. Indeed, the government does not meaningfully dispute that DEI, DEIA, and environmental justice are viewpoints. The agencies, the termination letters, and the Executive Orders do not define these terms, but dictionary definitions demonstrate that DEI, DEIA, and environmental justice are not merely neutral topics. Instead, the terms convey the viewpoint that the exclusion of historically disadvantaged groups is undesirable. *diversity, equity and inclusion*, Merriam-Webster, https://perma.cc/84ZW-7JSR (last visited Aug. 12, 2025) ("a set of values and related policies and practices focused on establishing a group culture of equitable and inclusive treatment and on attracting and retaining a diverse group of participants, including people who have historically been excluded or discriminated against"); *diversity, equity and inclusion*, Cambridge English Dictionary, https://perma.cc/M2GS-L4UT (last visited Aug. 12, 2025) ("the idea that all people should have equal rights and treatment and be welcomed and included, so that they do not experience any disadvantage because of belonging to a particular group, and that each person should be given the same opportunities as others according to their needs"); *environmental justice*, Cambridge English Dictionary, https://perma.cc/V5CK-Z2GP (last visited Aug. 12, 2025) ("the idea that all groups of people deserve to live in a clean and safe environment").

We are bound by the bedrock principle that the government cannot "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" or "aim at the suppression of dangerous ideas" in the provision of subsidies. *Finley*, 524 U.S. at 587 (citation modified) (quoting *Regan*, 461 U.S. at 550). The government does not dispute that it terminated the subject grants because they promoted DEI, DEIA, or environmental justice. We therefore conclude that the government has failed to make a strong showing that the district court abused its discretion when it concluded that the DEI Termination Class was likely to succeed on the merits of its First Amendment claim.

The agencies' implementation of the DEI Executive Orders reinforces our conclusion. McDonald's declaration states that NEH staff reviewed open grants in light of the DEI Executive Orders, and NEH's "policy for selecting grants for termination at NEH focused first on identifying open grants that focused on or promoted (in whole or in part) 'environmental justice,' 'diversity, equity, and inclusion,' or 'diversity, equity, inclusion and accessibility,' and 'gender ideology.'" NEH created and used spreadsheets that identified grants as "either 'High, Medium, Low, or No Connection' in terms of the Executive Orders." Coogan's declaration states that the grant termination process "began by looking at grant titles and project descriptions." Although his declaration states that the EPA reviewed and terminated grants "independent from" the Executive Orders, the EPA's public announcements state the opposite. For example, on March 10, 2025, the EPA announced that it "cancelled grants and contracts related to DEI and environmental justice." *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th*

A24

*Round of Cuts with DOGE, Saving Americans More than $1.7B*, EPA (Mar. 10, 2025), https://perma.cc/3P2M-6PUY

Because the current record suggests that the government aimed at the suppression of speech that views DEI, DEIA, and environmental justice favorably, the government has not shown that it is likely to succeed on the merits of its claim that the district court abused its discretion when it concluded the agencies likely terminated the grants based on viewpoint.[6]

## II. Remaining *Nken* factors

The government argues that the preliminary injunction risks irreparable harm to the government and the public interest by: (1) interfering with the President's ability to carry out core Executive Branch policies, and (2) compelling the government to disburse funds that it cannot recover.[7]

The government first argues the district court's preliminary injunction will interfere with the Executive Branch's chosen policy agenda. This argument rests on the assumption that the government's conduct is lawful. But the government has not made a strong showing of a likelihood of success on the merits, and the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th

---

[6] Because we conclude the government failed to show that it was likely to succeed on the merits of its claim that the district court abused its discretion when it concluded that Plaintiffs were likely to succeed on their First Amendment claim, we do not reach the government's argument challenging the class's claim that the terminations were contrary to NEH's enabling statute.

[7] To the extent the government argues that the third and fourth factors merge, that is so when the government is the party opposing a stay, rather than the party seeking one. *See Nken*, 556 U.S. at 435.

A25

Cir. 2013). Moreover, we have rejected the assertion that "the irreparable harm standard is satisfied by the fact of executive action alone." *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020). The government's first claimed harm is not irreparable because the government "may yet pursue and vindicate its interests in the full course of this litigation." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam).

The government also contends that it will be irreparably harmed because the district court's preliminary injunction requires it to disburse money it may never recover. For support, the government principally relies on *Department of Education*, where the plaintiffs did "not refute[] the Government's representation that it [was] unlikely to recover the grant funds once they [were] disbursed." 145 S. Ct. at 968–69.

Even if the government may be unable to recover at least some of the funds it disburses pursuant to the grants and may therefore suffer some degree of irreparable harm, *see id.*, the remaining equitable factors do not favor the government.[8] Unlike in *Department of Education*, where the plaintiffs conceded that they could "keep their programs running" in the absence of grant funding, *id.*, Plaintiffs have established that the termination of grants will result in layoffs, interruptions to graduate programs, destruction of research

---

[8] In *Department of Education*, the Supreme Court relied on the government's factual representation—reflected in a declaration submitted in the district court—that funds disbursed pursuant to the grants at issue would be difficult to recover. 145 S. Ct. at 969. The government submitted no comparable evidence here. Further, unlike in *Department of Education*, Plaintiffs here contend—and the Government does not meaningfully contest—that there are "existing mechanisms to recoup funds."

A26

projects, and injury to Plaintiffs' professional reputations. Further, if research projects are lost due to grant funding being halted midstream, the public will obtain no benefit from research in which substantial funds have already been invested—a significant waste of taxpayer dollars. Thus, Plaintiffs have shown that entry of a stay will result in considerable harm to Plaintiffs and the public.

The government failed to meet its burden to show that the remaining *Nken* factors favor entry of a stay pending appeal.

## CONCLUSION

The government's motion for partial stay pending appeal (Dkt. No. 7) is **DENIED.**