No. 25-4249

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NEETA THAKUR, on behalf of themselves
and all others similarly situated; et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; et al.,

Defendants-Appellants,

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-04737

APPELLANTS' REPLY BRIEF

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney
General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

DANIEL TENNY
SOPHIA SHAMS
*Attorneys, Appellate Staff
Civil Division, Room 7213
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-514-2495*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 3

    I.    The Form Termination Class Is Not Likely To Prevail On The Merits ................................................................................................ 3

    II.    The Equity Termination Class Is Not Likely To Prevail On The Merits .............................................................................................. 12

    III.   Plaintiffs Cannot Establish Article III Injury To Justify The Class-Wide Relief Awarded ................................................................... 18

    IV.   The Equities Weigh Decisively In Favor Of The Government ............. 20

CONCLUSION ....................................................................................................... 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) ............................................................................... 14

*American Med. Ass'n v. Reno*,
  57 F.3d 1129 (D.C. Cir. 1995) .............................................................. 10

*American Pub. Health Ass'n v. National Insts. of Health*,
  145 F.4th 39 (1st Cir. 2025) ............................................................. 4, 5

*Block v. Community Nutrition Inst.*,
  467 U.S. 340 (1984) ................................................................................ 6

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) .............................................................................. 19

*Clarke v. Security Indus. Ass'n*,
  479 U.S. 388 (1987) ................................................................................ 6

*Climate United Fund v. Citibank, N.A.*,
  No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sep. 2, 2025) ...................... 17

*Community Legal Servs. in East Palo Alto v. U.S. Dep't of Health & Human Servs.*,
  137 F.4th 932 (9th Cir. 2025) ............................................................... 8

*Department of Educ. v. California*,
  145 S. Ct. 966 (2025) ......................................................................... 4, 5

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ................................................................................. 12

*Global Health Council v. Trump*,
  No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025),
  *reh'g en banc denied*, Order (Aug. 28, 2025) .................................... 7

*Koala v. Khosla*,
  931 F.3d 887 (9th Cir. 2019) ......................................................... 15, 16

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ............................................................................. 8, 9

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ............................................................................... 7

*National Insts. of Health v. American Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025) ........................................................ 1, 4, 5, 21, 22, 23

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ........................................................................ 13, 14

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................. 20

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Human Servs.*,
    No. 25-cv-10910, 2025 WL 2528380 (D. Mass. Sep. 3, 2025) ........................ 16, 17

*Regan v. Taxation With Representation of Washington*,
    461 U.S. 540 (1983) .................................................................................. 13

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) .................................................................................. 14

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ............................................................................ 13, 15

*Seven County Infrastructure Coal. v. Eagle County*,
    145 S. Ct. 1497 (2025) ............................................................................... 10

*Smiley v. Citibank (S.D.), N.A.*,
    517 U.S. 735 (1996) .................................................................................. 12

*Thakur v. Trump*,
    No. 25-4249, 2025 WL 2414835 (9th Cir. Aug. 21, 2025) ................... 11, 14, 20, 21

*Tootle v. Secretary of the Navy*,
    446 F.3d 167 (D.C. Cir. 2006) ..................................................................... 7

*Trump v. Boyle*,
    145 S. Ct. 2653 (2025) ............................................................................... 21

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ............................................................................ 19, 20

## Statutes:

5 U.S.C. § 701(a)(2) ........................................................................................ 8

20 U.S.C. § 1234a ......................................................................................... 22

20 U.S.C. § 1234b ............................................................................... 22

28 U.S.C. § 1491(a)(1) ......................................................................... 7

## Regulations:

2 C.F.R. § 200.340(a)(4) ............................................................... 10, 11

2 C.F.R. § 200.346 .............................................................................. 22

## Other Authority:

Order Granting Stay, *Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. March 14, 2025) ............................................... 15

# INTRODUCTION

Plaintiffs fail on all fronts to show that they are likely to succeed on their claims challenging the government's termination of certain research grants.

As to the Administrative Procedure Act (APA) claims, the Supreme Court has repeatedly stayed injunctions against analogous grant terminations on the ground that the Court of Federal Claims has exclusive jurisdiction over such claims. Indeed, the Supreme Court did so last month in *National Institutes of Health v. American Public Health Association (NIH)*, 145 S. Ct. 2658 (2025), which plaintiffs themselves had previously characterized as "nearly identical" to this case. Of course, plaintiffs now seek to distinguish it. But their only grounds for doing so—that they are not the grant recipients themselves—was equally true of some plaintiffs in *NIH*, was raised by those plaintiffs in *NIH*, and yet was not regarded by the Supreme Court as sufficient to circumvent the Tucker Act. This Court should follow the Supreme Court's guidance and vacate the district court's injunction as to plaintiffs' APA claims.

Jurisdiction aside, plaintiffs fall short of showing that the agencies' grant terminations ran afoul of the APA. For one, an agency's decision to terminate a discretionary grant is committed to agency discretion and thus not reviewable under the APA's reasoned decision-making requirements. Although plaintiffs try to argue that there are manageable standards by which to assess the grant terminations in this case, they never explain what these standards might be, nor do they identify a single statutory provision giving substance to such standards.

In any event, the grant terminations here were reasonable as they were based on the agencies' efforts to carry out the President's policy priorities. And they were reasonably explained given that the termination notices articulated the bases for termination, including the regulatory provision that allows for termination if a grant no longer serves the agency's policy priorities. Plaintiffs' contrary arguments reflect nothing more than disagreement with the Executive Branch's policy determinations, which is insufficient to support an arbitrary-and-capricious claim.

Turning to the First Amendment claims, plaintiffs continue to assert that the government may *award* grants to projects it determines serve the public interest, but cannot *terminate* grants for projects it no longer finds serve the public interest. That rule has no basis in the law or common sense. Whether a funding decision is made at the outset or during the life of a grant, the First Amendment does not prohibit the government from limiting selective subsidies to content and even viewpoints that it supports. That is not "censorship." The constitutional line is only crossed if the government leverages subsidies to suppress speech beyond the scope of the funded program, and plaintiffs do not argue that the agencies here did anything like that.

Plaintiffs also fail to explain why this Court should presume, on a class-wide basis, that injunctive relief is appropriate to remedy injuries that will in each case depend on a researcher's ability to obtain alternate funds. And even if plaintiffs could make some showing of standing in one or more instances, they fail to justify the district court's overly broad order fully reinstating all of the terminated grants.

2

Finally, the equities weigh decisively against a preliminary injunction. As the Supreme Court has recognized, the government and public fisc face irreparable harm when the government is required to pay grant funds that it is unlikely to recover. That rule fully applies here, and these harms to the government and public outweigh any harms alleged by plaintiffs, which are largely remediable after the fact.

## ARGUMENT

### I.     The Form Termination Class Is Not Likely To Prevail On The Merits

The Form Termination Class's arbitrary-and-capricious claim is barred several times over. For one, the Supreme Court's stay decision in *NIH*—which was issued after the panel's order denying the government's stay motion here—makes clear that the Tucker Act likely forbids APA review of plaintiffs' arbitrary-and-capricious claim. Furthermore, arbitrary-and-capricious review does not extend to discretionary acts such as funding determinations. And even if plaintiffs' arbitrary-and-capricious claims were reviewable, the grant terminations in this case were reasonable and thus easily satisfy APA review.

**A.** The Supreme Court's stay decision in *NIH*—a case that plaintiffs themselves called "nearly identical" to this one after the First Circuit had denied a stay in that case (Opp. Stay Mot. 8)—makes clear that the government is likely to succeed in showing that the district court lacked jurisdiction over the Form Termination Class's APA claims.

3

**1.** The *NIH* case, like this one, involved a district-court order "vacating the Government's termination of various research-related grants." 145 S. Ct. at 2659. In particular, the plaintiffs in *NIH* brought APA claims alleging that the government's terminations of their Diversity, Equity, and Inclusion (DEI)-related research grants were arbitrary and capricious, and the district court vacated the terminations on those grounds. *American Pub. Health Ass'n v. National Insts. of Health*, 145 F.4th 39, 43-44, 47 (1st Cir. 2025). Although the First Circuit denied a stay, *see id.*, the Supreme Court granted one. Citing its recent decision in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), the Court stayed the district court's order on the ground that the APA's "limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *NIH*, 145 S. Ct. at 2659 (cleaned up). And the Court further determined that the government faced irreparable harm given that "plaintiffs do not state that they will repay grant money if the Government ultimately prevails." *Id.*

Like in *NIH*, the Form Termination Class's APA claims challenge grant terminations as arbitrary and capricious. Their claims are thus "based on the research-related grants" through which they receive federal funds. *NIH*, 145 S. Ct. at 2659 (quotation omitted). And as in *NIH*, the district court—by vacating the government's termination of the grant agreements and reinstating the grants so that plaintiffs may continue to receive federal funding through those grants—ordered "relief designed to

enforce [an] obligation to pay money pursuant to" the research-related grants. *Id.* (quotation omitted). *NIH* thus squarely controls here.

Because *NIH* was issued after the panel's denial of the government's request for a stay, the panel did not have the opportunity to consider *NIH* and its application to this case. But the Supreme Court has now twice stayed district court injunctions vacating grant terminations on the ground that claims challenging grant terminations belong in the Court of Federal Claims, not district court, and rejecting the stay panel's contrary reasoning. *NIH*, 145 S. Ct. 2658; *Department of Educ.*, 145 S. Ct. 966.

**2.** Plaintiffs do not contest in their response brief that, as a general matter, APA claims regarding the termination of grants must be brought in the Court of Federal Claims. Instead, their only argument now is one that the stay panel did not accept: that they are entitled to pursue an APA challenge in district court because they are not parties to the grant agreements and therefore have no possible claim in the Court of Federal Claims. They now assert that, despite the "similarities between this case and *[NIH]*," *NIH* is inapplicable because "the Court of Federal Claims lacks jurisdiction to hear Plaintiffs' claims in this case." Resp. Br. 35-36.

But that does not distinguish *NIH* at all. Several of the plaintiffs in *NIH* were also indirect recipients of grant funding, not themselves parties to the grant contracts. *American Pub. Health Ass'n*, 145 F.4th at 44 ("The plaintiffs in the first case are private research and advocacy organizations and individual researchers who receive NIH funding."). And the plaintiffs in *NIH* resisted a stay in the Supreme Court on that

5

precise ground. *See* Respondents' Opposition to Application for Stay at 28-29, *NIH*, No. 25A103, 2025 WL 2244206 (Aug. 1, 2025) (arguing that because some of the plaintiffs are indirect beneficiaries of grant funding, they should have a right to review because otherwise "no court will have jurisdiction to hear [their] claims"). The issue was thus raised by the *NIH* plaintiffs as a means of avoiding Tucker Act preclusion. Yet the Supreme Court did not accept that argument. Instead, the Court held that the district court likely lacked jurisdiction over all the plaintiffs' APA claims, without regard to whether the plaintiffs were direct or indirect recipients of grant funding.

Plaintiffs' suggestion (Resp. Br. 38) that every entity affected by the grants must also have a forum to challenge the grant terminations misses the mark. These are not constitutional claims; they are statutory claims. Congress is free to restrict who may pursue them. If plaintiffs have no viable claim in the Court of Federal Claims, that is because Congress in the Tucker Act provided only certain remedies to certain parties for breach of contract by the federal government. *See Clarke v. Security Indus. Ass'n*, 479 U.S. 388, 399 (1987) ("The essential inquiry is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law." (cleaned up)). And when Congress establishes a remedial scheme with limitations on the parties who can seek relief, the proper inference is not that other parties can seek relief without regard to the remedial scheme's limitations, but rather that other parties cannot seek relief at all. *See Block v. Community Nutrition Inst.*, 467 U.S. 340, 345-47, 349 (1984) (declining APA review over a challenge under the

Agricultural Marketing Agreement Act of 1937 because by limiting challenges under the Act to a particular class, the Act "impliedly precluded" judicial review over similar challenges by those outside the class); *Global Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *10-11 (D.C. Cir. Aug. 28, 2025), *reh'g en banc denied*, Order (Aug. 28, 2025) (holding that the Impoundment Control Act, which contemplates claims by Comptroller General, impliedly precludes APA claims by private plaintiffs).

Here, Congress, through the Tucker Act, has expressed its intent that all "claim[s] against the United States founded … upon any express or implied contract" be channeled to the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). It would defy logic to allow indirect recipients of grant funding to bring APA claims challenging the government's grant terminations while barring direct recipients of the grants (here, the universities) from bringing those same claims. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (explaining that the APA's preemption-carveout provision "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes").

The cases that plaintiffs rely on do not suggest otherwise. Those were cases in which there was no jurisdiction under the Tucker Act because the subject matter of the lawsuit fell outside the jurisdiction of the Court of Federal Claims. *See Tootle v. Secretary of the Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006). In such cases, there is no basis for preclusion at all—as to anyone—and so the case may proceed under the APA. But when Congress has limited a category of claims to particular parties in a

particular forum, there is no basis for concluding that those *same claims* can be brought outside the designated forum by the wrong parties. This Court's contrary suggestion in a stay posture, *Community Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*, 137 F.4th 932, 939 (9th Cir. 2025), cannot be reconciled with the Supreme Court's decision in *NIH* or with the principles set out by the cases described above.

**B.** Jurisdiction aside, federal agencies have largely unreviewable authority to terminate funding agreements that no longer serve the government's interests. *See Lincoln v. Vigil*, 508 U.S. 182, 185-93 (1993). That precludes APA review too. *Id.*

Plaintiffs cite the panel's determination in its denial of a stay that various regulations pertaining to the termination of federal grants "provide a meaningful standard by which courts may review the agencies' exercise of discretion." Resp. Br. 52 (quotation omitted). But that goes nowhere, since plaintiffs have not argued that the terminations here violated any of these regulations. The mere fact that there may be regulations that limit an agency's discretion does not justify APA arbitrary-and-capricious review; only statutes or regulations that are *allegedly being violated* provide a meaningful standard for review.

Here, review of plaintiffs' arbitrary-and-capricious claim is clearly foreclosed under *Lincoln*, which held that "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" and therefore unreviewable under 5 U.S.C. § 701(a)(2). 508 U.S. at 192. While plaintiffs assert that the government's grant terminations failed to comply with

"detailed statutory requirements," they never identify what those requirements actually are, much less explain how they were violated, and the district court's holding was that the terminations were arbitrary and capricious and not that they were contrary to law as established by any statute. Resp. Br. 52. Plaintiffs assert that the government has not rebutted the presumption that agency action is reviewable, Resp. Br. 53, but ignore the statutes that confer on these agencies broad discretion with respect to selecting recipients of appropriated grant funds (Gov't Br. 34) and identify no statutory provision by which to judge an agency's particular allocation of funds.

Plaintiffs' alternative argument (Resp. Br. 53) that these grants fall outside *Lincoln*'s ambit because they "are not challenging a purely discretionary funding decision to allocate certain portions of appropriated funds to various entities" is baffling. That is exactly what they are doing. Focusing, as plaintiffs do, on the fact that these are *terminations* does not distinguish this case from *Lincoln*, which also involved a program termination. 508 U.S. at 194. Nor can plaintiffs seriously argue that this case is different from *Lincoln* because it involves "appropriated funds being completely withheld from their intended statutory purpose." Resp. Br. 53. As explained above, none of the enabling statutes require agencies to allocate funding specifically for plaintiffs' projects, and plaintiffs do not suggest otherwise.

**C.** Even if the Form Termination Class's claims were reviewable under the APA, they are not likely to succeed on the merits.

Plaintiffs aver that the agencies failed to conduct any individualized review of the grants prior to termination, but that misstates the facts. The record shows that the agencies reviewed the grants, classified them according to their connection to equity-related topics as set forth in the Executive Orders, and terminated grants on that basis. Br. 36. Plaintiffs and the district court may disagree with the agency's policy rationale for terminating these grants, but that is beside the point. The Executive has discretion in determining how to allocate discretionary funds, and it is not the role of plaintiffs or courts to substitute their policy judgment. Here, the general terms and conditions of the grants incorporated regulations that expressly permit termination by an agency if a grant "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). It was thus entirely reasonable for agencies to decline to continue subsidizing equity-related projects that the President determined no longer serve the public interest.

Plaintiffs are also wrong in contending that the termination notices failed to provide a reasonable explanation. Resp. Br. 46-47. The extent of "judicial review may … affect the type of information and level of detail required," which "'will vary with the statutory authority invoked and the context of the situation presented.'" *American Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995) (quotation omitted). Even a "relatively brief agency explanation" can suffice in some circumstances. *Seven County Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1512 (2025).

The extent of explanation in this case was ample in light of the government's significant discretion in operating grant programs. The notices explained that the grants were terminated in light of the Executive Orders and pursuant to the agencies' authority under 2 C.F.R. § 200.340(a)(4). Although plaintiffs assert that termination on this basis is "standardless," Resp. Br. 47, that is precisely the kind of discretion that agencies hold under the regulation to terminate grants. (Notably, plaintiffs do not challenge the regulation itself.) And plaintiffs' suggestion that some terminations did not appear to apply the policy faithfully, even if credited, provides no basis for the class-wide, categorical relief they received. At most that would support narrow, as-applied relief from terminations of grants that were not truly equity-related.

While plaintiffs rely (Resp. Br. 45) on the stay panel's conclusion that "the letters left the recipients guessing as to the agencies' rationale," *Thakur v. Trump*, No. 25-4249, 2025 WL 2414835, at *6 (9th Cir. Aug. 21, 2025), that conclusion is unsupported by the record. The termination notices are clear—they informed grantees that the grants no longer served the Executive Branch's policy priorities and cited the regulatory basis for termination. ER-97-98; ER-153-54; ER-130-31; ER-239. It is hard to imagine what further explanation the agency was required to provide.

Plaintiffs are also wrong in arguing that the government was required to consider specific reliance interests prior to termination. Any purported reliance interests with respect to the terminated grants were unreasonable in light of the fact that grantees had clear notice that the grants could be terminated if they no longer

served the agency's policy priorities. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (requiring agencies to consider "legitimate reliance"); Gov't Br. 6. Plaintiffs contend that *Department of Homeland Security v. Regents of the University of California* held otherwise, but that case involved the removal of aliens from the United States. 591 U.S. 1, 8 (2020). That is a far cry from this case, which concerns essentially a breach-of-contract claim challenging the government's decision to terminate contracts for projects it no longer wishes to subsidize.

In this context, the only valid reliance is on the government's promise to abide by the contract terms—and the only remedy for breach of that promise lies in the Court of Federal Claims. As we explained in our principal brief, many grant agreements contain close-out provisions in the event of termination. Gov't Br. 37. And to the extent plaintiffs have suffered any reliance costs from a breach, they may seek proper relief under the Tucker Act.

## II. The Equity Termination Class Is Not Likely To Prevail On The Merits

Plaintiffs' First Amendment and statutory claims for the Equity Termination Class would be unlikely to succeed in any forum. The Supreme Court has repeatedly rejected First Amendment challenges to state and federal funding decisions, recognizing that the government has broad discretion in this area. And plaintiffs' statutory claims fail because they cannot identify a single statutory provision that entitles them to receive grant funding.

**A. 1.** As we discussed in our principal brief, governments have "wide latitude" to "allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998); *see also Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983). Plaintiffs do not dispute that point. Indeed, the district court itself acknowledged that the "government may, of course, create programs intended to advance a certain message, and selectively fund certain speech to the exclusion of other speech in order to advance its chosen message." ER-24-25.

Plaintiffs instead seem to argue that, despite having broad discretion in choosing which projects to fund, the government cannot *terminate* funding for projects it no longer views as favorable or serving the public interest. That is an astounding principle that has no basis in First Amendment law. As we explained, Gov't Br. 12-13, 16, the Supreme Court has recognized that "[t]he government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Just like the government is entitled to award grants because it wishes to subsidize the grants' viewpoints, the government may terminate those grants if it no longer wishes to do so. "In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.* That is the controlling principle of law in this case.

The panel in its order denying a stay erroneously discounted *Finley* and *Rust*, and instead relied on *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819 (1995). *Thakur*, 2025 WL 2414835, at *6-7. But as we explained in our opening brief, Gov't Br. 17-18, the Supreme Court rejected the same error in *Finley* itself. It held that *Rosenberger* is inapplicable to government funding decisions based on a "competitive process" and where "the Government does not indiscriminately encourage a diversity of views from private speakers." *Finley*, 524 U.S. at 586 (quotation omitted). It is undisputed that the grants here were awarded on a competitive basis and did not purport to represent all viewpoints. That makes this case materially different from *Rosenberger*, and akin to *Finley* and *Rust*.

**2.** Plaintiffs' attempt to cast the government's grant terminations as censorship is unavailing. Resp. Br. 42. Plaintiffs rely (Resp. Br. 41) on dicta from *Finley* reserving the question of whether the government may "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints." 524 U.S. at 587. But as the Supreme Court later elaborated, this kind of constitutional concern arises only when the government "seek[s] to leverage funding to regulate speech outside the contours of the program itself," *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013). It does not apply in cases like this one involving run-of-the-mill funding allocation decisions by the Executive Branch. After all, any decision to fund certain viewpoints and not others could be characterized as penalizing disfavored viewpoints, but that is obviously not what the Supreme Court

14

meant in that language in *Finley* or similar language in other cases. Reading the cases that way would swallow the rule that the Court has established in *Rust* and other cases, under which the government has latitude to make funding determinations based on criteria that would be impermissible in regulations of speech.

Here, plaintiffs cannot show that the government in any way attempted to regulate beyond the grant agreements themselves. The Executive Orders that plaintiffs cite simply reflect the President's determination that DEI-related projects are generally no longer a policy initiative that the government seeks to fund, and the terminations reflect the agencies' efforts to comply with the President's policy priorities. That kind of policy decision concerning the allocation of federal funds falls squarely within the government's discretion and does not implicate the First Amendment—even if based on viewpoint. *See Rust*, 500 U.S. at 193; Order Granting Stay, *Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. March 14, 2025) (Harris, J., concurring) (explaining that one of the relevant Executive Orders did not contemplate "termination of grants based on a grantee's speech or activities outside the scope of the funded activities," and thus likely did not violate the First Amendment).

This Court's decision in *Koala v. Khosla*, 931 F.3d 887 (9th Cir. 2019), does not, as plaintiffs suggest (Resp. Br. 44), suggest otherwise. That case involved a refusal to fund a single student newspaper after it published an article that administrators deemed offensive. *See Koala*, 931 F.3d at 892-93. This Court's discussion of the Free

Press Clause has no evident relevance here.  *See id.* at 896-99.  And *Koala*'s discussion of freedom of speech centered on the view that the school had created a limited public forum—a contention that would not be plausible here and that plaintiffs have not even advanced.  *See* Gov't Br. 19.

**3.**  Perhaps recognizing the overwhelming case law that supports the government's discretion over funding allocations, plaintiffs aver that these cases are inapplicable because they involve funding decisions by Congress, while this case involves funding decisions by the President and agencies that plaintiffs allege violate the enabling statutes.  Resp. Br. 43-44.  But the question of whether the Executive Branch complied with Congress's statutory mandate has no bearing on whether plaintiffs are likely to succeed on their First Amendment claim, which asks only whether the government has impermissibly infringed on plaintiffs' speech rights. After all, the First Amendment binds Congress and the President alike.  On this point, the Supreme Court has been clear—the government has broad discretion in granting or denying subsidies, and it may exercise that discretion in accordance with its policy preferences.

Plaintiffs are also misguided in their suggestion in a letter to this Court that *President & Fellows of Harvard College v. United States Department of Health & Human Services* (*Harvard*), No. 25-cv-10910, 2025 WL 2528380 (D. Mass. Sep. 3, 2025), supports their First Amendment claim.  The district court's holding in *Harvard* pertained to a First Amendment retaliation claim, which plaintiffs have not advanced

16

here and for which they have no evidence. Instead, plaintiffs have alleged a First Amendment violation based on viewpoint discrimination, an issue *Harvard* expressly did not address. *See id.* at *26 (explaining that "the Court need not reach Harvard's … claim that Defendants impermissibly imposed on Harvard content- and viewpoint-based funding conditions that were unrelated to any legitimate government interest"). Thus, regardless of whether *Harvard* is correct on its own terms, it is inapplicable here.

    **B.** Plaintiffs' statutory claims fail on the merits too. Plaintiffs point to several policy aims Congress expressed in the enabling statutes, but fail to identify a single provision that requires the agencies to provide funding to any specific project. Resp. Br. 49-50. Nor can they. The grants established through these statutes are discretionary, and their policy objectives are broad. *See* Gov't Br. 20-22. Although plaintiffs contend that the statutes' general policy aims restrict the government's ability to terminate their grants, Resp. Br. 50-51, they again identify "no statutory provision that barred the cancellation of the grants." *Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881, at *10 (D.C. Cir. Sep. 2, 2025) (rejecting a similar statutory argument in a challenge to the Environmental Protection Agency's decision to terminate discretionary grants).

    That plaintiffs seemingly agree (Resp. Br. 50) that the enabling statutes provide agencies discretion in allocating grant funds in the first instance only further proves the point. It would be nonsensical to conclude, as plaintiffs argue, that a statute that

imposes no obligation on the government to fund particular grants somehow bars the government from terminating those grants. And it is even more inconceivable to think, as plaintiffs suggest, that plaintiffs' projects are the only ones that could satisfy the enabling statutes, which provide broad policy directives and delegate to the agencies discretion in selecting particular grants.

Further, Plaintiffs make no effort to refute that, even apart from the broad discretion afforded to the agencies, terminating the particular grants at issue here is in little tension with the statutes on which they rely. That is presumably because it is beyond dispute that, for example, researchers from the University of California are not from underrepresented institutions, a grant about Istanbul's Orthodox Christian communities in the final Ottoman century has little to do with American cultural heritage, and facilitating discussions on racial equity has little to do with emphasizing underserved groups and regions when developing intellectual capital. *See* Gov't Br. 22-23. The agencies were plainly entitled to conclude that the statutory goals were better advanced in other ways, and that is exactly what they did.

## III.    Plaintiffs Cannot Establish Article III Injury To Justify The Class-Wide Relief Awarded

**A.** Plaintiffs, none of whom are parties to the grant agreements themselves, cannot establish a sufficient connection between their alleged injuries and the grant terminations, much less establish a basis for the sweeping relief the district court ordered.

Plaintiffs' theory of standing is that because grantees may not be able to fund their projects following the termination of the grants, indirect beneficiaries of the grants may directly challenge the grant terminations. That reasoning, if adopted, would stretch Article III beyond its limits. Plaintiffs have provided no declarations from the grantees, or any other evidence, to support that they are likely to lose all funding for their research. To the contrary, that some plaintiffs have already received alternative funding undermines their claim that the grant terminations are likely to impact their research. Gov't Br. 40. Even if such alternative funding may not fully replace lost funds, Resp. Br. 33, plaintiffs have not come close to demonstrating that every single grant must be fully restored in order to redress their injuries.

**B.** Even if plaintiffs' asserted injuries could be traced to some of the grant terminations, the district court erred in fully reinstating the terminated grants. It is a fundamental principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Because plaintiffs are not the grant recipients, their alleged injuries stem from only that portion of the grants for which the grant recipients have not found or been provided alternative funding (and are not likely to do so). Plaintiffs fail to show that at least one class member has standing to seek full reinstatement of each grant covered by the injunction. The district court's injunction fully reinstating the grants was thus, at a minimum, overbroad. *Trump v. CASA, Inc.*, 606 U.S. 831, 851-55, 860-61 (2025).

Plaintiffs contend that the "different levels of harm is of no moment" because class certification under "Rule 23(b)(2) … focus[es] on *defendants'* conduct, not whether all class members were injured in the same way." Resp. Br. 33-34. And the panel in its order denying a stay stated that these kinds of issues are relevant only to class certification. *Thakur*, 2025 WL 2414835, at *4. Neither of these addresses the government's point, however, which is that—regardless of whether class certification or standing was proper—the scope of relief awarded was not. As the Supreme Court has made clear, courts should not award relief "broader than necessary to provide complete relief to each plaintiff with standing to sue." *CASA*, 606 U.S. at 861.

## IV.     The Equities Weigh Decisively In Favor Of The Government

The harms to government and public interest, which "merge" here, *Nken v. Holder*, 556 U.S. 418, 435 (2009), clearly warrant vacating the injunction.

**A.** An injunction preventing the government from terminating the grants interferes with core Executive Branch policies. This kind of intrusion into Article II authority, the Supreme Court has held, alone constitutes irreparable harm. *CASA*, 606 U.S. at 859.

Moreover, the Supreme Court's decision in *NIH* makes clear that the government suffers irreparable monetary harm from an injunction requiring the payment of grant funds. "[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds cannot be recouped and are thus

20

irrevocably expended." *NIH*, 145 S. Ct. at 2659 (quotation omitted). Thus, the Supreme Court held in *NIH* that the government faced irreparable harm because the "plaintiffs d[id] not state that they w[ould] repay grant money if the Government ultimately prevails." *Id.* This decision must "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025); *see also NIH*, 145 S. Ct. at 2659 (Gorsuch, J., concurring in part and dissenting in part) (explaining that the Supreme Court's emergency orders in cases like *Department of Education* "bind[] lower courts as a matter of vertical *stare decisis*").

This is a like case. The district court's order vacating the termination notices and requiring the agencies to continue to make payments pursuant to the grants will irreparably harm the public fisc. As in *NIH*, plaintiffs have not promised to return withdrawn funds (nor could they, since they are not the grant recipients), and the government is unlikely to be able to recover the funds disbursed to nonparty grant recipients. The panel's suggestion in its denial of a stay (*Thakur*, 2025 WL 2414835, at *8 n.8) that the government needed to submit a declaration stating that it would be unable to recover any grant funds disbursed is belied by *NIH*, in which the government also did not provide any such declarations, but the Supreme Court in any event recognized that the government faced irreparable harm because the "plaintiffs d[id] not state that they w[ould] repay grant money if the Government ultimately prevails." *NIH*, 145 S. Ct. at 2659. And given the millions of dollars that the

government is unlikely to be able to recover, the $100 injunction bond fails to protect against the government's substantially larger injuries.

Citing Justice Jackson's dissent in *NIH*, plaintiffs assert—for the first time— that "there are legal mechanisms for the government to recoup funds if it ultimately prevails on the merits." Resp. Br. 55-56. But as Justice Gorsuch noted in his patrial concurrence, "the promise of our legal system that like cases are treated alike means that a lower court ought not invoke the 'persuasive authority' of a dissent or a repudiated court of appeals decision to reach a different conclusion on an equivalent record." *NIH*, 145 S. Ct. at 2664 (Gorsuch, J., concurring in part and dissenting in part). Anyway, plaintiffs are wrong. The statutory provisions relied upon in Justice Jackson's *NIH* dissent pertain to the Department of Education's ability to recoup funds spent in a manner that is unallowable under a grant. 20 U.S.C. §§ 1234a, 1234b. Plaintiffs do not identify any statutory provision similarly authorizing recovery by the agencies in this case. And even if they could, those provisions would be irrelevant because the government here did not terminate the grants based on funds being used in a manner inconsistent with the terms; rather, the government terminated the grants because the projects no longer serve the Executive Branch's policy priorities. Plaintiffs' reliance on 2 C.F.R. § 200.346, which pertains to the recoupment of funds paid in excess of a federal award, is equally misguided given that the injunction bars the government from terminating the grants in the first place.

**B.** Plaintiffs' asserted injuries, by contrast, do not support injunctive relief. Any harm to plaintiffs resulting from a loss of funding will be resolved should the grant recipients who employ plaintiffs ultimately prevail in the Court of Federal Claims. Although plaintiffs assert that they face impending harm from labs being closed and research being halted, Resp. Br. 55, those too are remediable given that plaintiffs may be able to recover any lost funds and therefore reinstate any lost projects. And while there may be a decrease in research conducted while litigation is pending, that does not justify requiring the government to pay millions of dollars that it is unlikely to be able to recover. *See NIH*, 145 S. Ct. at 2659 (concluding that the harm to the public fisc outweighed plaintiffs' interest in continuing to receive research-related grant funds).

Plaintiffs' alleged First Amendment harm relies entirely on their erroneous First Amendment theory. There is no basis for plaintiffs' apparent view that any selective grant termination is not only impermissible but categorically subject to a preliminary injunction because it inflicts constitutional harm.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
 *Assistant Attorney General*

YAAKOV M. ROTH
 *Principal Deputy Assistant Attorney*
  *General*

ERIC D. McARTHUR
 *Deputy Assistant Attorney General*

DANIEL TENNY

*s/ Sophia Shams*

SOPHIA SHAMS
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7213*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-2495*
 *Sophia.shams@usdoj.gov*

SEPTEMBER 2025

24

## CERTIFICATE OF COMPLIANCE

I hereby certify that this reply brief complies with the limit of Ninth Circuit Rules 21-2(c), 32-1(b), and 32-3(2) because it totals 5,883 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this petition complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5)-(6) because it has been prepared using Microsoft Word 2013 in a proportionally spaced typeface, 14-point Garamond font.

*s/ Sophia Shams*
Sophia Shams

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2025, I electronically filed the foregoing with the Clerk of the Court by using the appellate case management system. Participants in the case are registered ACMS users, and service will be accomplished via ACMS.

*s/ Sophia Shams*
Sophia Shams