**FILED**

**FOR PUBLICATION**

DEC 23 2025

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| NEETA THAKUR, on behalf of themselves and all others similarly situated; KEN ALEX; NELL GREEN NYLEN; ROBERT HIRST; CHRISTINE PHILLIOU; JEDDA FOREMAN; ELI BERMAN; SUSAN HANDY, <br><br> Plaintiffs - Appellees, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF GOVERNMENT EFFICIENCY; AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation; NATIONAL ENDOWMENT FOR THE HUMANITIES; MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment for the Humanities; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of the U.S. | No. 25-4249 <br><br> D.C. No. 3:25-cv-04737-RFL <br><br> AMENDED ORDER |

Department of Agriculture; AMERICORPS, aka the Corporation for National and Community Service; JENNIFER BASTRESS TAHMASEBI, in her official capacity as Interim Agency Head of AmeriCorps; UNITED STATES DEPARTMENT OF DEFENSE; PETER HEGSETH, in his official capacity as Secretary of the U.S. Department of Defense; UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of the U.S. Department of Education; UNITED STATES DEPARTMENT OF ENERGY; CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human Services; UNITED STATES CENTERS FOR DISEASE CONTROL; MATTHEW BUZZELLI, in his official capacity as Acting Director of the Centers for Disease Control; UNITED STATES FOOD AND DRUG ADMINISTRATION; MARTIN A. MAKARY, in his official capacity as Commissioner of the Food and Drug Administration; UNITED STATES NATIONAL INSTITUTES OF HEALTH; JAYANTA BHATTACHARYA, in his official capacity as Director of the National Institutes of Health; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his

official capacity as Secretary of the Interior; UNITED STATES DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of the U.S. Department of State; UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as Secretary for the U.S. Department of Transportation,

    Defendants - Appellants.

Appeal from the United States District Court
for the Northern District of California
Rita F. Lin, District Judge, Presiding

Argued and Submitted July 31, 2025
San Francisco, California

Before: Richard A. Paez, Morgan B. Christen, and Roopali H. Desai, Circuit Judges.

CHRISTEN, Circuit Judge:

On June 23, 2025, the district court issued a class-wide preliminary injunction ordering three government agencies to reinstate research grants the agencies had terminated pursuant to certain Executive Orders. The government appealed and moved for a partial stay pending appeal of the preliminary injunction.[1] We grant in part and deny in part the government's motion.

---

[1] The government's motion for partial stay requested relief by August 4, 2025, but did not invoke this court's rule governing emergency motions. Fed. R. App. P. 27-3. Instead, the government invoked Rule 27-1(3), which permits a movant to request relief by a date certain to avoid irreparable harm. Fed. R. App. P. 27-1(3).

## FACTUAL BACKGROUND

Plaintiffs are six researchers at the University of California (UC) who applied for and received multi-year federal research grants from three agencies: the Environmental Protection Agency (EPA), the National Science Foundation (NSF), and the National Endowment for the Humanities (NEH).[2] On appeal, the government moves for a stay of the injunction only as it pertains to the research grants awarded by EPA and NEH, so we limit our discussion to those two agencies.[3]

In April 2025, EPA and NEH sent form letters to Plaintiffs notifying them that their grants were terminated. The EPA form letter states: "the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities." The NEH form letter states: "[y]our grant no longer effectuates the agency's needs and priorities," and informs

---

The motion did not explain the government's need for a ruling by August 4, 2025. At oral argument, however, the government stated that there was no specific reason that relief was requested by that date, other than the general urgency to avoid irreparable harm.

[2] Plaintiffs have since amended their complaint to include additional plaintiffs who received funding from other agencies.

[3] On August 19, 2025, the government filed a citation of supplemental authorities requesting that NSF join the arguments raised in the government's motion to stay the injunction. *See* Fed. R. App. P. 28(j). Because the government has not moved for NSF to join that motion, we do not address the request here.

the recipient that "NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda."

Plaintiffs allege that these terminations resulted from agency implementation of at least eight Executive Orders the President issued in January and February 2025: Executive Orders 14173, 14151, 14168, 14154, 14217, 14238, 14158, and 14222. Executive Orders 14173 and 14151 (the "DEI Executive Orders") seek to eliminate diversity, equity, and inclusion ("DEI") and diversity, equity, inclusion, and accessibility ("DEIA") policies and initiatives from all aspects of the federal government. More specifically, Executive Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, states that "critical and influential institutions of American society," including the federal government and institutions of higher education, "have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation." 90 Fed. Reg. 8633, 8633 (Jan. 21, 2025). This Executive Order directs the Office of Management and Budget (OMB) to "[e]xcise references to DEI and DEIA principles under whatever name they may appear," including federal grants. *Id.* at 8634. Executive Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, instructs "each agency, department, or commission

head," to provide the director of OMB with a list of all "[f]ederal grantees who received [f]ederal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." 90 Fed. Reg. 8339, 8339–40 (Jan. 20, 2025). This Executive Order directs agency heads to assess the operational impact and cost of those specified grants and recommend action. *Id.* at 8340. It expressly directs agency heads to "terminate . . . all . . . 'equity-related' grants." *Id.* at 8339. Similarly, Executive Order No. 14168, titled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, directs that "federal funds shall not be used to promote gender ideology." 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025).

The remaining Executive Orders reflect the various mechanisms through which the administration seeks to refocus or reduce government spending, including the establishment of the Department of Government Efficiency (DOGE). For example, Executive Orders 14217, 14158, and 14222 instruct OMB and federal agencies to work with DOGE to review existing grants and terminate those considered unnecessary in an effort to reduce federal spending. 90 Fed. Reg. 10577, 10577 (Feb. 19, 2025); 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025); 90 Fed. Reg. 11095, 11095–96 (Feb. 26, 2025).

## PROCEDURAL HISTORY

Plaintiffs filed suit on behalf of a proposed class of similarly situated UC

researchers against sixteen agencies, alleging that the mass termination of grants violated separation of powers, the First and Fifth Amendments of the Constitution, and the Administrative Procedure Act (APA). Plaintiffs sought an order vacating the grant terminations and a preliminary injunction enjoining the agencies from giving effect to those terminations.

The district court granted Plaintiffs' motion for a preliminary injunction and provisionally certified two classes of UC researchers: (1) those whose research grants were terminated by form letter without any grant-specific explanation (the "Form Termination Class"); and (2) those whose research grants were terminated because of the DEI Executive Orders (the "DEI Termination Class"). The court concluded that the Form Termination Class was likely to succeed on its claim that the terminations were arbitrary and capricious, and that the DEI Termination Class was likely to succeed on its claims that the terminations violated the First Amendment and were contrary to the agencies' congressionally mandated directives. The government appealed and moved for a partial stay of the district court's injunction.

## ANALYSIS

We consider four factors when we decide whether to stay an injunction pending appeal: (1) has the stay applicant made a strong showing that she is likely to succeed on the merits; (2) will the applicant be irreparably injured absent a stay;

(3) will issuance of the stay substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The party seeking a stay pending appeal—here, the government—bears the burden of establishing that these factors favor a stay. *See id.* at 433–34. The government's motion challenges the injunction only as it applies to the EPA and NEH grants.

## I. Likelihood of success on the merits

The government's motion renews the arguments it made before the district court that: (1) the district court lacks jurisdiction over the Form Termination Class's APA claim; (2) at least some members of the Form Termination Class lack standing; and (3) Plaintiffs are not likely to succeed on the merits of their claims.

### A. Jurisdiction over the Form Termination Class's APA claim

The government argues that the Tucker Act precludes district court jurisdiction over the Form Termination Class's APA claim. In light of the Supreme Court's decision in *National Institutes of Health v. American Public Health Ass'n* (*NIH*), 145 S. Ct. 2658 (2025), we agree.

The Tucker Act gives the Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Because this statute "grants consent to suit" and "impliedly forbids" declaratory and injunctive

relief, it precludes bringing contract claims against the United States in federal district court pursuant to the APA's waiver of sovereign immunity. 5 U.S.C. § 702. *See Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645–46 (9th Cir. 1998). In other words, for contract claims against the United States seeking more than $10,000, the Tucker Act confers exclusive jurisdiction on the Court of Federal Claims.[4] *Id.*

The Tucker Act "'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). To determine whether a claim is a disguised breach-of-contract claim, we apply the *Megapulse* test, which considers: (1) the source of the rights upon which the plaintiff bases its claims and (2) the type of relief sought (or appropriate). *N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994). If the plaintiff's rights and remedies, as alleged, "are *statutorily* or *constitutionally* based, then district[] courts have jurisdiction," but if those rights and remedies "are *contractually based* then

---

[4] Pursuant to the Little Tucker Act, district courts have "concurrent jurisdiction with the claims court for actions not exceeding $10,000." *N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993) (en banc) (per curiam) (citing 28 U.S.C. § 1346(a)(2)).

only the Court of Federal Claims does." *United Aeronautical*, 80 F.4th at 1026 (emphasis in original).

We are bound by *NIH*, which held that the APA's limited waiver of sovereign immunity did "not provide the District Court with jurisdiction to adjudicate" similar APA claims challenging grant terminations. 145 S. Ct. at 2658. Here, the Form Termination Class challenges the government's termination of research grants as arbitrary and capricious under the APA. *NIH* held that similar claims were "based on . . . research-related grants." *Id.* (citation modified). Further, the Form Termination Class sought—and the district court awarded—vacatur of the termination notices and reinstatement of the terminated grants. *NIH* held that such relief is "designed to enforce an[] obligation to pay money pursuant to [the] grants" at issue. *Id.* (citation modified). Accordingly, we conclude the government has made a strong showing that it is likely to establish that the district court lacks jurisdiction to review the Form Termination Class's APA claim.[5]

### B. DEI Termination Class's likelihood of success

The government argues that the district court abused its discretion when it concluded that the DEI Termination Class was likely to succeed on the merits of its

---

[5] Because we conclude the government is likely to prevail on its argument that the district court lacks jurisdiction, we need not address whether the government is likely to succeed in showing that members of the Form Termination Class lack Article III standing, that the grant terminations are not reviewable under the APA, or that the grant terminations were reasonable.

First Amendment claim that the agencies unlawfully terminated their grants based on their viewpoint. The government relies on the significant flexibility it is afforded when acting as a patron to subsidize speech, as opposed to when it regulates speech as a sovereign. The government argues that it "can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest" to the exclusion of other activities. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549–50 (1983). In support, the government relies on *National Endowment for the Arts v. Finley* to argue that there is a First Amendment violation only when the government uses its sovereign power to "drive 'certain ideas or viewpoints from the marketplace'"—not when the government simply ceases funding those ideas or viewpoints. 524 U.S. 569, 587 (1998) (citation omitted).

In our view, the government misreads *Finley*. There, Congress amended the National Endowment for the Arts's (NEA) reauthorization bill to require that grant applications be evaluated by "taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (citation omitted). The Plaintiffs, performance artists who applied for grants, brought a facial challenge to the amendment and argued that it violated their First Amendment rights. *Id.* at 577, 580. Importantly, the Plaintiffs "d[id]

not allege discrimination in any particular funding decision," and therefore, the Supreme Court "ha[d] no occasion . . . to address an as-applied challenge in a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination." *Id.* at 586–87. The Court explained that "[i]f the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then [it] would confront a different case." *Id.* at 587. The Court went on to emphasize that "*even in the provision of subsidies*, the Government may not 'aim at the suppression of dangerous ideas.'" *Id.* (emphasis added) (citation modified) (quoting *Regan*, 461 U.S. at 550).

Contrary to the government's argument, this case does not appear to be one in which an agency decided not to "fund a program." *See Rust*, 500 U.S. at 193. Rather, it is one in which more than a dozen agencies selected particular grants for termination regardless of the programs through which they were funded, based on their connection to DEI, DEIA, and environmental justice. Thus, we "confront a different case" than *Finley* (where plaintiffs brought a facial challenge to Congress's mandate that NEA consider standards of decency in awarding grants), *Rust* (where plaintiffs brought a facial challenge to HHS regulations interpreting Title X's prohibition on funding for abortion services), and *Regan* (where plaintiffs brought a facial challenge to the IRS's requirement that organizations refrain from lobbying to qualify for § 501(c)(3) tax-exempt status). Plaintiffs' as-applied

challenge is closer to *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995).  In that case, the University of Virginia made funds available to cover printing costs for student newspapers.  *Id.* at 843.  The University denied a Christian newspaper's application for funds because the newspaper engaged in "religious activity" by "promot[ing] or manifest[ing] a particular belie[f] in or about a deity or an ultimate reality," conduct prohibited by the University's guidelines for student activity funding.  *Id.* at 827.  The Court concluded that the University "d[id] not exclude religion as a subject matter" but "select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints."  *Id.* at 831, 833, 835 ("[W]hen the State is the speaker, it may make content-based choices," but "[h]aving offered to pay the third-party contractors on behalf of private speakers who convey their own messages, the [State] may not silence the expression of selected viewpoints.").

Here, the record at this stage shows that the agencies selected grants for termination based on viewpoint.  Indeed, at the oral argument held on July 31, 2025, the government did not meaningfully dispute that DEI, DEIA, and environmental justice are viewpoints.  The agencies, the termination letters, and the Executive Orders do not define these terms, but dictionary definitions demonstrate that DEI, DEIA, and environmental justice are not merely neutral topics.  Instead, the terms inherently convey the viewpoint that the exclusion of

historically disadvantaged groups is undesirable. *diversity, equity and inclusion*, Merriam-Webster, https://perma.cc/84ZW-7JSR (last visited Aug. 12, 2025) ("a set of values and related policies and practices focused on establishing a group culture of equitable and inclusive treatment and on attracting and retaining a diverse group of participants, including people who have historically been excluded or discriminated against"); *diversity, equity and inclusion*, Cambridge English Dictionary, https://perma.cc/M2GS-L4UT (last visited Aug. 12, 2025) ("the idea that all people should have equal rights and treatment and be welcomed and included, so that they do not experience any disadvantage because of belonging to a particular group, and that each person should be given the same opportunities as others according to their needs"); *environmental justice*, Cambridge English Dictionary, https://perma.cc/V5CK-Z2GP (last visited Aug. 12, 2025) ("the idea that all groups of people deserve to live in a clean and safe environment").

We are bound by the bedrock principle that the government cannot "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" or "aim at the suppression of dangerous ideas" in the provision of subsidies. *Finley*, 524 U.S. at 587 (citation modified) (quoting *Regan*, 461 U.S. at 550). The government does not dispute that it terminated the subject grants because they promoted DEI, DEIA, or environmental justice; instead, it contends that government funding decisions need not be viewpoint neutral. We

agree that the government enjoys broad discretion in choosing which programs to fund, but we cannot reconcile the position the government advances here—that it is free to terminate funding even when it does so based on viewpoint—with binding Supreme Court authority. *See id.* We therefore conclude that the government has failed to make a strong showing that the district court abused its discretion when it concluded that the DEI Termination Class was likely to succeed on the merits of its First Amendment claim.

The agencies' implementation of the DEI Executive Orders reinforces our conclusion. Acting Chairman of NEH Michael McDonald stated in a declaration that, between January and April 2025, NEH staff reviewed open grants in light of the DEI Executive Orders, and NEH's "policy for selecting grants for termination at NEH focused first on identifying open grants that focused on or promoted (in whole or in part) 'environmental justice,' 'diversity, equity, and inclusion,' or 'diversity, equity, inclusion and accessibility,' and 'gender ideology.'" NEH created and used spreadsheets that identified grants as "either 'High, Medium, Low, or No Connection' in terms of the Executive Orders." Daniel Coogan, Deputy Assistant Administrator for Infrastructure and Extramural Resources in the EPA's Office of Mission Support, stated in a June 2025 declaration that the grant termination process "began by looking at grant titles and project descriptions." Although his declaration states that the EPA reviewed and terminated grants

"independent from" the Executive Orders, the EPA's public announcements state the opposite. For example, on March 10, 2025, the EPA announced that it "cancelled grants and contracts related to DEI and environmental justice." *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B*, EPA (Mar. 10, 2025), https://perma.cc/3P2M-6PUY.

Because the current record suggests that the government aimed at the suppression of speech that views DEI, DEIA, and environmental justice favorably, the government has not shown that it is likely to succeed on the merits of its claim that the district court abused its discretion when it concluded the agencies likely terminated the grants based on viewpoint.[6]

## II. Remaining *Nken* factors

The government argues that the preliminary injunction risks irreparable harm to the government and the public interest by: (1) interfering with the

---

[6] Because we conclude the government failed to show that it was likely to succeed on the merits of its claim that the district court abused its discretion when it concluded that Plaintiffs were likely to succeed on their First Amendment claim, we do not reach the government's argument challenging the class's claim that the terminations were contrary to NEH's enabling statute.

President's ability to carry out core Executive Branch policies, and (2) compelling the government to disburse funds that it cannot recover.[7]

The government first argues the district court's preliminary injunction will interfere with the Executive Branch's chosen policy agenda. This argument rests on the assumption that the government's conduct is lawful. But the government has not made a strong showing of a likelihood of success on the merits in regard to Plaintiffs' First Amendment claim, and the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Moreover, we have rejected the assertion that "the irreparable harm standard is satisfied by the fact of executive action alone." *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020). The government's first claimed harm is not irreparable because the government "may yet pursue and vindicate its interests in the full course of this litigation." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam).

The government also contends that it will be irreparably harmed because the district court's preliminary injunction requires it to disburse money it may never recover. "[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably

---

[7] To the extent the government argues that the third and fourth factors merge, that is so when the government is the party opposing a stay, rather than the party seeking one, as it is here. *See Nken*, 556 U.S. at 435.

expended.'" *NIH*, 145 S. Ct. at 2658 (citation omitted). Here, as in *NIH*, the government "faces such harm." *Id.* Like the plaintiffs in *NIH*, Plaintiffs "do not state that they will repay grant money if the Government ultimately prevails." *Id.*

We consider the final two *Nken* factors "if the first two factors are satisfied." *Doe #1*, 957 F.3d at 1058. The government made such a showing as to the Form Termination Class, but not as to the DEI Termination Class. *See id.*

We are mindful of the Supreme Court's decision in *NIH*, where the Court concluded that similar circumstances justified a stay. *NIH*, 145 S. Ct. at 2658. Although such orders "are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). We conclude that the public interest would be harmed by requiring the agencies to continue to make payments pursuant to the grants, and that despite the harms identified by Plaintiffs, due consideration of the *Nken* factors warrants the entry of a stay as to the Form Termination Class. *See NIH*, 145 S. Ct. at 2658.

## CONCLUSION

The government's motion for partial stay pending appeal (Dkt. No. 7) is **GRANTED in part** as to the Form Termination Class and **DENIED in part** as to the DEI Termination Class. We express no opinion on Plaintiffs' remaining constitutional and statutory claims, nor on whether it would be appropriate for the

district court to certify other provisional classes based on those claims.